

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

EAG/JDG/CMP
F.#2008R00530

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

February 15, 2011

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Thomas Gioeli, et al.
           Criminal Docket No. 08-240 (S-6) (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in opposition to defendants Thomas Gioeli and Dino Saracino's oral motion to sever their case from defendant Cacace's case and to defendant Cacace's oral motion to sever his case from defendants Gioeli and Saracino's case.[1]  For the reasons set forth below, a severance is not warranted.

## BACKGROUND

      Each of the defendants is charged with one or more murders in connection with their membership in and association with the Colombo organized crime family of La Cosa Nostra (the "Colombo family").  Gioeli, who prior to his arrest held the position of "street boss" of the Colombo family, is charged with racketeering conspiracy, including the murders of Frank Marasa, John Minerva, Michael Imbergamo, Richard Greaves, Ralph Dols and William Cutolo (Count One), and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four).  Cacace, who prior to his arrest in January 2003 held the position of consigliere in the Colombo family, is charged with the murder of Ralph Dols in-aid-of racketeering (Count Three).  Saracino, who is a soldier in the

---

    [1]    Gioeli, Saracino and Cacace made their motions at the February 11, 2011 status conference.

Colombo family, is charged with racketeering conspiracy, including the murders of Greaves, Dols and Cutolo (Count One) and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four). As described below, Gioeli and Saracino are also variously charged with murder conspiracy, robbery, extortion, extortionate extension and collection of credit, and witness tampering.

### A. Charged Murders

#### 1. Murder of Frank Marasa

Gioeli is charged with the 1991 murder of Frank Marasa, also known as "Chestnut." Marasa was murdered in Brooklyn, New York on June 12, 1991. On that date, Marasa was found by New York City Police Department officers lying shot in the street. Marasa later died from the gun shot wounds.

Marasa was murdered in retaliation for his perceived involvement in the murder of Colombo family associate Ennab Awjab, also known as "OJ," on May 30, 1991. Gioeli, then a Colombo family soldier, authorized the murder. After obtaining Gioeli's permission, Colombo family associates, two of whom are now cooperating witnesses (hereinafter, "CW-1" and "CW-2"), carried out the murder, ambushing Marasa on the street. (In or about 1999, CW-1 was inducted into the Colombo family and was subsequently elevated to the position of captain.)

#### 2. Murder of Michael Imbergamo and John Minerva

Gioeli, together with CW-1 and others, participated in the murders of Michael Imbergamo and John Minerva on March 25, 1992. During the early 1990s, the Colombo family had split into two warring factions, one loyal to the then acting family boss Victor Orena and the other loyal to the then "official" boss of the family, Carmine Persico. Gioeli was a member of the faction loyal to Persico.

On the evening of March 25, 1992, Minerva, a soldier in the Orena faction, and Imbergamo were killed as part of the Colombo family war. Imbergamo was not the intended target, but was killed simply because he was with Minerva. Both men were shot inside of a car parked in front of the Broadway Café, located at 1129C Broadway in North Massapequa, New York.

### 3. Murder of Richard Greaves

Gioeli and Saracino, together with CW-1 and two other cooperating witnesses (hereinafter, "CW-3" and "CW-4") participated in the murder of Richard Greaves. Gioeli authorized the murder. On or about August 3, 1995, Saracino shot Greaves, a Colombo family associate, to death in Saracino's basement apartment in Brooklyn, in the presence of Gioeli, CW-1, CW-3 and CW-4. At the direction of Gioeli and CW-1, Saracino, CW-3, CW-4 and others then transported Greaves' body to a wooded area in Farmingdale, Long Island, where they buried him. Greaves' body has never been recovered.

### 4. Murder of Ralph Dols

Gioeli, Cacace and Saracino, together with CW-1 and CW-3, participated in the murder of Ralph Dols on August 25, 1997. At the time of his murder, Dols was a New York City Police Officer assigned to Police Service Area #1 in Brooklyn, New York. He was married to the ex-wife of Cacace, who was then a powerful and high-ranking member of the Colombo family. Cacace ordered Dols' murder; Gioeli conveyed the order to CW-1.

On the night of the murder, Saracino and CW-1 waited for Dols to return to his home in Brooklyn. As Dols parked his car in front of his building, Calabro and Saracino shot him multiple times. Police officers found Dols lying gravely wounded on the street next to his car, and Dols died a short time later from the gun shot wounds.

### 5. Murder of William Cutolo

Gioeli and Saracino, together with CW-1 and CW-3, participated in the murder of William "Wild Bill" Cutolo in-aid-of racketeering on or about May 26, 1999. At the time of his murder, Cutolo was underboss of the Colombo family. The acting boss at the time, Alphonse Persico, and administration member John DeRoss believed that Cutolo had become too powerful and were concerned that he would take over the crime family.[2]

---

[2] In December 2007, Persico and Colombo family administration member John DeRoss were convicted, after trial, of the murder of Cutolo in-aid-of racketeering, and were subsequently sentenced to mandatory life terms of imprisonment for their roles in that murder.

3

On May 26, 1999, after Gioeli lured Cutolo to the vicinity of Saracino's basement apartment, CW-1 shot Cutolo to death shortly after he entered Saracino's basement apartment. Saracino, together with CW-1 and CW-3 and others, transported Cutolo's body to Farmingdale, Long Island, where they buried Cutolo. Cutolo's body was recovered in a wooded area on October 6, 2008. The Suffolk County Medical Examiner determined that the cause of death was homicide.

B. <u>Charged Murder Conspiracies</u>

1. <u>Conspiracy to Murder Orena Faction Members</u>

In connection with the Colombo family war, Saracino, together with CW-1, CW-2 and CW-3, participated in a wide-ranging conspiracy to murder members of the Orena faction. Specifically, Saracino, CW-3 and others surveilled various locations where Orena faction members, including Joseph Scopo and John Baudanza, were perceived to reside or frequent and reported the information he obtained through his surveillance to his superiors within the Colombo family.

2. <u>Conspiracy to Murder Michael Burnside</u>

Following the murder of Saracino's brother, Frank Saracino, in April 1998, Saracino, CW-1, CW-3 and CW-4 conspired to kill Michael Burnside, the individual who they believed was responsible for Frank Saracino's murder. In connection with this conspiracy, Saracino sought assistance from fellow Colombo family members and associates to help him find Burnside.

C. <u>Charged Robberies</u>

1. <u>Robbery of Furs by Mina</u>

Saracino, along with Gioeli, CW-1 and others, participated in a violent robbery of a fur store, Furs by Mina, located at 408 Jericho Turnpike, in Syosset, New York, on February 11, 1991. Gioeli, CW-1 and another individual entered Furs by Mina, posing as a father and two sons interested in purchasing a fur for Valentine's Day. Once inside the store, they drew guns and then handcuffed and forced the owner and the owner's son to the floor. Saracino and others then filled garbage bags with fur coats from the store and loaded the coats into vehicles that were waiting outside.

### 2. Attempted Robbery of Elegant Furs

Gioeli also participated in an attempted robbery of another fur store, Elegant Furs, located on Hempstead Turnpike in Levittown, New York, on or about January 10, 1992. While Gioeli and other Colombo family associates waited outside, CW-1 and another entered the store, posing as customers. After gaining entrance, CW-1 and the other individual brandished firearms and ultimately pistol-whipped an employee. The group then fled the scene.

### 3. Robbery of Chemical Bank

Saracino and others participated in the robbery of Chemical Bank, located at 2419 Hempstead Turnpike, East Meadow, New York, on or about June 5, 1995. At or about 9:00 a.m. on June 5, 1995, CW-3 and another Colombo family associate stole a money bag containing approximately $210,000 from a bank employee who was retrieving a bag of money from the bank's night deposit boxes. CW-3 and the other Colombo family associate fled the scene in a vehicle driven by Saracino.

## D. Other Charged Crimes

### 1. Extortionate Collection of Credit

In or about 1993, at the direction of CW-1, Saracino and CW-3 attempted to collect an outstanding debt owed by John Doe #1. Specifically, Saracino and CW-1 went to the residence of John Doe #1, chased after him and stabbed him, resulting in serious injuries.

### 2. Cocaine Distribution

In or about 1998, prior to the murder of Saracino's brother, Frank Saracino, Saracino, Frank Saracino and others participated in a scheme to distribute cocaine. Saracino fronted the money to Frank Saracino to purchase the cocaine.

### 3. Loansharking

In or about and between 2008 and Saracino's arrest in June 2008, Saracino and CW-1 operated a lucrative loansharking business. At the time of his arrest, Saracino had numerous customers and over $100,000 in outstanding loans.

4.  <u>Extortion of John Doe #2</u>

Saracino is charged with the extortion of John Doe #2. Members of the Colombo family, including Cacace, Saracino, CW-1 and others, have long required John Doe #2 to make monthly payments to it in exchange for their "allowing" John Doe #2 to place and maintain joker poker machines in various Brooklyn establishments without risk of interference from other La Cosa Nostra families.[3]

5.  <u>Obstruction of Justice</u>

Saracino has attempted to obstruct the government's investigation of the Colombo family. Commencing in or about January 2008, numerous subpoenas were served on Saracino's associates. Aware that the individuals who were served with subpoenas had information that might assist the government in its investigation against Saracino, Saracino corruptly attempted to persuade these individuals not to provide the government with inculpatory information.

\* \* \*

For his role in the Dols murder, the government is seeking the death penalty against Cacace. It is not seeking the death penalty against Gioeli and Saracino.

<u>ARGUMENT</u>

I.  <u>The Legal Standard For Severance</u>

There is a strong preference for joint trials in the federal system, and a defendant seeking severance must meet an imposing standard. These legal principles are well-established:

> Since 1993, determinations of severance motions have been informed by <u>Zafiro v. United States</u>, 506 U.S. 534 (1993). . . . [J]oint trials are favored in the federal courts and should be held unless "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

---

[3]  Cacace has not been charged with this extortion.

6

>     innocence." [Zafiro,] 506 U.S. at
>     538-39 . . . .

United States v. Bellomo, 263 F. Supp. 2d 561, 578 (E.D.N.Y. 2003) (internal citation omitted).

The Supreme Court has highlighted the many benefits of joint trials:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987). Thus, while joint trials may invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that a joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). In those rare instances when a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Zafiro, 506 U.S. at 539.

II. Defendant Cacace Is Not Entitled To A Severance

Cacace argues that his case should be severed under Rule 14 of the Federal Rules of Criminal Procedure because of the risk of "spillover prejudice." His contention is without merit.

7

A.   <u>Legal Standard</u>

Spillover prejudice occurs "when proof inadmissible against a defendant becomes part of his trial solely due to the presence of co-defendants as to whom its admission is proper." <u>United States v. Salameh</u>, 152 F.3d 88, 115 (2d Cir. 1998). Where allegedly prejudicial evidence against a co-defendant would be admissible against the moving defendant even at a separate trial, however, there is no risk of spillover prejudice and the movant is not entitled to severance. <u>See</u>, <u>e.g.</u>, <u>United States v. Diaz</u>, 176 F.3d 52, 103 (2d Cir. 1999) (citing cases) (no severance required for defendant not charged with multiple murders committed by co-defendants, because murders were nonetheless admissible against defendant to prove existence and nature of criminal enterprise).

B.   <u>There Is No Spillover Prejudice</u>

Here, the murders and other crimes with which defendants Gioeli and Saracino – but not Cacace – are variously charged constitute evidence of the charged enterprise, <u>i.e.</u>, the Colombo family, and are independently admissible against Cacace to prove the existence of the enterprise and the racketeering activity of that enterprise. To prove the murder in-aid-of racketeering, with which Cacace is charged, the government will have to establish five elements: (1) that an enterprise existed; (2) that the enterprise was engaged in racketeering activity; (3) that the defendant had a position in the enterprise; (4) that the defendant committed the alleged crime of violence; and (5) that the perpetrators' general purpose in committing the crime of violence was to maintain or increase position in the enterprise. Sand, Modern Federal Jury Instructions, Instr. 52-36; <u>see also</u> <u>United States v. Rahman</u>, 189 F.3d 88 (2d Cir. 1999).

To establish that the Colombo family was an "enterprise," the government will offer evidence of association of various Colombo family members and associates for a "common purpose of engaging in a course of conduct," namely, acts of violence and other crimes. Sand, Instr. 52-37. The government will also offer evidence that the Colombo family was an "ongoing organization," meaning that its activities were not limited to one violent act, and that its members and associates functioned as a "continuing unit." <u>Id.</u> Thus, all of the evidence offered against the co-defendants concerning the creation, operation, common purposes and ongoing activities of the members of the Colombo family would also be admissible against Cacace in a separate trial.

8

Further, the government's burden of proving that the Colombo family "was engaged in racketeering activity" – the second element of a Section 1959 charge – means that evidence of racketeering activity engaged in by the Colombo family beyond the specific violent act with which Cacace is charged is independently admissible. The government would offer evidence of the other murders and attempted murders committed by Cacace and his fellow Colombo family members and associates in order to establish that the Colombo family was engaged in racketeering activity. See, e.g., United States v. Mejia, 545 F.3d 179, 206 (2d Cir. 2008) ("Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible to prove an essential element of the RICO crimes charged-the existence of a criminal enterprise in which the defendants participated" (internal citation and quotation marks omitted)); United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (upholding admission of evidence of uncharged murders); United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) ("the evidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise, the DeMeo Crew").

In addition, the cooperating witnesses expected to testify against Cacace, including CW-1 and CW-3, each of whom participated in the Dols murder, would variously testify about their participation in each of the murders with which Gioeli and/or Saracino is charged. Accordingly, the majority of the testimonial evidence establishing those murders (i.e., that based on cooperating witness testimony) also would be admitted as relevant background to complete the story of the crimes charges and the relationships, including relationships of trust, among the defendant and these witnesses.

C. Judicial Instructions Can Cure
   Any Arguable Spillover Prejudice

Any risk of spillover prejudice arising from differing levels of culpability and proof in multi-defendant cases is remedied by judicial instructions that each defendant must be considered separately, and that the proof against each defendant must be weighed individually. Zafiro, 506 U.S. at 540-41. A defendant can be protected from the risk of prejudicial spillover through a jury instruction "to consider and evaluate the evidence as against each defendant and render a fair and impartial verdict against each defendant separately based solely

9

upon such an evaluation of evidence." Bellomo, 263 F. Supp. 2d at 578 (denying severance); see also United States v. Coffey, 361 F. Supp. 2d 102, 120 (E.D.N.Y. 2005) ("The limiting instructions which may be required during the course of trial will, in any event, be sufficient to protect [the defendant] from prejudicial spillover from evidence admissible only against other co-defendants."); United States v. Imbrieco, 2003 WL 1193532, at *2 (E.D.N.Y. Jan. 13, 2003) (same).

A frequently quoted passage well-summarizes these rules:

> The ultimate question on a motion for severance is: whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct.  In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?  If so, though the task be difficult, severance should not be granted.

United States v. Biaggi, 672 F. Supp. 112, 123 (S.D.N.Y. 1987) (quoting United States v. Kahaner, 203 F. Supp. 78, 81-82 (S.D.N.Y. 1962)).

In sum, a severance of Cacace's case is not warranted based on spillover prejudice.

III. Defendants Gioeli and Saracino
    Are Not Entitled To A Severance

Nor are defendants Gioeli and Saracino entitled to a severance.

A.   There is No Spillover Prejudice

Gioeli and Saracino are charged with carrying out the murder with which Cacace is charged, i.e., the murder of Ralph Dols.  Therefore, all of the evidence admissible in the guilt phase of the trial of Cacace is admissible against Gioeli and Saracino, and a joint trial thus presents no risk of spillover prejudice as to Gioeli or Saracino.

10

B. A Death-Qualified Jury Does Not Warrant A Severance

Notwithstanding a lack of spillover prejudice, Gioeli and Saracino argue that their cases should be severed because if they were not, they would be decided by a death-qualified jury. The Supreme Court, however, has held that the trial of a capital defendant before a death-qualified jury does not violate the defendant's constitutional rights. Buchanan v. Kentucky, 483 U.S. 402, 420 (1987). A trial of a non-capital defendant before a death-qualified jury is no different.

In United States v. Stone, the Honorable I. Leo Glasser held that an alleged death-penalty bias did not justify severance. 2006 WL 436012 (E.D.N.Y. Feb. 22, 2006), aff'd sub nom, United States v. Nieves, 354 Fed. Appx. 547 (2d Cir. 2009). Regarding the claimed risk of prejudice the defendants "might suffer from being tried before a death-qualified jury," Judge Glasser explained:

> [T]he institutional and public interest in a single trial, balanced against the only minimal risk that a death-qualified jury will be more likely to convict, favors denying the motion. The crimes alleged here revolve around a particular racketeering conspiracy or involve the purpose of enabling particular defendants to increase their own or the power and prestige of the enterprise. . . . Joint trial will prevent significant duplicitous litigation. Ultimately, a death-qualified jury is still charged with a duty to first determine the guilt or innocence of the individual based on the evidence presented in the case.

Id. at *5. Numerous other courts have agreed. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 131-32 (2d Cir. 2008); United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010); United States v. Causey, 185 F.3d 407, 417 (5th Cir. 1999); United States v. Sanchez, 75 F.3d 603, 604 (10th Cir. 1996); United States v. Bin Laden, 109 F. Supp. 2d 211 (S.D.N.Y. 2000); United States v. Heatley, 1998 WL 671462 (S.D.N.Y. Sept. 29, 1998); United States v. Gray, 173 F. Supp. 2d 1 (D.D.C. 2001); United States v. Edelin, 118 F. Supp. 2d 36 (D.D.C. 2000); United States v. Aiken, 76 F. Supp. 2d 1346 (S.D. Fla. 1999). .

11

Although various courts have granted motions for severance for defendants not facing the death penalty from those facing the death penalty, see United States v. Basciano, 2007 WL 3124622 (E.D.N.Y. Oct. 23, 2007); United States v. Rollack, 64 F. Supp. 2d 255 (S.D.N.Y. 1999); United States v. Jackson, 2003 WL 21787320 (S.D.N.Y. Aug. 4, 2003); United States v. Maisonet, 1998 WL 355414 (S.D.N.Y. July 1, 1998), those cases are not applicable here. In most cases, they "involve[d] instances in which the severed parties played no role or only a minor role in the acts of violence that justified the death penalty." Stone, 2006 WL 436012, at *4 (citing, inter alia, Jackson, 2003 WL 21787320, at *1-2 (severance where capital defendants charged with murder and non-capital defendants charged with narcotics distribution).

Basciano is also distinguishable. In that case, the Honorable Nicholas G. Garaufis granted a motion for a severance where the capital defendant had already been convicted of one of the murders with which the non-capital defendants were charged. Judge Garaufis observed that a joint trial would require a jury to perform "feats of 'mental dexterity'" by asking it to ignore the fact of [the capital defendant's] prior conviction in assessing [the non-capital defendants'] guilt" for the murder of which the capital defendant had already been convicted. Basciano, 2007 WL 3124622, at *5. Other district courts have granted severance for death-eligible defendants – prior to a decision by the Attorney General to seek or not seek the death penalty as to those defendants – simply because of the complexities associated with cases in which there are death-eligible defendants. See, e.g., Maisonet, 1998 WL 355414, at *4-5.

Unlike those cases, Gioeli and Saracino are charged with several murders in connection with the Colombo family. Furthermore, Gioeli and Saracino's respective roles in the Dols' murder – or indeed any of the charged murders – cannot be characterized as minor. In the Dols murder, Gioeli conveyed Cacace's order to CW-1, who then conveyed the order to Saracino and CW-3. Nor did Saracino play a minor role – he was one of the two individuals who fatally shot Dols. Accordingly, substantial evidence regarding Gioeli, Saracino and Cacace would be admissible at any trial regarding the Dols murder, and a severance is not warranted.

C. Speedy Trial Considerations Do Not Warrant Severance

Gioeli and Saracino also suggest that their cases should be severed to avoid a further delay. With respect to the Speedy Trial Act, as the Second Circuit has observed, Congress

12

made clear in enacting the Act that it was not intended to alter the rules on severance:

> The Senate Report states that "[t]he purpose of [Section 3161(h)(7)] is to make sure that [the Act] does not alter the present rules on severance of codefendants by forcing the Government to prosecute the first defendant separately or to be subject to a speedy trial dismissal motion under Section 3161. S. Rep. No. 1021, 93d Cong., 2d Sess. 38 (1974). Congress clearly intended that, where appropriate, joint trials of defendants should continue to be available as a means of promoting judicial efficiency by avoiding duplicative proof at successive trials. It thus intended that reasonable speedy trial time be excludable under Section 3161(h)(7) when necessary to enable joint trials to go forward.

United States v. Pena, 793 F.2d 486, 489 (2d Cir. 1986). To carry out Congress's intentions, the Speedy Trial Act provides that when the speedy trial clock stops for one defendant as a result of motion practice or otherwise, it stops for all codefendants as well. 18 U.S.C. § 3161(h)(7) ("The following periods of time shall be excluded . . . [a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."); see United States v. Gambino, 784 F. Supp. 129, 138 (S.D.N.Y. 1992) ("delay attributable to one defendant is charged to all co-defendants").

Gioeli and Saracino, therefore, cannot claim that their rights have been violated under the Speedy Trial Act unless and until an "unreasonable" delay occurs. Even assuming that Gioeli and Saracino are correct that a trial in this case will be delayed because of the death penalty issues, a delay would be limited in duration and should not come close to that which courts have deemed unreasonable. See Gambino, 784 F. Supp. at 141 (defendants filed severance motions in November 1991 and trial expected to commence in fall of 1992; court held that this delay was "eminently reasonable").

Nor does the expected delay violate Gioeli and Saracino's Sixth Amendment right to a speedy trial. See United States v. Vasquez, 918 F.2d 329, 338 (2d Cir. 1990) ("delay of 24 months is considerably shorter than that of other cases in which

no Sixth Amendment violation has been found"). Four factors are relevant in evaluating this issue: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice caused by the delay. United States v. Barker, 407 U.S. 514, 530 (1972). As discussed, a short period of delay is not unreasonable in this context. Further, the reason for the anticipated delay is valid; it is not the result of tactical measures or negligence by the government.

Accordingly, speedy trial considerations do not warrant severance.

### CONCLUSION

For the reasons set forth above, the defendants' motions for severance should be denied.

Respectfully submitted,

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By: /s/Elizabeth A. Geddes
Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys

cc: All Counsel (by ECF)
    Clerk of the Court (BMC) (by ECF)