AB:EAG/JDG/CMP
F.# 2005R00248

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                        08 CR 240 (S-6)(BMC)

THOMAS GIOELI and
DINO SARACINO,

          Defendants.

- - - - - - - - - - - - - - X


MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION <u>IN LIMINE</u> TO ADMIT CERTAIN
<u>EVIDENCE AGAINST THE DEFENDANTS AT TRIAL</u>


                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . 1

I.   Racketeering Conspiracy Charged in Count One . . . . . . . 1

III. Overview of the Government's Evidence of the
     Defendants' Other Acts . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 24

     A.   Evidence of Other Acts Is Admissible to Establish
          the Racketeering Enterprise and Conspiracy. . . . . 24

          1.   Legal Standard. . . . . . . . . . . . . . . 24

          2.   Analysis. . . . . . . . . . . . . . . . . 27

     B.   Certain Evidence of the Other Acts is Directly
          Relevant to and Inextricably Intertwined with the
          Evidence of the Charged Crimes . . . . . . . . . 30

          1.   Legal Standard . . . . . . . . . . . . . . 30

          2.   Analysis . . . . . . . . . . . . . . . . 30

     C.   Evidence of the Defendants' Other Acts
          Is Also Admissible Pursuant to
          Federal Rule of Evidence 404(b) . . . . . . . . . 34

          1.   Legal Standard . . . . . . . . . . . . . . 34

          2.   Analysis . . . . . . . . . . . . . . . . . .

              a.   Evidence of the Defendants' Uncharged
               Crimes Is Admissible as Background, to
               Complete the Story, and to Show
               Relationships of Trust . . . . . . . . . 36

              b.   Evidence Concerning the Defendants'
               Involvement In the Other Acts Evidences
               Identity, Opportunity and Motive . . . . 37

                  (1)  Identity . . . . . . . . . . . . 38

                  (2)  Opportunity . . . . . . . . . . 38

(3)  Motive . . . . . . . . . . . . . .  39

D.  The Probative Value of the "Other Acts" Evidence
Substantially outweighs Any Prejudicial Effect  . .  39

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . .  41

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its motion in limine to admit at trial evidence of certain acts by the defendants Thomas Gioeli and Dino Saracino. Specifically, the government seeks to admit evidence of uncharged murders, murder conspiracies, robberies, burglaries, sales of stolen goods, assault, extortion, obstruction, narcotics trafficking, loansharking and illegal gambling by the defendants. As demonstrated below, the evidence of these acts is admissible as evidence of the charged racketeering conspiracy. In addition, evidence of these other acts is directly relevant to and inextricably intertwined with the evidence of the charged crimes. In the alternative, evidence of these other acts is also admissible under Rule 404(b) of the Federal Rules of Evidence.

STATEMENT OF FACTS

I.   The Racketeering Conspiracy Charged in Count One

     A.   The Racketeering Enterprise

          Gioeli and Saracino are charged in Count One of the sixth superseding indictment ("Indictment" or "Ind.") with racketeering conspiracy. The Indictment charges that from approximately January 1991 through the present, the defendants and others were employed by or associated with the Colombo organized crime family of La Cosa Nostra (the "Colombo family") and "conspire[d] to . . . conduct and participate, directly and

1

indirectly, in the conduct of the affairs of [the Colombo family] through a pattern of racketeering activity." Ind. ¶ 16.

The Indictment alleges that the Colombo family operated through various "crews," which consisted of a number of "made" family members (sometimes referred to as "soldiers") as well as associates. Id. ¶ 2. Each crew was headed by a captain, who in turn reported to the family hierarchy, including the "boss," who was himself assisted by an "underboss" and a "consigliere" in supervising and protecting the family's overall activities. Id. ¶¶ 3-5.

As the Indictment alleges, the "principal purpose" of the Colombo family was "to generate money for its members and associates" through a wide range of criminal activities, "including drug trafficking, extortion, illegal gambling, and loansharking." Id. ¶ 8. To further these criminal moneymaking activities, Colombo members and associates engaged in still other crimes, some involving the use and threatened use of "physical violence, including murder." Id. In addition, "the members and associates at times used the resources of the Colombo family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the Colombo family" and that "[f]or those purposes, . . . were asked and expected to carry out, among other crimes, acts of violence, including murder and assault." Id. ¶ 9. The Indictment also alleges that "[t]he

2

members and associates of the Colombo family engaged in conduct
designed to prevent government detection[,]" conduct that
included "a commitment to murdering persons, particularly members
or associates of organized crime families, who were perceived as
potential witnesses against members and associates of the
[Colombo family]." Id. ¶ 10.

  B.  The Charged Racketeering Acts

     The government expects that much of the evidence of
both the charged crimes and the other acts that the government
seeks to offer at trial will come in the form of testimony by
five cooperating witnesses (CW-1, CW-2, CW-3, CW-4 and CW-5).
CW-1 and CW-2 commenced their cooperation with the government at
separate points after being indicted with the defendants in the
first superseding indictment (S-1) in 2008.  CW-3, CW-4 and CW-5,
who were not charged with the defendants, were also members or
associates of the Colombo family during the time period of the
charged RICO conspiracy.

     Each of the defendants is charged with one or more
murders in connection with his membership in and association with
the Colombo family.  Gioeli, who prior to his arrest held the
position of "street boss" of the Colombo family, is charged with
racketeering conspiracy, including the murders of Frank Marasa,
John Minerva, Michael Imbergamo, Richard Greaves, Ralph Dols and
William Cutolo (Count One), and three counts of murder in-aid-of

3

racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four).  Saracino, who is a soldier in the Colombo family, is charged with racketeering conspiracy, including the murders of Greaves, Dols and Cutolo (Count One) and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four). As described below, the Indictment also alleges that Gioeli and Saracino variously committed murder conspiracy, robbery, extortion, extortionate extension and collection of credit, and witness tampering.

    A.   <u>Charged Murders</u>

        1.   <u>Murder of Frank Marasa</u>

Gioeli is charged with the 1991 murder of Frank Marasa, also known as "Chestnut."  Marasa was murdered in Brooklyn, New York on June 12, 1991.  On that date, Marasa was found by New York City Police Department officers lying shot in the street. Marasa later died from the gun shot wounds.

Marasa was murdered in retaliation for his perceived involvement in the murder of Colombo family associate Ennab Awjab, also known as "OJ," on May 30, 1991.  Gioeli, then a Colombo family soldier, authorized the murder.  After obtaining Gioeli's permission, CW-1 and CW-3, together with then Colombo family associate Richard Greaves, carried out the murder, ambushing Marasa on the street.

2.   <u>Murder of Michael Imbergamo and John Minerva</u>

Gioeli, together with CW-1 and others, participated in the murders of Michael Imbergamo and John Minerva on March 25, 1992.  During the early 1990s, the Colombo family had split into two warring factions, one loyal to the then acting family boss Victor Orena and the other loyal to the then "official" boss of the family, Carmine Persico.  Gioeli was a member of the faction loyal to Persico.

On the evening of March 25, 1992, Minerva, a soldier in the Orena faction, and Imbergamo were killed as part of the Colombo family war.  Imbergamo was not the intended target, but was killed simply because he was with Minerva.  Both men were shot inside of a car parked in front of the Broadway Café, located at 1129C Broadway in North Massapequa, New York.

3.   <u>Murder of Richard Greaves</u>

Gioeli and Saracino, together with CW-1, CW-2 and CW-4, participated in the murder of Richard Greaves.  Gioeli authorized the murder.  On or about August 3, 1995, Saracino shot Greaves, a Colombo family associate, to death in Saracino's basement apartment in Brooklyn, in the presence of Gioeli, CW-1, CW-2 and CW-4.  At the direction of Gioeli and CW-1, Saracino, CW-2, CW-4 and others then transported Greaves' body to a wooded area in Farmingdale, Long Island, where they buried him.  Greaves' body has never been recovered.

4.   <u>Murder of Ralph Dols</u>

Gioeli and Saracino, together with co-defendant Joel Cacace, CW-1 and CW-2, participated in the murder of Ralph Dols on August 25, 1997.  At the time of his murder, Dols was a New York City Police Officer assigned to Police Service Area #1 in Brooklyn, New York.  He was married to the ex-wife of Cacace, who was then a powerful and high-ranking member of the Colombo family.  Cacace ordered Dols' murder; Gioeli conveyed the order to CW-1 and participated in planning the murder.

On the night of the murder, Saracino, CW-1 and CW-2 waited for Dols to return to his home in Brooklyn.  As Dols parked his car in front of his building, Saracino and CW-1 shot him multiple times.  Police officers found Dols lying gravely wounded on the street next to his car, and Dols died a short time later from the gunshot wounds.

5.   <u>Murder of William Cutolo</u>

Gioeli and Saracino, together with CW-1 and CW-2, participated in the murder of William "Wild Bill" Cutolo on or about May 26, 1999.  At the time of his murder, Cutolo was the underboss of the Colombo family.  The acting boss at the time, Alphonse Persico, and administration member John DeRoss believed

6

that Cutolo had become too powerful and they were concerned that
he would take over the crime family.[1]

On May 26, 1999, after Gioeli lured Cutolo to the
vicinity of Saracino's basement apartment, CW-1 shot Cutolo to
death shortly after he entered Saracino's basement apartment.
Saracino, together with CW-1 and CW-2 and others, transported
Cutolo's body to Farmingdale, Long Island, where they buried
Cutolo.  Cutolo's body was recovered in a wooded area on October
6, 2008.  The Suffolk County Medical Examiner determined that the
cause of death was homicide.

B.   Charged Murder Conspiracies

1.   Conspiracy to Murder Orena Faction Members

In connection with the Colombo family war, Gioeli and
Saracino, together with CW-1, CW-2 and CW-3, participated in a
wide-ranging conspiracy to murder members of the Orena faction.
Specifically, Saracino, CW-2 and others surveilled various
locations where Orena faction members, including Joseph Scopo and
John Baudanza, were perceived to reside or frequent and reported
the information they obtained through their surveillance to their
superiors within the Colombo family.

---

[1]    In December 2007, Persico and Colombo family
administration member John DeRoss were convicted, after trial, of
the murder of Cutolo in-aid-of racketeering, and were
subsequently sentenced to mandatory life terms of imprisonment
for their roles in that murder.

7

### 2.   Conspiracy to Murder Michael Burnside

Following the murder of Saracino's brother, Frank Saracino, in April 1998, Saracino, CW-1 and CW-4 conspired to kill Michael Burnside, the individual who they believed was responsible for Frank Saracino's murder.  In connection with this conspiracy, Saracino sought assistance from fellow Colombo family members and associates to help him find Burnside.

### C.   Charged Robberies

### 1.   Robbery of Furs by Mina

Gioeli, CW-1 and others, participated in a violent robbery of a fur store, Furs by Mina, located at 408 Jericho Turnpike, in Syosset, New York, on February 11, 1991.  Gioeli, CW-1 and another individual entered Furs by Mina, posing as a father and two sons interested in purchasing a fur for Valentine's Day.  Once inside the store, they drew guns and then handcuffed and forced the owner and the owner's son to the floor. Together with others, they then filled garbage bags with fur coats from the store and loaded the coats into vehicles that were waiting outside.

### 2.   Attempted Robbery of Elegant Furs

Gioeli also participated in an attempted robbery of another fur store, Elegant Furs, located on Hempstead Turnpike in Levittown, New York, on or about January 10, 1992.  While Gioeli, CW-2 and other Colombo family associates waited outside, CW-1 and

8

another entered the store, posing as customers.  After gaining entrance, CW-1 and the other individual brandished firearms and ultimately pistol-whipped an employee.  The group then fled the scene.

### 3.   Robbery of Chemical Bank

Saracino and others participated in the robbery of Chemical Bank, located at 2419 Hempstead Turnpike, East Meadow, New York, on or about June 5, 1995.  At or about 9:00 a.m. on June 5, 1995, CW-2 and Greaves stole a money bag containing approximately $210,000 from a bank employee who was retrieving a bag of money from the bank's night deposit boxes.  CW-2 and Greaves fled the scene in a vehicle driven by Saracino.

### D.   Other Charged Crimes

### 1.   Extortionate Collection of Credit

In or about 1993, at the direction of CW-1, Saracino and CW-2 attempted to collect an outstanding debt owed by John Doe #1.  Specifically, Saracino and CW-2 went to the residence of John Doe #1, chased after him and stabbed him, resulting in serious injuries to the victim.

### 2.   Cocaine Distribution

In or about 1998, prior to the murder of Saracino's brother, Frank Saracino, Saracino, Frank Saracino and others participated in a scheme to distribute cocaine.  Saracino fronted the money to Frank Saracino to purchase the cocaine.

9

3.   <u>Loansharking</u>

In or about and between 2002 and Saracino's arrest in June 2008, Saracino and CW-1 operated a lucrative loansharking business.  At the time of his arrest, Saracino had numerous customers and over $100,000 in outstanding loans.

4.   <u>Extortion of John Doe #2</u>

Saracino is charged with the extortion of John Doe #2. Members of the Colombo family, including Cacace, Saracino, CW-1 and others, have long required John Doe #2 to make monthly payments to them in exchange for their "allowing" John Doe #2 to place and maintain joker poker machines in various Brooklyn establishments without risk of interference from other La Cosa Nostra families.

5.   <u>Obstruction of Justice</u>

Saracino has attempted to obstruct the government's investigation of the Colombo family.  Commencing in or about January 2008, numerous subpoenas were served on Saracino's associates.  Aware that the individuals who were served with subpoenas had information that might assist the government in its investigation against Saracino, Saracino corruptly attempted to persuade these individuals not to provide the government with inculpatory information.

II.  Overview of the Government's Evidence
     of the Defendants' Other Acts

        During the course of their involvement in the criminal

enterprise charged in Count One (the Colombo family), the

defendants engaged in a variety of other criminal acts.  The

government will offer evidence of these criminal acts primarily

through the testimony of the cooperating witnesses.

     A.  Murders and Murder Conspiracies

        1.  Murder of A Nun

        On multiple occasions, Gioeli confided in CW-1, in sum

and substance and in part, that Gioeli was "going to hell"

because he and Colombo family soldier Joseph Carna, also known as

"Junior Lollipops," participated in a murder in the 1980s, in

which a nun was inadvertently killed.[2]

        2.  Conspiracy to Murder Paul Gulino (1993)

        In the summer of 1993, Richard Greaves and CW-1 were

assaulted by Paul Gulino, an associate of Anthony Spero, who was

then the consigliere of the Bonanno organized crime family.

Immediately after the assault, Greaves and CW-1 sought and

_____

        [2]  On January 4, 1982, fragments of a shotgun blast
penetrated the doors and walls of a residence on Lake Street in
Brooklyn, New York, which resulted in the death of Veronica
Zuraw, a social worker and former nun, who was inside the
residence at the time of the gunshots.  One of the apparent
intended targets, Colombo family soldier Joseph Peraino, Jr., was
also found dead on the stoop outside of the Lake Street
residence, as he apparently attempted to escape the shooting.
Also injured was Colombo family soldier Joseph Peraino, Sr., who
survived the shooting but was left paralyzed.

received Gioeli's authorization to kill Gulino.  Greaves and CW-1
surveilled Gulino's home on a few occasions, but shortly
thereafter, Gulino was killed by someone else.  Spero was later
convicted of the murder.

      3.   Murder of Joseph Miccio (March 18, 1994)

        In the early 1990s, Miccio and CW-2 operated a
lucrative "chop shop" garage on McDonald Avenue in Brooklyn
("McDonald Avenue Chop Shop"), where they altered vehicles that
they and others had stolen, and resold them or their parts.
CW-2's superiors in the Colombo family, including Gioeli and
CW-1, received a portion of the proceeds from the chop shop.

        On one occasion, they stole cars that they later
learned belonged to members and associates of the Gambino crime
family.  Upon learning this, Gioeli decided that those cars were
to be returned to the owners.  When Miccio balked at returning
the cars, CW-1 conveyed the order to kill Miccio to CW-2.  On or
about March 18, 1994, CW-2 shot and killed Miccio in a car, in
the presence of a witness.  Later that evening, Saracino advised
CW-2 to kill the witness, but CW-2 refused.  Saracino and CW-2
then disposed of the gun used to kill Miccio.

      4.   Murder of Carmine Gargano (July 10, 1994)

        Gargano was also involved in operating the McDonald
Avenue Chop Shop with CW-2.  On or about July 10, 1994, CW-2 shot
and killed Gargano at the shop based on a dispute relating to

12

their activities there.  Saracino, who was not present for and did not otherwise participate in Gargano's murder, and CW-2 then buried Gargano's corpse at the garage.  Shortly thereafter, CW-1 and Greaves expressed concern to Gioeli that Gargano's body might be found at the garage, and the three (i.e., Gioeli, CW-1 and Greaves) identified a new burial site near Gioeli's home in Farmingdale, Long Island.  Saracino, CW-1, CW-2, CW-3 and Greaves were involved in exhuming the body, transporting it and re-burying it at the Farmingdale site.

In November 2008, the FBI recovered hairs from the location in the McDonald Avenue Chop Shop where Saracino and CW-2 initially buried Gargano.  These hairs were later determined to have belonged to Gargano.

4.   Conspiracy to Murder James "Jimmy Brown" Clemenza

At some point between the murders of Ralph Dols (August 1997) and William Cutolo (May 1999), Gioeli told CW-1 that Colombo family acting boss Alphonse Persico wanted Colombo family member James "Jimmy Brown" Clemenza killed.  Gioeli provided CW-1 with an address where "Jimmy Brown" could be found, and Gioeli and CW-1 surveilled that address in an attempt to find Clemenza, but never located him.

5.   Conspiracy to Murder Ralph Lombardo

After the murder of Cutolo (May 1999), Alphonse Persico, who was then incarcerated, indicated that he wanted CW-1

13

to be inducted as a made member of the Colombo family and placed in the crew of Ralph Lombardo.  Persico wanted CW-1 to get close to Lombardo, whom Persico suspected of cooperating with the government, in order to kill Lombardo.  Gioeli and Calabro discussed Persico's order with Cacace, who suggested luring Lombardo to Cacace's boat and killing him there.  After Persico sent Gioeli a message inquiring about the status of the plan to kill Lombardo, Gioeli and CW-1 conveyed the order to another Colombo family member, but the murder was never committed.

        B.   <u>Robberies, Burglaries and Sales of Stolen Goods</u>

        The defendants, CW-1, CW-2, CW-4 and others were also involved in a string of robberies, burglaries, thefts and the subsequent sales of stolen goods during the time period of the charged racketeering conspiracy.  Several of those incidents are described below.

        1.   <u>Bank Burglaries and Robberies</u>

        In the early 1990s, the defendants, together with CW-1, CW-2 and CW-4, participated in one bank burglary, several bank burglary attempts/conspiracies and an attempted bank robbery, each of which are described below.

        On one occasion, Gioeli, CW-1 and CW-2 agreed to burglarize a bank in Farmingdale.  CW-2 acted as a lookout while CW-1 broke through the wall behind an ATM and emerged with a stack of cash.  CW-1 and CW-2 then proceeded to Gioeli's

14

residence where they equally divided up the approximately $20,000 in proceeds.

On another occasion, Saracino, CW-1, CW-2 and Greaves agreed to burglarize the night deposit box of a Chase Bank located in the vicinity of Route 110 of Farmingdale. The co-conspirators drove to the location to commit the burglary, but abandoned the scheme after they determined that the area was too populated.

Gioeli, Saracino, CW-1, CW-4 and Greaves participated in a bank burglary of a bank on Long Island. On that attempt, Gioeli and Saracino acted as lookouts, while CW-1, CW-4 and Greaves gained entrance to the bank by kicking in a wall constructed of drywall and then used a blowtorch to open a safe located inside of the bank. The group aborted the plan when Gioeli and Saracino reported, over a radio, that an alarm had been activated.

Saracino, together with CW-1, CW-2, CW-4 and Greaves, also participated in the attempted burglary of a night depository box on Long Island. After CW-1 and Greaves constructed and installed a plywood structure to obscure their attempt, CW-2 and CW-4 used a blowtorch to melt the screws securing the night depository box to the wall of the bank. Saracino acted as a lookout. The plan was abandoned only after their co-conspirators spotted a security guard. CW-1 totaled his vehicle and then

15

injured his hand while climbing over a fence as he fled the scene.

Saracino, CW-1, CW-2 and Greaves also attempted to rob a bank in the Mill Basin neighborhood of Brooklyn. The group planned to gain entrance to the bank by breaking a window and then grab bags of money from bank employees as the employees emptied the night-deposit boxes. As planned, CW-2 and Saracino threw a cinder block through a bank window, but it bounced off the front window. CW-2 and Saracino then fled the scene.

### 2. Thefts of Trailer Loads

In the early to mid-1990s, Gioeli, Saracino, CW-1, CW-2 and CW-4 variously stole several trailers containing shipments of goods and subsequently sold the stolen goods. For example, on one occasion CW-1 and CW-2 stole a trailer containing appliances and furniture from the Macy's parking lot in Massapequa Mall, and Gioeli arranged to lease a warehouse in Long Island to store the stolen goods. On another occasion, Saracino, CW-1, C-2, CW-4, Greaves and another co-conspirator ("CC-1") attempted to steal a trailer from a yard. They abandoned the attempt after CC-1 was not able to use the manual shift to navigate the trailer.

On at least two other occasions, CW-1, CW-2 and others stole truckloads of goods from a trucking depot located in Long Island. Specifically, the co-conspirators stole a tractor unit, gained access to the trucking depot, hitched the tractor unit to

16

a trailer found in the depot and drove the tractor-trailer away from the depot.  They then sold the stolen goods, and shared the proceeds with Gioeli.

On another occasion, Gioeli told CW-1, Greaves and others about a potential "score" involving leather coats after a family friend of Gioeli told Gioeli about a truckload of leather coats parked outside a particular residence.  Greaves and another individual later stole the truck, and brought it to a third location where they unloaded the coats from the truck and transported the coats back to Gioeli's residence.

### 3.  Miscellaneous Burglaries and Robberies

The defendants also participated in a series of robberies and burglaries of commercial establishments.

#### a.  Robbery of Convenience Store

When CW-1 returned from his honeymoon in January 1991, Greaves told CW-1 that Gioeli, Ennab "OJ" Awjab and Greaves had robbed a convenience store in Massapequa.  Greaves gave CW-1 a portion of the proceeds, including cash and scratch-off lottery tickets.

#### b.  Convenience Store Robbery

Also in 1991, Saracino and CW-2 robbed a candy store in the Mill Basin neighborhood of Brooklyn.  After entering the store, Saracino pointed a gun at the store clerk and CW-2 jumped over the counter to grab the cash in the register.  At their

17

demands, the clerk handed CW-2 cash from the register and from a brown paper bag.  Saracino and CW-2 then returned to CW-1's residence where they divided the proceeds.  In total, they obtained approximately $250, which they split among Saracino, CW-1 and CW-2.

     c.   <u>Robbery of a Drug Dealer</u>

Gioeli authorized CW-1 and Greaves to rob a drug dealer in Brooklyn.  After receiving permission from Gioeli, CW-1 and Greaves posed as flower delivery men to gain access to the house. They then handcuffed the residents inside and stole a safe containing cash and narcotics.  CW-1 and Greaves gave Gioeli a portion of the proceeds.

     d.   <u>Robbery of a Long Island Market</u>

Gioeli participated in an armed robbery of a market in Long Island.  Specifically, Gioeli, CW-1 and Greaves, armed with guns, waited for the owners to close the store and then followed the owners as they left.  Greaves then grabbed a bag filled with the evening's proceeds.

     e.   <u>Conspiracy to Rob a Jewelry Store</u>

Gioeli, CW-1 and Greaves agreed to rob a jewelry store in the vicinity of the intersection of Route 109 and Hempstead Turnpike in Farmingdale.  On at least one occasion, Gioeli, CW-1 and Greaves conducted surveillance of the location.

f.   Attempted Burglary of Farmingdale Meats Market

Gioeli, CW-1, CW-2 and Greaves attempted to rob Farmingdale Meats Market, located in Farmingdale, Long Island. They aborted the plan after an alarm went off.

g.   Conspiracy to Rob Pat's Farms

Gioeli and CW-1 conspired to rob the owner of Pat's Farms located in Farmingdale.  On at least one occasion, Gioeli and CW-1 conducted surveillance of Pat's Farms, and followed the owner of Pat's Farms to his residence.

h.   Conspiracy to Rob An Armored Car Depot

Gioeli, CW-1 and Greaves agreed to rob an armored car depot on Route 110 in or around Farmingdale.  In furtherance of the plan, the group conducted surveillance of the depot on a few occasions.

I.   Conspiracy to Rob Adventureland

Gioeli also proposed a robbery of the back office of Adventureland, an amusement park in Farmingdale, Long Island. Gioeli, CW-1 and Greaves surveilled the office but were not able to identify the schedule of money drops and pickups, and therefore aborted the plan.

j.   Fur Store Burglary

Gioeli, Saracino, CW-1 and CW-4 attempted to burglarize a fur store in the vicinity of Route 110 in Long Island.  Gioeli and Saracino waited outside while CW-1 and CW-4 broke into an

19

vacant retail store located adjacent to the fur store.  Once
inside the vacant store, CW-1 and CW-4 used sledgehammers to
break through the wall adjoining the vacant store to the fur
store.  They abandoned the plan after they determined that they
would not be able to gain access to the fur store.

k.   <u>Suit Store Burglary</u>

On or about January 25, 1996, Gioeli, Saracino, CW-1
and CW-2 burglarized a suit store in Long Island.  Gioeli waited
outside in a vehicle with a police scanner while Saracino, CW-1
and CW-2 broke into the store and stole suits, which they later
sold.

l.   Conspiracy to Burglarize
     <u>the Owner of Lotus Garden</u>

In or about 2000, Gioeli proposed to CW-1 to rob a
residence of the owner of Lotus Garden, a Chinese food restaurant
in Farmingdale.  Gioeli told CW-1 that he believed the restaurant
owner kept a significant sum of money in his residence and asked
CW-1 to have another Colombo family associate who had a history
of burglarizing residences to commit the burglary.  Gioeli, CW-1
and the Colombo family associate conducted surveillance, but, to
CW-1's knowledge, the plan was never executed.

m.   <u>Conspiracy to Rob Manhattan Jewelry Store</u>

Shortly before Cacace was incarcerated in February
2003, Gioeli told CW-1 that Cacace wanted them to rob a jewelry
store in Manhattan.  Gioeli explained that Cacace had a contact

20

at the jewelry store and that the robbery would be an inside job. Gioeli and CW-1 conducted surveillance of the jewelry store on one occasion.  CW-2 also conducted surveillance of the location with CW-1.

    C.   <u>Assaults</u>

       1.   <u>Assault at a Carting Company</u>

In the early 1990s, Gioeli told CW-1 and Greaves that they needed to run an errand for then Colombo family captain Joseph "Jo Jo" Russo involving a "garbage stop."  Thereafter, at Gioeli's direction, Gioeli, CW-1, CW-2 and Greaves went to a carting company located in the vicinity of Route 110 in Huntington, and assaulted a male who was inside.

       2.   <u>Assault at a Meat Market</u>

In the early 1990s, Gioeli recruited CW-1 and CW-3 to assault an individual.  At Gioeli's direction, CW-1 and CW-2 traveled to a meat market in Brooklyn, where they expected to find the individual.  When they encountered the individual, CW-1 and CW-2 assaulted him.

       3.   <u>Assault at Lenny's Candy Store</u>

In the mid 1990s, Colombo family soldier William Russo asked Gioeli and CW-1 to assist Russo in collecting money owed to him.  Russo arranged for "Lenny the Barber" to lure the debtor to Lenny's candy store located in downtown Brooklyn.  When the

debtor arrived at the shop, Lenny exited, and Gioeli and CW-1 entered, demanded that the debt be paid and assaulted him.

               4.    <u>Assault of Gioeli's Daughter's Boyfriend</u>

On one occasion while CW-1 and CW-2 were at Gioeli's residence in Farmingdale, Gioeli observed the boyfriend of one of his daughters harassing his daughter.  At Gioeli's instruction, Gioeli, CW-1 and CW-2 went to Gioeli's daughter's boyfriend's residence and CW-2 assaulted him.

    D.   <u>Extortion</u>

Gioeli collected protection money from a variety of business owners, and on occasion relied on CW-1 to collect the money.  For example, for several years, the owner of a nightclub located on Route 110 in Long Island paid Gioeli a monthly sum of $2,000.  Gioeli also collected an annual payment from a Colombo family associate who operated a lucrative bookmaking business.

    E.   <u>Obstruction</u>

For much of the duration of the charged enterprise, Saracino, on behalf of the Colombo family, stored firearms in a stand-alone garage located on property owned by a relative of Saracino.  (Notably, several of the firearms used in the charged murders were taken from the stash that Saracino maintained at that location.)  On March 4, 2005, New York City Police Department ("NYPD") officers seized nine guns from the stand-alone garage.  Upon learning of this incident, Saracino informed

22

a cooperating witness ("CW-5") that the firearms belonged to him and corruptly attempted to persuade the witness to claim responsibility for the firearms.

F.   Narcotics Trafficking

In or about 2006, Saracino recruited CW-4 and another co-conspirator ("CC-2") to assist in a scheme to distribute pounds of marijuana.  At Saracino's instruction, CW-4 obtained marijuana from CC-2 and mailed it to Colombo family associates on "record" with Saracino in New York for distribution.

G.   Illegal Gambling

1.   Joker Poker Machines

In the 1990s, Gioeli collected the proceeds from numerous Joker Poker machines located in establishments in Brooklyn and Long Island.

2.   Sports-Betting

During the 2006 and 2007 football seasons, Saracino engaged in a sports-betting business with CW-4 and other Colombo family associates.  Each week, a Colombo family associate faxed a sheet that listed a variety of college and professional football games to CW-4's residence in California and CW-4 and others then took bets.  Saracino, CW-4 and others split the proceeds.

ARGUMENT

The government moves in limine for the admission of evidence pertaining to the acts set forth above.  The evidence of

23

these acts is admissible as evidence of the charged racketeering conspiracy.  In addition, evidence of these other acts is directly relevant to and inextricably intertwined with the evidence of the charged crimes.  In the alternative, evidence of the defendants' bad acts is also admissible under Rule 404(b) of the Federal Rules of Evidence.

>    A.    Evidence of Other Acts Is Admissible to
>          <u>Establish the Racketeering Enterprise and Conspiracy</u>

>    1.    <u>Legal Standard</u>

The Second Circuit has repeatedly held that evidence of "other" or "uncharged" crimes is admissible to establish the existence of the enterprise and conspiracy in prosecutions for racketeering offenses and other conspiracies.  For example, in <u>United States v. Baez</u>, 349 F.3d 90, 93 (2d Cir. 2003), the Second Circuit held:  "It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."  <u>Id.</u> (upholding district court's admission of sixteen uncharged robberies).  Moreover, a criminal act committed in furtherance of the alleged conspiracy is "not an 'other act' within the meaning of Rule 404(b); rather, [it is] part of the very act charged."  <u>United States v. Concepcion</u>, 983 F.2d 369, 392 (2d Cir. 1992).  Thus, crimes committed in furtherance of the racketeering enterprise do not fall within the ambit of Rule 404(b).  <u>See</u> <u>United States v. DiNome</u>, 954 F.2d 839, 843 (2d Cir.

1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (district court did not abuse its discretion in admitting evidence of uncharged murders, where "the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice").

In United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997), where the defendants were charged with being felons in possession of a firearm, the Second Circuit upheld admission of evidence regarding a burglary by the defendants because it was relevant to both motive for defendants' possession of firearms and to provide "crucial background evidence that gave coherence to the basic sequence of events."  In rejecting the defendant's claim to preclude this evidence pursuant to Rule 404(b), the court held:

> It is well established that "evidence of uncharged criminal activity is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'"

25

Id. (quoting United States v. Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (emphasis added)).

Evidence of "other" or "uncharged" crimes is particularly relevant in this case, where the defendants are charged with racketeering conspiracy (as opposed to substantive racketeering) in light of the elements necessary to prove the existence of a racketeering conspiracy. A racketeering conspiracy is "an agreement to conduct or to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity." United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009). As the Second Circuit explained in Pizzonia, a racketeering conspiracy is not a conspiracy to commit two or more predicate acts, because "it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the combination of these two elements[.]" Id. at 463 (citation and internal quotation marks omitted). In addition, it is well-settled that, "to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern[.]" Id. at 465 (emphasis added; citation and internal quotation marks omitted).

26

2.   Analysis

First, as described below, evidence of many of the above-described uncharged murders and murder conspiracies, including the Miccio and Gargano murders, and the conspiracies to murder Gulino, Clemenza and Lombardo, is integral to proving the existence and nature of the enterprise, i.e., the Colombo family, and the racketeering conspiracy.  Such evidence is admissible as proof of, inter alia, the activities, purpose and means of the charged enterprise; the defendants' roles in that enterprise; and proof that the alleged predicate racketeering acts constitute a "pattern of racketeering activity."

- ■ Murder of Joseph Miccio: Evidence of the Miccio murder shows the methods that the Colombo family employed to protect its money-making operations.  Specifically, CW-2 killed Miccio, in part, to quash a potential feud between the Colombo and Gambino crime families, and thereby protect the livelihood of the chop shop (i.e., a money-making operation for the Colombo family). Saracino's advice to kill the witness to Miccio's murder is also probative of the Colombo's family interest in evading law enforcement detection.  See Ind. ¶ 10.

- ■ Murder of Carmine Gargano: Evidence of the Gargano murder is also probative of the activities, purpose and means of the Colombo family.  The steps taken by Gioeli, Saracino and others to dispose of Gargano's body, including (I) burying him in the chop shop in Brooklyn, (ii) identifying a more discrete location in Long Island, (iii) digging up Gargano's body, (iv) transporting him from Brooklyn to Long Island and (v) re-burying him, are particularly probative of the Colombo family's efforts to evade law enforcement detection.  See id.

- ■ Conspiracies to murder Clemenza and Lombardo: Evidence of the conspiracies to murder James Clemenza and Ralph

27

Lombardo is probative of the fact that Colombo family leaders asked, and expected, their members and associates to carry out acts of violence.  See id. ¶ 9. Specifically, Persico, who was then the acting boss of the family, on separate occasions asked Gioeli and others to murder each Clemenza and Lombardo.  Evidence of the Lombardo murder conspiracy is also probative of the means considered by the family to avoid law enforcement detection, specifically, by murdering an individual suspected of cooperating with law enforcement.  See id.

- ■ Conspiracy to murder Gulino: Evidence of the conspiracy to murder Paul Gulino is probative of the use of violence by members and associates of the Colombo family – with the approval of their superiors – to settle grievances.  Id.  Specifically, in a similar manner to which Gioeli authorized the charged murder of Marasa, Gioeli, the Colombo family member to whom Greaves and CW-1 reported at the time, authorized the murder of Gulino.

The obstruction in which Saracino engaged when he attempted to persuade CW-5 to accept responsibility for firearms recovered from a property associated with Saracino is also evidence of the Colombo family's routine employment of means to evade law enforcement detection to protect its interests.  That is, rather than risk a charge relating to firearms possession, which could subject Saracino to an incarceratory sentence and interfere with his ability to earn money for the Colombo family, Saracino attempted to persuade an associate to accept any blame.

The robberies, burglaries, sales of stolen goods, assaults, extortion, narcotics trafficking, loansharking and illegal gambling described above also show the defendants' commitment to engaging in an ongoing and extensive pattern of

28

committing crime to make money.  See Pizzonia, 577 F.3d at 465
("[T]he threat of continued criminal activity over an open period
can be established where discrete predicates can be attributed to
a defendant operating as part of a long-term association that
exists for a criminal purpose.").  Taken together, these other
acts plainly manifest the "continuity required to prove a
pattern" that is required to prove the existence of the
racketeering conspiracy and the defendants' involvement in that
conspiracy."  Pizzonia, 577 F.3d at 465.

       In addition, the murder in which a nun was killed, to
which Gioeli admitted his participation, is highly probative of
Gioeli's long-term association with and membership in the
enterprise.  Specifically, Gioeli's participation in the murder
exemplifies how Gioeli rose through the hierarchy of the Colombo
family to become a powerful captain and, eventually, its street
boss.

    B.    **Certain Evidence of Other Acts is
Directly Relevant to and Inextricably Intertwined
with the Evidence of the Charged Crimes**

       For the following reasons, certain evidence of other
acts is inextricably intertwined with the evidence of the charged
offenses and thus admissible to complete the story of the charged
crimes.

1.   <u>Legal Standard</u>

It is well settled that "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"  <u>United States v. Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000) (quoting <u>United States v. Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997)); <u>see also</u> <u>United States v. Towne</u>, 870 F.2d 880, 886 (2d. Cir. 1989) (same).

2.   <u>Analysis</u>

Evidence of the other acts described above are so intricately intertwined that they are "necessary to complete the story of the crime on trial," <u>Carboni</u>, 204 F.3d 44, because this evidence explains how the defendants and their co-conspirators evolved from a group of bandits committing robberies and burglaries in Long Island and Brooklyn into a murderous crew who killed to protect themselves, each other, and the criminal enterprise to which they belonged, and efficiently destroyed the evidence of their crimes.

Evidence of the uncharged murders of Miccio and Gargano is especially salient in this regard.  Although Gioeli and CW-1 had long been close and together participated in the charged

murders of Marasa, Minerva and Imbergamo, Saracino and CW-2 did not. Accordingly, Saracino and CW-2's participation in the uncharged Miccio and Gargano murders is necessary to understand how Saracino and CW-2 proved themselves capable to kill and effectively hide and destroy evidence of the murders – such that Gioeli would involve them (i.e., Saracino and CW-2) in the three charged murders – that of Richard Greaves, another member of their crew; Ralph Dols, a New York City police officer whose murder was ordered by Colombo administration member Joel Cacace; and William Cutolo, one of the most powerful members of the Colombo family and a rival to acting boss Alphonse Persico – each of which were extremely sensitive and/or high profile. Put another way, Saracino, CW-2 and CW-3 proved their worth by killing Miccio and Gargano, two relatively tangential players in the Colombo family criminal enterprise, and successfully disposing of the corpses and murder weapons. Without understanding the history of how this crew evolved around Gioeli, the jury would be left to wonder why Gioeli and CW-1 had entrusted Saracino and CW-2 with committing the charged murders.[3]

---

[3]     It is also likely that the defendants will wish to cross-examine the cooperating witnesses about their participation in these murders pursuant to Giglio v. United States, 405 U.S. 150 (1972). If the government is not permitted to question the witnesses about these events during direct examination, the jury will be left with the misimpression that the government was attempting to conceal important and damaging information about these witnesses from the jury.

The Gargano murder is significant for another reason:
Carmine Gargano's body was the first to be buried in the same
general area in Farmingdale, Long Island, where Cutolo's remains
were recovered in 2008 and where Greaves' remains are still
buried.  After the botched burial of Gargano at the McDonald
Avenue garage, the defendants and the rest of their crew found a
solution – burial in Farmingdale, Long Island, an area well-known
to Gioeli, who lived in Farmingdale until his arrest, yet far
enough from the scene of the crimes to effectively conceal the
evidence.  In this respect, the Gargano murder is necessary to
complete the story of the Greaves and Cutolo murders.

The Clemenza and Lombardo murder conspiracies are also
integral to understanding the Dols and Cutolo murders.  Prior to
ordering Cutolo's murder, Persico had already ordered Gioeli and
CW-1 to murder Clemenza, another one of Persico's rivals within
the family.  By accepting this order, Gioeli and CW-1
demonstrated their loyalty to Persico, which helps to explain why
Persico entrusted Gioeli and CW-1 with killing Cutolo, the
underboss of the crime family.  Similarly, the Lombardo murder
conspiracy, which occurred after the Cutolo murder, demonstrates
how the Cutolo murder enhanced Persico's faith in Gioeli's crew's
effectiveness as killers and their loyalty to Persico.  The
Lombardo murder conspiracy is also critical to illuminating
Gioeli's and CW-1's relationship with Cacace – after Gioeli's

crew killed Ralph Dols on behalf of Cacace, Cacace offered to help Gioeli and CW-1 kill Lombardo.  The Clemenza and Lombardo murder conspiracies thus demonstrate the ongoing and mutually-beneficial relationship among Persico, Cacace, Gioeli, CW-1 and the rest of Gioeli's crew, including Saracino.

Finally, evidence of the robberies, burglaries and assaults is necessary to understanding how the crew operated as a unit with Gioeli as their leader in criminal activity.  At almost all of the assaults, robberies and burglaries described above, Gioeli had a leadership role.  For example, Gioeli proposed most of the robberies and robbery conspiracies, such as the conspiracies to rob Adventureland and the owner of the Lotus Garden restaurant; leased the warehouse to store the stolen goods after the trailer heist; and manned the police scanner in other robberies.  Gioeli also ordered the assaults and recruited CW-1, CW-2 and Greaves to carry them out, notably including the assault on Gioeli's daughter's boyfriend.  This evidence is thus important to demonstrate his leadership role vis-a-vis Saracino, CW-1, CW-2 and CW-3, and to explain how he came to be in a position to order the others in the crew to commit murders.

C.  Evidence of the Defendants' Other Acts Is Also
     Admissible Pursuant to Federal Rule of Evidence 404(b)

In the alternative, the government seeks to admit
evidence of the murders, murder conspiracies, robberies,
burglaries, sales of stolen goods, assaults, extortion,
obstruction, narcotics trafficking and illegal gambling described
above pursuant to Federal Rule of Evidence 404(b).

1.  Legal Standard

Uncharged crimes or "other" acts evidence is admissible
pursuant to Rule 404(b) if relevant to the issues of motive,
opportunity, intent, preparation, plan, knowledge, identity or
absence of mistake or accident.  See United States v. Ortiz, 857
F.2d 900, 903 (2d Cir. 1988).  Rule 404(b) evidence is only
admissible if, under Rule 403, the probative value of the
evidence is not substantially outweighed by the danger of unfair
prejudice or by considerations of judicial economy such as the
needless presentation of cumulative evidence.  Id.

The Second Circuit has established a three-prong test
for the admission of "other crimes" evidence under Rule 404(b).
First, a trial court must determine that the evidence is offered
for a purpose other than to prove the defendant's bad character
or criminal propensity.  See United States v. Pitre, 960 F.2d
1112, 1119 (2d Cir. 1992); United States v. Mickens, 926 F.2d
1323, 1328 (2d Cir. 1991).  Second, the trial court must
determine that the evidence is relevant under Rules 401 and 402

34

of the Federal Rules of Evidence and that its probative value is substantially outweighed by the danger of unfair prejudice. See Pitre, 960 F.2d at 1119; Mickens, 926 F.2d at 1328. Third, the court must provide an appropriate limiting instruction to the jury, if one is requested. See Pitre, 960 F.2d at 1119.

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) (internal citation omitted), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a rule of broad reach and liberal application. Id. ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible."). Here, the government offers evidence of the defendants' participation in uncharged acts not to show propensity but rather, as explained below, as relevant background to demonstrate how the relationships of trust among the defendants and their co-conspirators were formed. See United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."). Evidence of the other crimes is also relevant to establish motive, opportunity, plan, knowledge and identity.

35

2.   Analysis

   a.   Evidence of the Defendants' Uncharged Crimes
        Is Admissible as Background, to Complete the
        Story, and to Show Relationships of Trust

The Second Circuit has repeatedly permitted the admission of evidence under Rule 404(b) to provide background information to inform the jury of the complete story relating to the crime charged.  See United States v. Williams, 205 F.3d 23 (2d Cir. 2000); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization"); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); Pitre, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

36

As described in detail above, the uncharged acts that
the government seeks to admit are critical to establishing "how
the illegal relationship" among the defendants and cooperating
witnesses developed.  Id.  That is, the uncharged acts provide
the necessary background evidence to show how these individuals
trusted each other so much that they participated in multiple
murders and subsequent clean-up/burial operations together.  They
also show how and why the Colombo family leadership – in
particular, Persico and Cacace – entrusted Gioeli and his crew
with carrying out extremely sensitive murders.  Additionally,
Gioeli's admission to CW-1 that he had participated in the
inadvertent murder of a nun demonstrates the deep relationship of
trust between Gioeli and CW-1.  Accordingly, even if the evidence
of uncharged acts is not admitted as direct evidence of the
racketeering conspiracy, such evidence should be admitted within
the limitations of Rule 404(b).

>           b.    Evidence Concerning the Defendants'
>                 Involvement In the Other Acts
>                 <u>Evidences Identity and Opportunity</u>

The evidence of the defendants' involvement in several
of the other acts detailed above is also admissible to show
"motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident."  Fed. R. Evid.
404(b); <u>see</u> <u>United States v. Bok</u>, 156 F.3d 157, 166 (2d Cir.
1998).

(1)  <u>Identity</u>

Because the government's evidence of the defendants' participation in the charged murders is primarily based on the testimony of cooperating witnesses, the government anticipates that the identity of the murderers will be vigorously contested. The Gargano, Greaves and Cutolo murders, however, carry the same "signature" – all three bodies were buried in Farmingdale. <u>United States v. Mills</u>, 895 F.2d 897 (2d Cir. 1990) (Rule 404(b) permits government to show that defendant was in fact a perpetrator of conduct in issue with proof of a "signature crime."). Moreover, the "similarity sufficient to admit evidence of past acts to establish a recurring <u>modus</u> <u>operandi</u> need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." <u>United States v. Sliker</u>, 751 F.2d 477, 486-87 (2d Cir. 1984). Since Greaves' remains have never been recovered, the defendants are likely to also vigorously contest the cooperating witnesses' testimony that his body was buried in Farmingdale. Proof that yet another victim, Gargano, was buried there only a year before Greaves, and that this area had been chosen for the Gargano burial specifically by Gioeli, CW-1 and Greaves, is "sufficiently idiosyncratic to permit a fair inference" (<u>id.</u>) of the existence of a pattern.

38

(2)   <u>Opportunity</u>

Because Gioeli ordered others to carry out the murders of Dols and Cutolo, he is naturally the furthest removed from the actual scenes of the crimes.  The fact that by the time Greaves was murdered, Gioeli had already assembled a crew of capable killers, shows that he had the opportunity to use his crew members to kill Dols and Cutolo.

(3)   <u>Motive</u>

Before he was murdered, Greaves was part of Gioeli's crew and participated in murder (including the uncharged Gargano murder), murder conspiracy (including the uncharged conspiracy to murder Gulino) and a string of uncharged robberies, burglaries and assaults with Gioeli and/or Saracino.  Thus, if Greaves had cooperated with law enforcement, he could have implicated Gioeli and Saracino in this extensive criminal activity.  The evidence of Gioeli and Saracino's crimes with Greaves is thus relevant to showing their motive for murdering Greaves.

D.   The Probative Value of the "Other Crimes"
<u>Evidence Far Outweighs Any Prejudicial Effect</u>

Finally, the probative value of the other acts evidence is not substantially outweighed by its prejudicial effect. Evidence of other crimes is admissible when offered for a proper purpose through the various types of evidence, including the testimony of cooperating witnesses, so long as the evidence "'[does] not involve conduct any more sensational or disturbing

39

than the crime[] with which [the defendant has been] charged.'" _Pitre_, 960 F.2d at 1120 (quoting _United States v. Roldan-Zapata_, 916 F.2d 795, 804 (2d Cir. 1990)).  Where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under the Rule 403 balancing test.  _See_ _United States v. Livoti_, 196 F.3d 322, 326 (2d Cir. 1999) (upholding admissibility of evidence that the defendant, a police officer charged with engaging in excessive use of force with an arrestee, choked another arrestee on the basis that "the evidence did not involve conduct more inflammatory than the charged crime, and the district court gave a careful limiting instruction").

As noted above, the evidence relating to the other criminal acts listed above will come primarily from the testimony of cooperating witnesses.  Accordingly, the quality of the evidence is no more prejudicial than that offered with regard to the other charged crimes.  More importantly, the uncharged criminal acts are either similar in nature or less sensational than the charged crimes.  Unlike in the trial of John "Sonny" Franzese in 2010 (08 CR 240), where the Court excluded recordings of Franzese discussing myriad murders because it found such evidence to be far more sensational and inflammatory than the charged extortions and loansharking, the defendants here are _already_ charged with multiple murders and murder conspiracies.  The "other act" murders, murder conspiracies and robberies are no

40

more sensational than the charged murders, particularly so with respect to the killing of New York City Police Officer Ralph Dols.  Thus, the uncharged crimes are not more prejudicial than those with which the defendants are charged.  In any event, any potential prejudice to the defendants can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  <u>See</u>, <u>e.g.</u>, <u>United States v. Mickens</u>, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

<u>CONCLUSION</u>

For the reasons set forth above, the government's motion <u>in</u> <u>limine</u> should be granted.

Dated:     Brooklyn, New York
           April 22, 2011


                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York


Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
     (Of Counsel)

41