UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

UNITED STATES OF AMERICA,

                        Plaintiff,

        - against -

THOMAS GIOELI and DINO SARACINO,

                  Defendants.

-------------------------------------------------------- X

**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 2 8 2011 ★

BROOKLYN OFFICE

**MEMORANDUM**
**DECISION AND ORDER**

CR-08-240-2 (BMC)

**COGAN,** District Judge.

    This case is before me on the Government's motion *in limine* for an anonymous and partially sequestered jury and its motion *in limine* to admit certain evidence against the defendants. The motion for an anonymous and partially sequestered jury is granted. The motion to admit certain evidence is granted in part and denied in part.

## BACKGROUND

### I.    The Enterprise

    The Sixth Superseding Indictment (the "Indictment") charges that the Colombo organized crime family of La Cosa Nostra is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The Colombo family allegedly operates through several groups of "crews," each with their own hierarchical structure. The crews are headed by captains; there is also a separate hierarchical structure above the captains – a "boss," "underboss," and "consigliere." These three members of the Colombo family are allegedly "responsible for setting policy, resolving disputes between members and associates of the Colombo family and members and associates of other criminal

organizations, and approving all significant actions taken by members and associates of the Colombo family, including murder."

According to the Indictment, "[t]he principal purpose of the Colombo family was to generate money for its members and associates," which it allegedly achieved "through various criminal activities, including drug trafficking, extortion, illegal gambling, and loansharking." Moreover, Colombo family members and associates allegedly "furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder."

The Indictment also alleges that Colombo family members and associates used the family's resources "to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the Colombo family." To this end, Colombo family members and associates were directed to commit acts of violence, including murder and assault. In addition, Colombo family members and associates allegedly "engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities." This included a commitment to murdering persons, including other members and associates of organized crime families, thought to be potential witnesses against Colombo family members and associates.

## II.    Charged Conduct

Defendants Thomas Gioeli and Dino Saracino are charged with engaging in a racketeering conspiracy (from January 1991 through the present) and three counts of murder in-aid-of racketeering. Saracino is also charged with conspiring to make an extortionate extension of credit, prevention of testimony, withholding of testimony and records, and obstruction of official proceeding. According to the Indictment, Gioeli was, at various times, an acting boss,

captain, soldier, and associate within the Colombo family; Saracino was, at various times, a soldier and associate within the Colombo family.

As part of the racketeering conspiracy, Gioeli and Saracino are variously charged with committing sixteen predicate racketeering acts. Specifically, Gioeli and Saracino are both charged with (1) conspiring to murder members of a warring faction of the Colombo family; (2) conspiring to murder and murdering Richard Greaves; (3) conspiring to murder and murdering William Cutolo; and (4) conspiring to murder and murdering Ralph Dols.[1]  Gioeli is individually charged with (5) conspiring to murder and murdering Frank Marasa; (6) conspiring to murder and murdering John Minerva; (7) murdering Michael Imbergamo; (8) conspiring to rob and robbing Furs by Mina; and (9) conspiring to rob and attempting to rob Elegant Furs. Saracino is individually charged with (10) conspiring to murder Michal Burnside; (11) conspiring to use extortionate means and using extortionate means to collect and attempt to collect an extension of credit from John Doe #1; (12) conspiring to rob and robbing Chemical Bank; (13) conspiring to distribute cocaine; (14) conspiring to make an extortionate extension of credit; (15) extortion; and (16) witness tampering.

The Government proffered that the majority of the evidence it will seek to offer at trial will come from the testimony of five cooperating witnesses (CW-1, CW-2, CW-3, CW-4, and CW-5). CW-1 and CW-2 were charged together with Gioeli and Saracino in the First Superseding Indictment. Although not charged with Gioeli and Saracino, CW-3, CW-4, and CW-5 were members or associates of the Colombo family during the charged conspiracy period.

---

[1] The Greaves, Dols, and Cutolo murders also form the basis for the murder in-aid-of racketeering charges. Specifically, the Indictment charges Gioeli and Saracino with committing these murders "for the purpose of gaining entrance to and maintaining and increasing position in the Colombo family."

## DISCUSSION

I.   **The Government's Motion for an Anonymous and Partially Sequestered Jury**

The Government requests that: (1) the identities of all prospective jurors – including names, addresses, and places of employment – not be revealed to either the parties or their attorneys; and (2) each juror be escorted by representatives of the United States Marshals Service to and from the courthouse each day and at all times during recesses from the time they are empanelled until the conclusion of the trial. These types of precautionary measures have "serious implications for a defendant's interest in effectively conducting *voir dire* and in maintaining the presumption of innocence." United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994). Nevertheless, it is well settled that, "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); see also Wong, 40 F.3d at 1376.

The standard for evaluating the Government's motion requires me to first consider whether there is "strong reason to believe that the jury needs protection." United States v. Amuso, 21 F.3d 1251, 1265 (2d Cir. 1994) (quoting United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985)). If so, I must take "reasonable precaution[s] . . . to minimize the effect that such a decision might have on the jurors' opinions of the defendants." Id. (quoting Thomas, 757 F.2d at 1365). In making my initial determination, relevant factors to consider include: "(1) the seriousness of the charges, (2) the threat of corruption of the judicial process, and (3) the expectation of publicity." United States v. Gotti, 02 CR 743, 2004 U.S. Dist. LEXIS 20270, at *5 (S.D.N.Y. Oct. 7, 2004); see also United States v. Gotti, 459 F.3d 296, 345-46 (2d Cir. 2006); United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Paccione, 949 F.2d 1183,

Case 1:08-cr-00240-BMC-RER   Document 1195   Filed 07/28/11   Page 5 of 20 PageID #: 6279

1192 (2d Cir. 1991).  Moreover, in making this evaluation, I can rely on the Government's

proffer of facts showing that the jury needs protection.  See Wong, 40 F.3d at 1376-77.

      I find that there is strong reason to believe that the jury needs protection.  First, the

seriousness of the charges levied against Gioeli and Saracino cannot be underscored.  Both men

are charged with committing multiple violent crimes, including several murders.  Government

witnesses will testify about these murders, and about how members and associates of the

Colombo family used violence to further their criminal enterprise.  This includes testimony that

government witnesses, Gioeli, and Saracino participated in the Richard Greaves' murder, in part,

because they wanted to prevent him from "ever cooperating with law enforcement."  I find that

the "trial evidence will depict a pattern of violence by the defendants and his [sic] associates

such as would cause a juror to reasonably fear for his own safety."  Vario, 943 F.2d at 241.  As

the Court suggested in Vario, this factor is sufficient, on its own, to warrant an anonymous and

partially sequestered jury.

      Second, Gioeli and Saracino are both alleged to have a history of obstructing or

attempting to obstruct justice.  Most notably, the Indictment charges Saracino with (1)

attempting to prevent John Doe #3 from testifying before the grand jury; (2) inducing John Doe

#3 to withhold testimony, records, documents, and other objects from the grand jury; and (3)

attempting to corruptly obstruct, influence, and impede the grand jury.  Accordingly, I find that

there is strong evidence to believe that Saracino has already attempted to interfere with the

current judicial process.  Again, this factor alone is sufficient to warrant an anonymous and

partially sequestered jury.  See id. at 240 ("An obstruction of justice charge, particularly one

involving jury tampering, has always been a crucial factor in our decisions regarding anonymous

juries.").

Page 5 of 20

Similarly, the Government alleges that, in 2007, Gioeli, Michael Catapano (a Colombo family captain), and others attempted to tamper with a witness whom they thought had agreed to testify against an attorney charged with, *inter alia*, promoting prostitution by the New York County District Attorney's Office.  According to CW-1, Catapano gave Gioeli the name of the witness's father and, after talking to Catapano, CW-1 believed that Gioeli was going to have someone from the Colombo family contact the father to ensure that his son would not testify.

Third, Gioeli and Saracino are alleged to be ranking members of the Colombo family (acting boss and soldier, respectively).  And, as the Government details in its motion papers, the Colombo family has a decades-long history of engaging in obstructive conduct, including jury tampering.  Most notably, in 1998, Andrew Russo and Dennis Hickey (both Colombo family members) were convicted of witness tampering, obstruction of justice, and hindering an investigation by the Federal Bureau of Investigation.  See generally United States v. Russo, 302 F.3d 37 (2d Cir. 2002).  This charge arose from a 1994 investigation.  At the time, Judge Sifton was presiding over a trial of Colombo family members and had decided to empanel an anonymous jury.  Russo was involved in an attempt to contact one of the jurors; then, when the Government began investigating Russo, he and a coconspirator hid a key witness to prevent her from being served with a grand jury subpoena.  This is only one of several examples cited by the Government where Colombo family members and associates attempted to interfere with the judicial process.  Clearly, there is strong evidence to believe that the Colombo family has the means to contact and harm jurors.  See Thomas, 757 F.2d at 1365 (upholding use of anonymous jury because "there was strong evidence of defendants' past attempts to interfere with the judicial process" and because "defendants were alleged to be part of a group that possessed the means to harm jurors").

Finally, this case has already generated media coverage. See, e.g., Mitchel Maddux, Colombo Boss Feared "Going to Hell" After Nun's Murder, N.Y. Post, May 12, 2011; John Marzulli, Thomas (Tommy Shots) Gioeli Will Have Private Viewing of Deceased Father in Courthouse Garage, N.Y. Daily News, Apr. 12, 2011; John Marzulli, Lawyer With Mobster Dad Barred From Representing Accused Cop Killer, Is Under Investigation, N.Y. Daily News, Apr. 4, 2011.  This coverage will only increase as the trial begins.  And, as the Second Circuit has recognized, "[p]re-trial publicity may militate in favor of an anonymous jury because it can 'enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public.'"  Vario, 943 F.2d at 240 (quoting United States v. Persico, 621 F. Supp. 842, 878 (S.D.N.Y. 1985)).

Based on the foregoing, it is clear that there is strong evidence to believe that the jury needs protection; the use of an anonymous and partially sequestered jury is therefore warranted. The issue thus becomes what reasonable precautions must I take to minimize the effect that this decision may have on the jurors' opinions of Gioeli and Saracino.  There are several precautionary measures available in these situations that have been approved by the Second Circuit. See Wong, 40 F.3d at 1377; United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989).  I see no need to finalize the measures at this point; rather, I will hear from the parties on how they wish to proceed in advance of *voir dire* and trial.[2]

---

[2] I do note that, at a Status Conference held on June 28, 2011, the defendants suggested (and the Government did not oppose) the use of juror questionnaires to facilitate the jury selection process and to minimize any prejudicial effect arising from juror anonymity.  The parties discussed submitting a joint questionnaire to the Court.  I therefore think it appropriate to wait until the parties have conferred with one another before making any additional rulings regarding specific precautionary measures.  The parties should submit their joint questionnaire promptly.

## II.     The Government's Motion to Admit Certain Evidence Against the Defendants

### A.  The Government's Proffered Evidence

The Government seeks to introduce evidence, through the testimony of its cooperating witnesses, that Gioeli and Saracino engaged in a variety of uncharged criminal activities while they were engaged in the racketeering conspiracy charged in Count One of the Indictment.  The Government argues that this evidence is admissible (1) to prove the existence and nature of the charged enterprise and racketeering conspiracy; and (2) because it is necessary to complete the story of the charged crimes.  Alternatively, the Government argues that this evidence is admissible, under Rule 404(b) of the Federal Rules of Evidence, as background evidence, to explain how the criminal relationships between Gioeli, Saracino, the cooperating witnesses, and their coconspirators developed, and to show identity, opportunity, or motive under Rule 404(b) of the Federal Rules of Evidence.

Specifically, the Government seeks to allow its cooperating witnesses to variously testify about the following acts:

### 1.  Murders and Murder Conspiracies

- Gioeli stated, on multiple occasions, that he was "going to hell" because he "participated in a murder in the 1980s, in which a nun was inadvertently killed."[3]

- In the summer of 1993, Paul Gulino assaulted CW-1 and Richard Greaves (a Colombo family associate).  Following the assault, CW-1 and Greaves sought and received Gioeli's authorization to kill Gulino.  They conducted surveillance of his home on numerous occasions, but Gulino was ultimately murdered by someone else.

- In the early 1990s, Joseph Miccio and CW-2 operated a "chop shop" in Brooklyn. After learning that Miccio and CW-2 accidentally stole cars that belonged to members and associates of the Gambino crime family, Gioeli ordered the cars

---

[3] According to the Government, this statement refers to the death of Veronica Zuraw on January 4, 1982.  Zuraw was a social worker at the time, but she had previously been a nun.  She was hit with fragments of a shotgun blast while inside a residence in Brooklyn.  During the shooting that led to Zuraw's death, one Colombo family soldier was killed and another was left paralyzed.

returned. When Miccio refused, "CW-1 conveyed the order to kill Miccio to CW-2." CW-2 shot and killed Miccio in the presence of a witness. Saracino advised CW-2 to kill the witness; CW-2 refused. Saracino and CW-2 disposed of the gun used to kill Miccio.

- On July 10, 1994, CW-2 murdered Carmine Gargano at the same chop shop in Brooklyn. CW-2 and Saracino (who was not otherwise involved in the murder) buried Gargano at the chop shop. Afterwards, "CW-1 and Greaves expressed concern to Gioeli that Gargano's body might be found." Gioeli, CW-2 and Richard Greaves identified a new burial site (near Gioeli's home in Farmingdale, Long Island). Saracino, CW-1, CW-2, CW-3, and Greaves exhumed the body, transported it, and re-buried it in Farmingdale.

- Sometime between August 1997 (the Dols murder) and May 1999 (the Cutolo murder), Gioeli told CW-1 that Alphonse Persico (the acting boss of the Colombo family) wanted James "Jimmy Brown" Clemenza murdered. Gioeli gave CW-1 Clemenza's address. Gioeli and CW-1 conducted surveillance of Clemenza's home, but were unable to locate him.

- After William Cutolo's murder in May 1999, Persico (who was incarcerated at the time) wanted to place CW-1 in Ralph Lombardo's crew so that CW-1 could get close to Lombardo. Persico suspected Lombardo of cooperating with the Government and Persico wanted CW-1 to kill Lombardo. Gioeli and CW-1 eventually ordered an unidentified Colombo family member to murder Lombardo, but the murder was never carried out.

## 2. Bank Burglaries and Robberies

- Gioeli, CW-1, and CW-2 agreed to burglarize a bank in Farmingdale. CW-1 and CW-2 effectuated the burglary and then went to Gioeli's residence where the three men equally divided the $20,000 stolen from the bank.

- Saracino, CW-1, CW-2, and Richard Greaves agreed to burglarize the night deposit box of a Chase Bank in Farmingdale, but abandoned the plan after they arrived at the location and found it too populated.

- Gioeli, Saracino, CW-1, CW-4, and Greaves participated in the burglary of a bank on Long Island. CW-1, CW-4, and Greaves gained entrance to the bank, but abandoned the plan after Gioeli and Saracino reported (over a radio) that an alarm had been activated (Gioeli and Saracino were acting as lookouts).

- Saracino, CW-1, CW-2, CW-4, and Greaves attempted to burglarize a night depository box on Long Island. The men were in the process of carrying out the burglary, but aborted the plan after observing a security guard.

- Saracino, CW-1, CW-2, and Greaves attempted to rob a bank in Brooklyn. The group tried to gain entrance to the bank by throwing a cinder block through its front window; however, the cinder block bounced off the window and CW-2 and Saracino fled the scene.

### 3.  Thefts of Trailer Loads

- CW-1 and CW-2 stole a trailer from a Macy's parking lot in Long Island. Gioeli arranged to lease a warehouse in Long Island to store the stolen goods.

- Saracino, CW-1, CW-2, CW-4, Greaves, and another coconspirator attempted to steal a trailer from a yard. They abandoned the attempt after the co-conspirator was unable to operate the trailer's manual shift.

- On two other occasions, CW-1, CW-2, and others stole truckloads of goods from a trucking depot in Long Island. They sold the stolen goods and shared the proceeds with Gioeli.

- Gioeli told CW-1, Greaves, and others about a truckload of leather coats parked outside a residence. Greaves and another individual stole the truck, brought it to another location, unloaded the coats, and took them to Gioeli's residence.

### 4.  Miscellaneous Burglaries and Robberies

- In January 1991, Greaves told CW-1 that Gioeli, Ennab "OJ" Awjab, and Greaves had robbed a convenience store in Massapequa, Long Island. Greaves gave CW-1 some of the proceeds from the robbery.

- In 1991, Saracino and CW-2 robbed a candy store in Brooklyn. Saracino was armed. Saracino and CW-2 stole approximately $250 from the store's register and returned to CW-1's residence. Saracino, CW-1, and CW-2 split the proceeds.

- Gioeli authorized CW-1 and Greaves to rob a drug dealer in Brooklyn. CW-1 and Greaves entered the house disguised as flower deliverymen, handcuffed the residents, and stole a safe that contained narcotics and cash. Gioeli shared in the proceeds.

- Gioeli participated in the armed robbery of a market in Long Island. Gioeli, CW-1, and Greaves followed the owners of the store after they left for the night. Greaves grabbed a bag from one of the owners, which was filled with the store's proceeds.

- Gioeli, CW-1, and Greaves agreed to rob a jewelry store in Farmingdale. Although they never completed the robbery, they did conduct surveillance of the location on at least one occasion.

- Gioeli, CW-1, CW-2, and Greaves attempted to rob Farmingdale Meats Market. During the attempt, an alarm went off and they abandoned the plan.

- Gioeli and CW-1 conspired to rob the owner of Pat's Farms in Farmingdale. They conducted surveillance at least once and also followed the owner to his residence.

- Gioeli, CW-1, and Greaves conspired to rob an armored car depot in Farmingdale. The group conducted surveillance on a few occasions, but never effectuated the robbery.

- Gioeli, CW-1, and Greaves conspired to rob an amusement park in Farmingdale. They conducted surveillance, but aborted the plan.

- Gioeli, Saracino, CW-1, and CW-4 attempted to burglarize a fur store in Long Island. Gioeli and Saracino waited outside of the store. CW-1 and CW-4 broke in to a vacant retail store next to the fur store and unsuccessfully attempted to gain access to the fur store by breaking through an adjoining wall.

- On January 25, 1996, Gioeli, Saracino, CW-1, and CW-2 burglarized a suit store in Long Island. Gioeli waited outside with a police scanner; Saracino, CW-1, and CW-2 broke into the store. They sold the stolen suits.

- In 2000, Gioeli, CW-1, and another Colombo family associate conspired to rob the owner of a Chinese food restaurant. The group conducted surveillance of the owner's residence (where Gioeli believed he kept a large sum of money), but the plan was never executed.

- In February 2003, Gioeli, CW-1, and CW-2 conspired to rob a jewelry store in Manhattan. Gioeli and CW-1 conducted surveillance of the store once; CW-1 and CW-2 also conducted additional surveillance.

## 5. Assaults

- In the early 1990s, "Gioeli told CW-1 and Greaves that they needed to run an errand for then Colombo family captain Joseph 'Jo Jo' Russo." Gioeli directed CW-1, CW-2, and Greaves to accompany him to a carting company in Huntington, Long Island, where they assaulted a man inside.

- In the early 1990s, Gioeli directed CW-1 and CW-2 to assault an individual at a meat market in Brooklyn.

- In the mid-1990s, Gioeli and CW-1 assaulted a man at a candy store in Brooklyn at the request of William Russo (a Colombo family soldier). The man owed Russo money. Prior to assaulting the man, Gioeli and CW-1 demanded that the man pay the debt.

- Gioeli once saw his daughter being harassed by her boyfriend. Gioeli directed CW-1 and CW-2 to accompany him to the boyfriend's house, where CW-2 assaulted the boyfriend.

## 6. Extortion

- Gioeli collected "protection money" from multiple business owners and an annual payment from a Colombo family associate who operated a bookmaking business. On one occasion, Gioeli had CW-1 collect the protection money.

## 7. Obstruction

- During most of the charged enterprise period, Saracino stored firearms in a stand-alone garage located on his relative's property. He stored these firearms "on behalf of the Colombo family." Several of the firearms used in the charged murders were taken from this stash. On March 4, 2005, the New York City Police Department seized nine guns from the garage. Saracino told CW-5 that he owned the firearms and attempted to persuade CW-5 to claim responsibility for them.

## 8. Narcotics Trafficking

- In 2006, Saracino recruited CW-4 and another coconspirator to help him distribute marijuana. At Saracino's instruction, CW-4 got marijuana from the coconspirator and mailed it to Colombo family associates in New York.

## 9. Illegal Gambling

- In the 1990s, Gioeli collected the proceeds from numerous "Joker Poker" machines located in Brooklyn and Long Island.

- During the 2006 and 2007 football seasons, Saracino operated a sports-betting business with CW-4 and other Colombo family associates. Saracino, CW-4, and others shared in the proceeds.

## B. Defendants' Cross-Motion for Further Information from the Government

In his opposition to the motion, Gioeli cross-moves for further information from the Government so that he can properly respond to the motion. Saracino joins in Gioeli's cross-motion. Essentially, Gioeli requests that the Government provide the specific dates, times, and locations of the acts, as well as the names of unidentified participants and victims. According to Gioeli, "neither the Court nor the defense is in a position to responsibly evaluate the

government's motion without additional information." I disagree. As set forth below, the

Government provides sufficient information to allow Gioeli and Saracino to contest (and for me

to rule on) its motion. No further information is required or necessary. Gioeli's cross-motion is

therefore denied.

C. **Existence and Nature of the Enterprise and Racketeering Conspiracy**

The Government's first argument is that the uncharged acts are admissible to prove the

existence and nature of the charged enterprise (the Colombo family) and the racketeering

conspiracy charged in Count One of the Indictment. I agree (with one exception discussed

below). It is well settled that the Government is allowed to offer uncharged criminal acts as

direct evidence of the existence, organization, nature, and membership of a charged enterprise

and racketeering conspiracy. See United States v. Baez, 349 F.3d 90, 93-94 (2d Cir. 2003);

United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997); Wong, 40 F.3d at 1378; Thai, 29 F.3d

at 812. When offered for these purposes, evidence is admissible independent of Rule 404(b).

See Miller, 116 F.3d at 682.

The one exception is CW-1's testimony that Gioeli stated (multiple times) that he was

"going to hell" because he participated in a Colombo family-related murder that resulted in a

former nun's accidental death. Uncharged criminal activity that occurs prior to the start of a

charged conspiracy is admissible as background evidence, not as direct evidence of the

conspiracy itself. See United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986). Because

the underlying murder occurred in 1982, almost ten years before the conspiracy charged in the

Indictment began, the Government cannot offer this testimony as direct evidence of the

racketeering conspiracy.[4]  Nevertheless, the testimony is still admissible as direct evidence of the enterprise because the murder allegedly involved the Colombo family.

Saracino's general argument that all of the evidence is inadmissible because the Government fails to show how the uncharged criminal acts were committed "in furtherance of the enterprise" is unavailing.  The uncharged criminal acts variously show how Gioeli, Saracino, the cooperating witnesses, and other Colombo family members and associates (1) engaged in criminal activities as a means of generating money; (2) used murder and violence to further their criminal moneymaking activities; (3) attempted to evade detection by law enforcement; (4) committed (and attempted to commit) murder and other acts of violence when directed to do so by their superiors; and (5) settled personal grievances with violence.  These are all charged hallmarks of the Colombo family.  It is clear that the criminal acts as alleged were therefore connected to and done in furtherance of the Colombo family and the racketeering conspiracy.

Gioeli and Saracino do not otherwise contest the well-settled law that evidence of uncharged criminal acts is ordinarily admissible to prove the existence, nature, organization, and membership of a charged enterprise and racketeering conspiracy.  Rather, they inform the Government and the Court that they will not be contesting some of the Government's allegations about the Colombo family and argue that these representations obviate the Government's need to offer this evidence for these purposes.[5]  These representations impact my decision as to whether the Government's evidence should be excluded under Rule 403 of the Federal Rules of

---

[4] The Government proffered at the June 28, 2011 Status Conference that the remaining uncharged criminal acts all took place during the charged racketeering conspiracy.

[5] Specifically, Gioeli and Saracino state that they will not contest the following: (1) the Colombo family enterprise exists; (2) the Colombo family has engaged in racketeering activities; (3) members of the Colombo family engaged in a conspiracy to conduct their affairs through a pattern of racketeering activity; (4) members of the Colombo family committed crimes, including murder, murder conspiracy, obstruction of justice, robberies, burglaries, sales of stolen goods, assaults, extortion, narcotics trafficking, loansharking, and illegal gambling; and (5) these activities had an effect on interstate commerce.

Evidence.  See Old Chief v. United States, 519 U.S. 172, 179, 184-85, 117 S. Ct. 644 (1997).

Accordingly, I will consider them when making that determination.

### D.  Completing the Story of the Charged Crimes

The Government also argues that some of the uncharged criminal activity completes the

story of the charged crimes.  Specifically, it argues that evidence of some of the uncharged

murders and murder conspiracies explain why Gioeli and Saracino participated in the charged

murders of Richard Greaves, Ralph Dols, and William Cutolo.  The Government's argument is

as follows.  The uncharged Gargano murder is necessary to explain why Greaves and Cutolo

were buried in Farmingdale.  In addition, Saracino and CW-2's involvement in the uncharged

Miccio and Gargano murders explains why Gioeli trusted them to participate in the charged

Greaves, Dols, and Cutolo murders.[6]  Similarly, Persico trusted Gioeli and CW-1 to participate in

the charged Cutolo murder because they had previously participated in the conspiracy to murder

Clemenza.  Then, after successfully murdering Cutolo, Persico again trusted Gioeli and CW-1

when he wanted Lombardo murdered.  Finally, the Government argues that "evidence of the

robberies, burglaries and assaults is necessary to understand how the crew operated as a unit with

Gioeli as their leader in criminal activity."

The Government argues that this evidence is admissible for these purposes under two

different legal theories.  First, the Government argues that the evidence is admissible because it

is necessary to complete the story of the charged crimes.  See United States v. Carboni, 204 F.3d

39, 44 (2d Cir. 2000).  Second, it argues that the evidence is admissible "to inform the jury of the

background of the conspiracy charged, in order to help explain how the illegal relationship

---

[6] The Government also seeks to offer evidence of the Miccio and Gargano murders to avoid the appearance of trying
to hide impeachment evidence from the jury.  This is permissible.  See United States v. Coonan, 938 F.2d 1553,
1561 (2d Cir. 1991).

between participants in the crime developed, [and] to explain the mutual trust that existed

between coconspirators." United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); see also

United States v. Diaz, 176 F.3d 52, 79-80 (2d Cir. 1999). The only practical difference is

whether the evidence is admissible independent of or pursuant to Rule 404(b). Compare United

States v. Greer, 631 F.3d 608, 614 (2d Cir. 2011) (holding that evidence that is "necessary to

complete the story of the crime on trial" is "not constrained by Rule 404(b)") with Rosa, 11 F.3d

at 333-34 (holding that evidence offered as background of a conspiracy, to explain the

development of an illegal relationship, or to explain coconspirators' mutual trust is admissible

pursuant to Rule 404(b)).

It is clear that the Government's evidence is admissible, pursuant to Rule 404(b), for the

reasons discussed in Rosa, Diaz, and a host of other Second Circuit cases.[7] The only issue is

therefore whether the evidence is also admissible, independent of Rule 404(b), because it is

necessary to complete the story of the crimes charged. For the reasons advanced by the

Government, I find that evidence of the Miccio and Gargano murders; the conspiracy to murder

Clemenza; and the robberies, burglaries, and assaults is necessary to complete the story of the

crimes charged. In contrast, the Lombardo murder conspiracy occurred after the charged

murders. Thus, it cannot be said that this uncharged act is *necessary* to explain those murders.

In so ruling, I reject Gioeli and Saracino's arguments that the charged crimes stand on

their own independent of the uncharged crimes. I believe they take far to narrow a view of the

large-scale enterprise and racketeering conspiracy charged in the Indictment. This is not a case

where defendants are charged with committing isolated or sporadic crimes with each other and

their coconspirators. Every crime Gioeli, Saracino, the cooperating witnesses, and their other

---

[7] In fact, as the Government argues, all of its uncharged crimes evidence is admissible for the reasons discussed in
Diaz and Rosa.

coconspirators committed crimes with one another necessarily explains why they committed subsequent crimes.

***

In sum, I find that: (1) all of the uncharged criminal activities are admissible as direct evidence of the Colombo family enterprise; (2) all of the uncharged criminal activities, except for Gioeli's confessions about Zuraw, are admissible as direct evidence of the racketeering conspiracy; (3) the evidence of the Miccio and Gargano murders; the Clemenza murder conspiracy; and the robberies, burglaries, and assaults are admissible to complete the story of the charged crimes; (4) the Government is permitted to question its cooperating witnesses about their involvement in the Miccio and Gargano murders to avoid the appearance of hiding impeachment evidence from the jury; and (5) all of the uncharged criminal activities are admissible, under Rule 404(b), as background evidence; to help explain how the illegal relationships between Gioeli, Saracino, the cooperating witnesses, and the other coconspirators developed; and to explain why they all trusted one another. Accordingly, it is unnecessary for me to rule on the Government's remaining alternative arguments that some of these acts are also admissible, pursuant to Rule 404(b), to prove identity, opportunity, or motive.

### E. Rule 403

Evidence that is otherwise admissible may still "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. As applied to criminal defendants, Rule 403 "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief, 519 U.S. at 180, 117 S. Ct. 644.

I find that Gioeli and Saracino's concessions about the Colombo family are insufficient to warrant excluding the Government's evidence under Rule 403 in so far as it is offered as direct proof of the charged enterprise. As an initial matter, Gioeli and Saracino are still contesting their own roles in the Colombo family enterprise. Thus, their concessions do not speak to the full weight of the Government's evidence when offered as proof of the charged enterprise.

Moreover, as the Supreme Court has affirmed, "the prosecution is entitled to prove its case by evidence of its own choice[;] . . . a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." Old Chief, 519 U.S. at 186-87, 117 S. Ct. 644; see also United States v. Salameh, 152 F.3d 88, 122 (2d Cir. 1998). In other words, "a defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense." Old Chief, 519 U.S. at 183, 117 S. Ct. 644.

Finally, the Government's evidence is separately admissible for other purposes. Accordingly, even if I were to conclude that, in light of Gioeli and Saracino's concessions, the evidence was unduly prejudicial when offered as direct proof of the enterprise, I would still conclude that the evidence was admissible, as set forth above, as direct proof of the racketeering conspiracy, to complete the story of the charged crimes, and as background evidence. Gioeli and Saracino's concessions in no way impact the relevance of the evidence when offered for these purposes.

Nevertheless, I find that the probative value of Gioeli's confessions about his role in Zuraw's death is substantially outweighed by its prejudicial effect. The incendiary nature of the act – Gioeli's alleged participation in the unintentional murder of a social worker and former nun – coupled with the sensationalized nature of Gioeli's alleged confessions are likely to unfairly

excite the jurors' emotions against Gioeli and, by association, Saracino.  See United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980).

I find that the remaining allegations of uncharged criminal activities are highly probative when offered for their permissible purposes.  They are "not especially worse or shocking" in comparison to the charged conduct.  United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006).  In fact, all of the uncharged acts involve the same or similar conduct as the charged crimes.  Moreover, any potential risk of unfair prejudice can be, if requested by Gioeli or Saracino, "satisfactorily reduced . . . with . . . thorough and carefully worded limiting instruction[s]."  Paulino, 445 F.3d at 223; see also United States v. Snype, 441 F.3d 119, 129-30 (2d Cir. 2006).  I therefore find that this evidence is not unduly prejudicial under Rule 403.[8]

This ruling is obviously made without the benefit of context, which is only available when evidence is offered at trial.  For this reason, some judges withhold making a Rule 403 determination until trial.  See, e.g., United States v. Gotti, No. 02 CR 743, 2004 U.S. Dist. LEXIS 21775, at *15-16 (S.D.N.Y. Oct. 29, 2004).  I believe the parties are entitled to such a ruling in advance of trial so that they can adequately prepare their respective cases.  That does not, however, mean that my opinion will remain the same when the Government offers its evidence of uncharged crimes at trial.  If the evidence of uncharged crimes begins to overshadow the evidence of the charged crimes, I may reconsider this ruling at trial.

---

[8] Saracino's contention that the Government's proffered evidence is unduly prejudicial as offered against him because of spillover prejudice is unavailing.  Gioeli and Saracino are both charged with engaging in the same racketeering conspiracy.  All of this evidence is therefore admissible against both of them and Saracino cannot show spillover prejudice.  See Salameh, 152 F.3d at 115.

## CONCLUSION

The Government's [1133] motion *in limine* for an anonymous and partially sequestered jury is granted. The Government's [1134] motion *in limine* to admit certain evidence against the defendants at trial is granted in part and denied in part.

**SO ORDERED.**

/s/(BMC)

_____

U.S.D.J.

Dated: Brooklyn, New York
       July 26, 2011