# CARL J. HERMAN
ATTORNEY AT LAW

443 Northfield Avenue
West Orange, New Jersey 07052
Telephone: (973) 324-1011   Facsimile: (973) 324-1133
Email: cjherman@carlherman.com   Website: www.cjhermanlaw.net
www.carljherman-criminal-lawyer.com

August 22, 2011

**VIA ECF**

Hon. Brian M. Cogan, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:   *United States v. Thomas Gioeli and Dino Saracino*
               Criminal No.: 08-cr-240 (BMC)

Dear Judge Cogan:

    On behalf of Thomas Gioeli we respectfully request to join in the motion filed on behalf of Dino Saracino (Doc. 1242).

    In addition to the factual and legal arguments submitted by Mr. Saracino, we wish to draw the Court's attention to the order of the Assistant Attorney General for Administration (No. 261-2002) regarding telephone activity records kept by the Bureau of Prisons, appended to the government's letter dated August 10, 2011 (Doc. 1216). According to this order, which was filed on April 5, 2002, and which addresses all Bureau of Prison records, "… automated records in this system are maintained on magnetic medium ordinarily for six years from the date created at which time they will be over written with new data." As such, if the MDC is using an automated (digital) recording system to capture inmate telephone calls, this regulation mandates that such digital recordings be maintained for at least a six-year period.

    As it turns out, in fact, the MDC has been utilizing a digital recording system since, at least, August of 2004. Attached to this letter is a partial transcript of a hearing which took place on August 5, 2004 before the Honorable Raymond J. Dearie in *United States v. Garland Tyree* (the matter referred to by Ms. Kellman during the status conference). The issue before Judge Dearie involved the retention and preservation of inmate telephone calls. The witness in

question was Les Owen, a staff attorney at the MCC New York who had previously served in the same position at the MDC Brooklyn. At page 95, Mr. Owen testified that the MCC utilized digital recording (as opposed to analogue reels) to capture inmate telephone conversations. During the colloquy Assistant United States Attorney Fodeman informed the court that the MDC had recently installed the same system (page 96).

The foregoing establishes that in the present case, Bova's recordings were magnetic medium and should have been preserved until overwritten with new data, which BOP states is ordinarily a six year period. But MDC has now stated that it does not follow that regulation. Rather, it affirmatively destroys the material on a six-month basis. As the government states:

> The MDC has informed us that pursuant to this order, the MDC maintains recorded inmate telephone calls for 180 days. After such time, such recorded telephone calls are purged from the computer system which maintains the calls.

*See*, Letter of AUSA James D. Gatta, dated August 10, 2011 at ECF Doc. No. 1216. Perhaps Mr. Gatta is not even aware of this policy, even that the MDC uses a digital system.

In any case, given the fact that MDC Brooklyn has willfully ignored a Department of Justice order which has been in effect since 2002, which has precluded the defense from obtaining court-ordered material in this case, the relief requested by co-defendant Saracino should be granted in this matter. Alternatively, this court should hold an evidentiary hearing to determine how it came about that this order was violated.

Thank you.

Respectfully submitted,

CARL J. HERMAN

CJH:mdr

cc:   All counsel of record (Via CM/ECF)

Page 1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------------x
     UNITED STATES OF AMERICA,
 3              Plaintiff,
                                           DOCKET#
 4
 5          versus              United States Courthouse
                                225 Cadman Plaza East
 6                              Brooklyn, N.Y.  11201
     GARLAND TYREE,
 7
                DEFENDANT.
 8
     ------------------------------------------x
 9
                                August 5,  2004
10                              10:10 a.m.
             TRANSCRIPT OF HEARING
11   Before:  HON. RAYMOND J. DEARIE,
                                DISTRICT COURT JUDGE
12
                     APPEARANCES
13
     ROSLYNN R. MAUSKOPH
14   United States Attorney - Eastern District of New York
     One Pierrepont Plaza
15   Brooklyn, New York  11201
             MORRIS FODEMAN, ESQ.
16   Assistant United States Attorney
17   ATTORNEY FOR DEFENDANT:
18   SUSAN KELLMAN, ESQ.
19
20
     Court Reporter:    ALLAN R. SHERMAN, CSR, RPR
21                      225 Cadman Plaza East Rm 374
                        Brooklyn, New York  11201
22                      Tel: (718) 260-2529  Fax: (718) 254-7237
23
24
25   Proceedings recorded by mechanical stenography, transcription
     by CAT.
```

Page 82

1 subpoena?
2  A  When.
3  Q  Between March 2004 and April 2004?
4  A  Are you saying between this?
5  Q  The first E-mail and the second E-mail.
6  A  I believe I had a conversation with Mr. Owen after I had
7  sent this E-mail which is how I found out that I was
8  incorrect.
9  Q  What was that conversation?
10 A  I had asked him what generally is done as far as when we
11 received so ordered subpoenas and he had said that we were
12 supposed to have -- someone was supposed to put a hold on it.
13 Q  And that was something you told us that you didn't do,
14 sir, right?
15 A  That's correct, I wasn't aware of it at the time and I
16 also wasn't aware what MDC Brooklyn had or had not done at the
17 time.
18 Q  None of the training that you received either from the
19 Bureau of Prisons in Philadelphia or in the MDC were you ever
20 told when you get a so ordered subpoena, that the policy of
21 the Bureau of Prisons requires that subpoena to go directly to
22 SIS?
23 A  No.
24 Q  You were never told that in any of your training?
25 A  No.

Page 83

1  Q  You now know that to have been the policy back at that
2  time?
3  A  Yes, I now know that.
4       MS. KELLMAN: I have nothing further.
5       THE COURT: Anything further?
6       MR. FODEMAN: No, your Honor.
7       THE COURT: All right, sir, step down if you would.
8  Thank you very much.
9       (Witness excused.)
10      THE COURT: My thoughts will not surprise you. I'm
11 just wondering how much more of this is there to develop.
12 I don't mind hearing the testimony, I just --
13 Who do you have here? You have this chap's boss,
14 Mr. Owen?
15      MR. FODEMAN: Mr. Owen might be able to shed a
16 little bit more light on the circumstances surrounding the
17 policy.
18      THE COURT: And the other gentleman?
19      MS. KELLMAN: He is the gentleman from SIS, although
20 he wasn't at SIS at the time although he might be able to shed
21 some light on the mechanism in place.
22      If your Honor doesn't feel the need to hear from
23 him, the government doesn't feel particularly strong.
24      THE COURT: Ms. Kellman.
25      MS. KELLMAN: If SIS wasn't ever informed of the

Page 84

1  subpoena and he wasn't there at the time, I can't see what
2  relevance his testimony has.
3       THE COURT: That doesn't mean you want their
4  assurance that there wasn't a policy in place though because I
5  don't know what the outcome of this is going to be but if it
6  were to happen again.
7       MS. KELLMAN: It sounds like the policy was in
8  place, they just didn't follow it or were aware of it.
9       THE COURT: Do you want to bring on Mr. Owen.
10 Streamline the testimony.
11      MR. FODEMAN: Absolutely.
12 LES   OWEN, having been called as a
13 witness, first being duly sworn, was examined and
14 testified as follows:
15      THE CLERK: Please be seated.
16 Would you state and spell your name for the record.
17      THE WITNESS: Les Owen, O W E N.
18      THE COURT: Thank you.
19 Welcome, Mr. Owen. I appreciate your being here.
20 Mr. Fodeman.
21      MR. FODEMAN: Thank you, your Honor.
22 DIRECT EXAMINATION
23 BY MR. FODEMAN:
24 Q  Mr. Owen, what do you do for a living?
25 A  I'm a staff attorney at the MCC New York.

Page 85

1  Q  How long have you held that position?
2  A  I've been at the MCC New York for just over three years.
3  Q  Prior to coming to the MCC, what position did you hold?
4  A  I had spent time between both the regional office in
5  Philadelphia and MDC Brooklyn.
6  Q  Both as staff attorney for the Bureau of Prisons?
7  A  Yes.
8  Q  Now do you serve in any supervisory capacity?
9  A  Yes, I do, we have sort of administratively combined the
10 two legal departments into a consolidated legal center. I'm
11 the CLC advisor.
12      THE COURT: Hold on folks, I have to take an
13 important call inside.
14      (Recess.)

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

Page 78

```
 1  time.
 2  Q  So when you say that policy, are you referring to the
 3  policy that we just spoke about or the policy that is
 4  incorporated -- is represented in Government's Exhibit 7?
 5  A  Government's Exhibit 7.
 6  Q  So you are now telling us that you didn't know the policy
 7  that was in the policy statement that said that the United
 8  States Attorney's requests have to go through the regional
 9  counsel's office, right?
10  A  I'm sorry.
11  Q  You didn't know the policy that I just read to you, is
12  that right, with respect to getting monitored telephone
13  monitored information, correct?
14  A  I said that I was aware of it but I believe that it was
15  delegated to us.
16  Q  And you were not -- at the time that you wrote this
17  letter, this E-mail to Ms. Cavanagh on March 5, 2004, you
18  weren't aware that it was Bureau of Prisons' policy to
19  maintain the tapes for 180 days or -- and no longer unless
20  they were needed for administrative or evidentiary purposes,
21  whichever was later, is that your testimony?
22  A  I was aware of the first half of it. I was aware of the
23  six months or when no longer needed for administrative or
24  evidentiary purposes.
25  Q  At the time that you wrote to Ms. Cavanagh on March 5
```

Page 79

```
 1  in response to her inquiry that your tape recordings now would
 2  only go back as far as September 5, had you had any phone
 3  conversations with her prior to these E-mails?
 4  A  No.
 5  Q  At the time that you wrote the response to her, you knew,
 6  did you not, that there had been a so ordered subpoena back
 7  in November of 2003?
 8  A  But I didn't know if anyone had done anything about it.
 9  Q  Did you ask her about it in your E-mail?
10  A  I guess not, no.
11  Q  You responded -- would it be fair to say that your
12  response to Ms. Cavanagh's inquiry was simply the subpoena is
13  overbroad and asks for any and all information and we only
14  maintain it for six months, an incorrect statement, right?
15  And we only had calls to September 5 and no reference
16  whatsoever about the tailored requests that were made by the
17  defense lawyer back in November?
18  A  Because I never received your tailored request.
19  Q  Did you say that in this E-mail?
20  A  No, I did not but I had assumed that she -- I didn't know
21  what she was doing.
22  Q  Did you ask?
23      MR. FODEMAN: Objection, argumentative.
24      THE COURT: I pretty much think we have gone as far
25  as we have to go so let's try to wrap it up.
```

Page 80

```
 1  Q  Do you recall a followup -- withdrawn.
 2      What conversation, if any, did you have --
 3      MS. KELLMAN: I'm sorry, your Honor, has this been
 4  offered, the E-mails, the March ones and the April ones?
 5      MR. FODEMAN: If it hasn't, I will offer it now.
 6      MS. KELLMAN: Those are the March 5, 2004 and
 7  April 19, 2004 E-mails.
 8      THE COURT: I thought the March were but in any
 9  event, are they collectively marked?
10      MR. FODEMAN: They are.
11      THE COURT: As?
12      What exhibit?
13      THE WITNESS: I think that it's S-4, your Honor.
14      THE COURT: No, four?
15      THE WITNESS: I think it is six.
16      MS. KELLMAN: It is six, your Honor.
17      THE COURT: So they are already in evidence.
18      MS. KELLMAN: So Exhibit 6 will be a two-page
19  document, is that right, Mr. Fodeman?
20      MR. FODEMAN: Yes.
21  Q  Do you have a copy of the April 19th E-mail in front
22  of you?
23  A  Yes, I do.
24  Q  And I'd ask you to take a look at that.
25      Between March 5th, 2004 and April 19, 2004,
```

Page 81

```
 1  what, if any, conversations did you have with Colleen Cavanagh
 2  with respect to the Garland Tyree subpoena?
 3  A  Conversations between March and between, this time you
 4  are asking?
 5  Q  Between March and April, from the first E-mail to
 6  this last E-mail.
 7  A  None.
 8  Q  No conversations?
 9  A  With the exception of this E-mail, none as far as I
10  recall.
11  Q  You had a conversation -- an E-mail in March and an
12  E-mail in April?
13  A  Correct.
14  Q  And nothing between those two, no conversations and no
15  additional E-mails?
16  A  To the best of my knowledge, I had no other conversations
17  between those two dates.
18  Q  And in the April 19th subpoena -- sorry, E-mail, do
19  you recall whether or not you informed the United States
20  Attorney that it wasn't feasible for the MDC to retain all the
21  tapes?
22  A  Yes, and I found out that I was mistaken on that.
23  Q  So that was another mistake.
24      Did you have any conversations between March and
25  April with Mr. Owen or with Reena Desai about the Garland
```

21 (Pages 78 to 81)

Page 82

1  subpoena?
2  A  When.
3  Q  Between March 2004 and April 2004?
4  A  Are you saying between this?
5  Q  The first E-mail and the second E-mail.
6  A  I believe I had a conversation with Mr. Owen after I had
7  sent this E-mail which is how I found out that I was
8  incorrect.
9  Q  What was that conversation?
10 A  I had asked him what generally is done as far as when we
11 received so ordered subpoenas and he had said that we were
12 supposed to have -- someone was supposed to put a hold on it.
13 Q  And that was something you told us that you didn't do,
14 sir, right?
15 A  That's correct, I wasn't aware of it at the time and I
16 also wasn't aware what MDC Brooklyn had or had not done at the
17 time.
18 Q  None of the training that you received either from the
19 Bureau of Prisons in Philadelphia or in the MDC were you ever
20 told when you get a so ordered subpoena, that the policy of
21 the Bureau of Prisons requires that subpoena to go directly to
22 SIS?
23 A  No.
24 Q  You were never told that in any of your training?
25 A  No.

Page 83

1  Q  You now know that to have been the policy back at that
2  time?
3  A  Yes, I now know that.
4      MS. KELLMAN: I have nothing further.
5      THE COURT: Anything further?
6      MR. FODEMAN: No, your Honor.
7      THE COURT: All right, sir, step down if you would.
8  Thank you very much.
9      (Witness excused.)
10     THE COURT: My thoughts will not surprise you. I'm
11 just wondering how much more of this is there to develop.
12     I don't mind hearing the testimony, I just --
13     Who do you have here? You have this chap's boss,
14 Mr. Owen?
15     MR. FODEMAN: Mr. Owen might be able to shed a
16 little bit more light on the circumstances surrounding the
17 policy.
18     THE COURT: And the other gentleman?
19     MS. KELLMAN: He is the gentleman from SIS, although
20 he wasn't at SIS at the time although he might be able to shed
21 some light on the mechanism in place.
22     If your Honor doesn't feel the need to hear from
23 him, the government doesn't feel particularly strong.
24     THE COURT: Ms. Kellman.
25     MS. KELLMAN: If SIS wasn't ever informed of the

Page 84

1  subpoena and he wasn't there at the time, I can't see what
2  relevance his testimony has.
3      THE COURT: That doesn't mean you want their
4  assurance that there wasn't a policy in place though because I
5  don't know what the outcome of this is going to be but if it
6  were to happen again.
7      MS. KELLMAN: It sounds like the policy was in
8  place, they just didn't follow it or were aware of it.
9      THE COURT: Do you want to bring on Mr. Owen.
10     Streamline the testimony.
11     MR. FODEMAN: Absolutely.
12 LES   OWEN, having been called as a
13 witness, first being duly sworn, was examined and
14 testified as follows:
15     THE CLERK: Please be seated.
16     Would you state and spell your name for the record.
17     THE WITNESS: Les Owen, O W E N.
18     THE COURT: Thank you.
19     Welcome, Mr. Owen. I appreciate your being here.
20     Mr. Fodeman.
21     MR. FODEMAN: Thank you, your Honor.
22 DIRECT EXAMINATION
23 BY MR. FODEMAN:
24 Q  Mr. Owen, what do you do for a living?
25 A  I'm a staff attorney at the MCC New York.

Page 85

1  Q  How long have you held that position?
2  A  I've been at the MCC New York for just over three years.
3  Q  Prior to coming to the MCC, what position did you hold?
4  A  I had spent time between both the regional office in
5  Philadelphia and MDC Brooklyn.
6  Q  Both as staff attorney for the Bureau of Prisons?
7  A  Yes.
8  Q  Now do you serve in any supervisory capacity?
9  A  Yes, I do, we have sort of administratively combined the
10 two legal departments into a consolidated legal center. I'm
11 the CLC advisor.
12     THE COURT: Hold on folks, I have to take an
13 important call inside.
14     (Recess.)

22 (Pages 82 to 85)

Page 86

1    THE COURT: Go ahead.
2    DIRECT EXAMINATION (Continued)
3    BY MR. FODEMAN:
4    Q   Mr. Owen, you were telling us that you are a supervisor
5    staff attorney, is that correct?
6    A   That's correct.
7    Q   And you mentioned that the legal departments of the MDC
8    and MCC have been combined, is that correct?
9    A   For administrative purposes, yes.
10   Q   You are the supervisor with respect to both offices?
11   A   I am.
12   Q   And you held that position in November of '03?
13   A   Yes, I did.
14   Q   And do you know an individual name Adam Johnson?
15   A   Yes, I do.
16   Q   Who is Adam?
17   A   He is a staff attorney that works for me in the MCC New
18   York.
19   Q   Do you know an individual or do you know an individual
20   named Jennifer Hanson?
21   A   Yes, I did.
22   Q   Who is Jennifer Hanson?
23   A   Jennifer Hanson is an attorney formerly assigned to the
24   MDC Brooklyn who is now in FMC Rochester, our medical center.
25   Q   I want to talk to you a little about -- obviously you are

Page 87

1    aware we're here to discuss subpoenas concerning inmates
2    telephone recorded conversations?
3    A   Yes.
4    Q   Since you've been a staff attorney, have you received --
5    withdrawn.
6        Is there a policy in place concerning how these
7    subpoenas from defense counsel should be handled?
8    A   In my about seven years in the Bureau, there is no
9    written policy that I'm aware of, it's just the standard
10   operating procedure for telephone tape recordings, the
11   requests for those, we generally move to quash when these are
12   requested for many reasons.
13   Q   Can you tell us about some of those reasons?
14   A   Going back a few years ago, it was our interpretation of
15   the wiretap statute itself which gives us the authority to
16   record and monitor inmate telephone calls that there was only
17   three listed purposes for which those calls could be released
18   or that information which was collected on wiretaps, and our
19   reading of the statute and we successfully defended it in a
20   number of courts was that defense counsel were simply not
21   authorized to obtain those recordings.
22       There has since been a case out of the District of
23   Columbia that has cast that into doubt. They basically said
24   that we are exempt from the wiretap statute, so we fall
25   outside of it, but there are still reasons oftentimes coming

Page 88

1    down to burdensomeness because a lot of times they are asking
2    for many calls as well as we feel that we have to protect the
3    privacy rights of those people who are making the telephone
4    calls on the other end, because while they may consent to
5    monitoring by the Bureau of Prisons, they understand that they
6    are speaking to an inmate, it doesn't necessarily mean that
7    they are consenting to have this made public.
8    Q   As a general proposition, you and your staff attorneys
9    move to quash defense counsel subpoenas?
10   A   Yes.
11       THE COURT: In each and every instance where they
12   seek inmate conversations?
13       THE WITNESS: Inmate conversations, yes, your Honor.
14   Q   How frequently has it come up in your experience?
15   A   Very infrequently.
16   Q   By very infrequently, in a given year, how many such
17   subpoenas might you receive?
18   A   If we receive one or two a year, that is a lot.
19   Q   With respect to law enforcement subpoenas seeking tape
20   recordings of inmate conversations, those from the U.S.
21   Attorney's Office, are these fulfilled?
22   A   Just about every day.
23   Q   And you get those on a regular basis?
24   A   Yes.
25   Q   Really the crux of the issue here is what is supposed to

Page 89

1    happen when a subpoena is served on the Bureau of Prisons
2    seeking such tape recordings?
3    A   Generally, and this is -- I can say I learned this sort
4    of on the job as our training is generally informal with
5    respect to this type of thing, day-to-day operations at the
6    prison, our general policy is to -- we review, the attorneys
7    review all subpoenas, whether from the U.S. Attorney's Office
8    or from defense counsel.
9    Q   Are they logged in in any way?
10   A   They are indeed. We log in, manual log that we log in
11   when we receive the subpoena, who is requesting the
12   information, the date and what have you. We then check
13   basically the four corners of the document to make sure that
14   it's facially valid, that it's from who it purports to be from
15   because as I understand it, there might have been situations
16   in the past that I was told where forged subpoenas were sent
17   through and released to improper parties.
18       So we check to make sure they are appropriate and
19   proper, that the person or party issuing the subpoena has
20   subpoena authority and we check for the dates with respect to
21   even with the United States Attorney's Office for telephone
22   conversations, they can not prospectively request those phone
23   calls, it can only be for past phone calls.
24       So we check for all those things, verify, sign off,
25   approve, fax it up to SIS and have them approve it.

Page 90

1  Q  SIS as I understand it is the part of the prison that is
2  responsible for maintaining these recording phone
3  conversations?
4  A  Correct.
5  Q  Are there any instructions that are associated with a
6  subpoena when it's forwarded to SIS?
7  A  It depends. With telephone conversations, the only
8  instructions I'll generally put on there for -- for the ones
9  that come from the U.S. Attorney's Office is whether or not it
10 needs to be expedited for one reason or another. Perhaps they
11 are on trial. I'll write certain notes to that degree on
12 there.
13     With respect to defense subpoenas, generally in the
14 past, defense subpoenas for telephone conversations, like I
15 said, we generally move to quash.
16 We were successful for a number of years and it
17 doesn't come up that much. More often than not with so
18 ordered subpoenas, because I think it was kind of known in the
19 defense bar that we were going to fight these and we weren't
20 going to give them up, but when it comes to so ordered, it's a
21 Court order so now it takes on a different meaning and we
22 address it accordingly, I would note on there moving to quash,
23 preserve or save these records until such time as we get a
24 ruling on the motion.
25 Q  Is that a product of some sort of written policy or is

Page 91

1  that something that you yourself realized was important to do?
2  A  No, it was the appropriate response to a Court order.
3  Q  Did you convey this or do you recall ever telling this to
4  Adam Johnson or any of the other staff attorneys prior to
5  November 2003?
6  A  No, it wasn't something that -- again, they are fairly
7  infrequent and with the new attorneys it's essentially an
8  on-the-job training scenario. They get something they have
9  not seen before, they bring it to me, we discuss it.
10     So it's not something that I would have instructed
11 them, if you ever get a subpoena that is so ordered, this is
12 what we do and I have never received any kind of training like
13 that. It was a similar on-the-job training that I learned how
14 to deal with it.
15 Q  You are obviously aware this a situation has developed in
16 connection with the subpoena in this case?
17 A  Yes.
18 Q  When did you first become aware of the problem?
19 A  Approximately this spring.
20 Q  Since that time have you pinpointed where the problem
21 occurred in this particular case?
22 A  Yes, it seems that --
23     MS. KELLMAN: I'm going to object to this kind of
24 testimony because this is -- we have it from the lawyer who
25 actually was involved except to the extent that we heard it

Page 92

1  hearsay from another witness. Now we are going to have the
2  investigative attorney who has asked everybody a lot of
3  questions, we are going to have his summary.
4      I thought the purpose of the hearing was to hear
5  from the people involved to find out not somebody's subjective
6  view of what happened but what happened.
7      THE COURT: I think we know what happened but I am
8  interested in this. And I will grant you it falls somewhat
9  outside the four corners of the hearing but I want to know
10 what is happening because I don't want it to happen again.
11 A  If I can start from the beginning. Really what it comes
12 down to is this was a mistake that arose essentially out of
13 the -- sort of a perfect storm of inexperience and our being
14 understaffed.
15     We had lost both our senior attorney and a paralegal
16 over at the MDC Brooklyn which is normally staffed with four
17 people, was left with Jen Hanson and a legal assistant
18 Mr. Cardu.
19     At the MCC New York, Adam was fairly new and we had
20 also just lost a legal assistant at the MCC New York.
21     So we were all kind of running short staffed. Jen
22 Hanson was very short staffed at MCC Brooklyn, called me and
23 said Les, I need some help. Are you guys busy? Can you help
24 us with a few things? I said absolutely. What do you need?
25 I have an issue on a litigation report, our response to

Page 93

1  complaints when we work with the U.S. Attorney's Office. And
2  I assigned Adam. I said no problem, I'll talk to Adam, have
3  him help you out. I spoke to Adam, said Jen has a few things
4  for you. Touch base with her, she will fax them to you and
5  please handle them. Jen faxed these subpoenas over. I never
6  saw them. In the process they went directly to Adam. Adam
7  was working on them and as far as I knew he did come in tell
8  me one was a -- he had a telephone tape subpoena that he moved
9  to quash and I didn't think much of it other than to say okay,
10 stay on it or whatever and that was the last I heard of it
11 until this spring when I understand that apparently Adam --
12 and not apparently I know that Adam was unaware and in fact
13 when I spoke to Jen Hanson afterwards, she was also unaware
14 there was a requirement that we preserve these tapes while we
15 were in the process of fighting these motions. And I became a
16 little disturbed, I said how is it that neither of those two
17 knew. So I called Todd Bailey, the attorney who recently left
18 there, in Washington, said were you aware and he said yeah, I
19 knew. And I said do you know why Jen never knew? He said it
20 never came up. So in essence we never had a subpoena that
21 addressed these concerns there so she never learned about it.
22 Similar situation at the MDC, it never came up. So I had
23 essentially two inexperienced attorneys who were working on
24 this and perhaps due to my lack of oversight but it wasn't
25 brought to my attention and I wasn't aware that they hadn't

Page 94

1  preserved these tapes until after the fact.
2  Q  In your practice, were you following that procedure of
3  alerting SIS to the problem?
4  A  Yes. And I actually can't remember -- I can't remember
5  in the last two or three years having had to deal with that
6  issue at MCC.
7       I do recall when I was at MDC having dealt with it
8  several times in the two and a half years that I was there in
9  -- back in '98, '99.
10      MR. FODEMAN: If I can just have a moment. I think
11 that may be all.
12      THE COURT: What is happening now?
13      From time to time you bring in new staff attorneys.
14 What is happening now so this doesn't happen again?
15      THE WITNESS: The first thing I did, I spoke to all
16 the attorneys.
17      In fact, we just have another attorney who showed
18 up, a brand new attorney who showed up a month and a half ago
19 and I sat them down, said this issue has arisen, I don't want
20 it to happen again. And I spoke to the regional counsel and
21 suggested that as part -- we have a new attorney training
22 curriculum. It's generally -- I believe it's a week of
23 training that's usually been held in D.C. in the past. With
24 cost cutting measures now they have tended to do it in
25 regional offices. And I suggested that they make this a part

Page 95

1  of that curriculum.
2       I think up to this point it hadn't been because
3  really the issue would only arise in a pretrial facility.
4       Pretrial facilities probably only comprise maybe
5  eight to 10 percent of the Bureau's facilities so it wasn't a
6  big overarching issue for new attorney training, so I
7  suggested to the regional counsel that I talk to the training
8  folks at our office of general counsel and have them place
9  this in the new attorney training.
10 Q  And I assume that you have instructed the current staff?
11 A  Yes.
12 Q  Have you discussed any of this with SIS or any of the
13 individuals there how to handle the situation?
14 A  I spoke with Mr. Coreno who is the head of the SIS
15 department at MCC and just to verify that we are on the same
16 page with it and we were. He said yeah, of course, we would
17 expect to hear from you guys that we need to save them and we
18 would.
19      There is -- we have a different capability now at
20 the MCC than the MDC does so it's actually a much easier
21 process for us with the new digital recording that we have.
22 The Bureau is still sort of in many places, Brooklyn as far as
23 I know, in the past with the analogue reels which used to make
24 it very burdensome to save those whole reels when we would ask
25 them to because they had to reuse them, they are very, very

Page 96

1  expensive. But that is not the situation at MCC. It's just a
2  matter of me calling there, writing out a subpoena hey, make
3  sure you lock these calls out so we don't lose them.
4       THE COURT: So that system you now have in place at
5  MCC?
6       THE WITNESS: Yes.
7       THE COURT: And MDC?
8       THE WITNESS: They do not have it yet. I understand
9  they are in the process.
10      MR. FODEMAN: I spoke with SIS. The person who was
11 here today told me as of the day before yesterday, they have
12 installed that system. So now they too have the ability to
13 simply lock in calls on an electronic basis and they also now
14 destroy phone calls on the exact six month basis as -- the
15 computer does it automatically unless the calls are held. So
16 there is no question as to whether something is destroyed six,
17 seven or eight months. It's automatically done as a part of
18 course.
19      I have nothing further for this witness.
20      THE COURT: Ms. Kellman, do you have anything for
21 Mr. Owen?
22      MS. KELLMAN: Just a little.
23 CROSS-EXAMINATION
24 BY MS. KELLMAN:
25 Q  Good afternoon, Mr. Owen.

Page 97

1  A  Good morning, or is it afternoon?
2  Q  We have spoken many times?
3  A  Yes.
4       THE COURT: Would you care to divulge the nature of
5  this relationship?
6       MS. KELLMAN: This week it was about marriages
7  actually.
8       THE WITNESS: Inmate marriages. I hope you found
9  that policy.
10 Q  You said that at some point it in spring of 2004 you
11 became aware of the difficulty related to this particular
12 subpoena, is that right?
13 A  Yes.
14 Q  Did you have any conversations with Ms. Cavanagh about
15 this situation?
16 A  No.
17 Q  Do you know whether -- withdrawn.
18      When you said you became aware of it, how did you
19 become aware?
20 A  Adam basically reported to me that we messed up.
21 Q  When you say we, would that be referring to himself and
22 somebody else, himself and the institution?
23 A  Our legal departments basically.
24 Q  And did you discuss with him what, if any, conversations
25 he had with Ms. Cavanagh in connection with this subpoena?

25 (Pages 94 to 97)