JM:EAG/JDG/CMP
F.#2008R00530

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                      08 CR 240 (S-6)(BMC)

THOMAS GIOELI and
DINO SARACINO,

             Defendants.

- - - - - - - - - - - - - - - X


MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION <u>IN LIMINE</u> TO ADMIT CERTAIN
<u>EVIDENCE AND PRECLUDE CERTAIN REFERENCES AT TRIAL</u>


LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
(Of Counsel)

i

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . 2

I.   The Racketeering Conspiracy Charged in Count One . . . . . 2

     A.   The Racketeering Enterprise . . . . . . . . . . . . 2

     B.   The Charged Racketeering Acts . . . . . . . . . . . 3

          1.   Charged Murders . . . . . . . . . . . . . . . 4

               a.   Murder of Frank Marasa . . . . . . . . . 4

               b.   Murders of John Minerva and
                    Michael Imbergamo . . . . . . . . . . . 5

               c.   Murder of Richard Greaves . . . . . . . 6

               d.   Murder of Ralph Dols . . . . . . . . . . 6

               e.   Murder of William Cutolo . . . . . . . . 7

          2.   Charged Murder Conspiracies

               a.   Conspiracy to Murder Orena Faction Members  8

               b.   Conspiracy to Murder Michael Burnside . . . 8

          3.   Charged Robberies

               a.   Robbery of Furs by Mina . . . . . . . . . 8

               b.   Attempted Rober of Elegan Furs . . . . . . 9

               c.   Robbery of Chemical Bank . . . . . . . . . 9

          4.   Other Charged Crimes

               a.   Extortionate Collection of Credit . . . . 10

               b.   Cocaine Distribution . . . . . . . . . . 10

               c.   Loansharking . . . . . . . . . . . . . . 10

d.   Extortion of John Doe #2 . . . . . . . .   10

e.   Obstruction of Justice . . . . . . . . .   11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . .   12

I.   The Recordings Offered by the Government
Should be Admitted Into Evidence at Trial . . . . . . .   12

A.   The Proffered Recordings . . . . . . . . . . . . .   12

1.   Consensual Recordings Made by CW-3 . . . . . .   13

2.   Consensual Recordings Made by CW-5 . . . . . .   17

3.   Consensual Recording Made by CW-6 . . . . . .   18

4.   Intercepted Telephone Calls of CW-3 . . . . .   18

B.   The Recordings are Highly Relevant and
Their Probative Value is Not Substantially
Outweighed by the Danger of Unfair Prejudice . . .   19

1.   The Recordings are Relevant . . . . . . . . .   19

2.   The Probative Value of the Recordings
is Not Substantially Outweighed by the
Danger of Unfair Prejudice . . . . . . . . .   22

C.   The Recordings Do Not Constitute
Inadmissible Hearsay . . . . . . . . . . . . . . .   23

1.   Statements Against Penal Interest . . . . . .   23

2.   Coconspirator Statements . . . . . . . . . .   24

a.   Applicable Law . . . . . . . . . . . . .   24

b.   Analysis . . . . . . . . . . . . . . . .   26

i.   Statements to CW-3 on the
Consensual Recordings . . . . . . .   26

ii.   CW-3 and Greaves' Statements
In the 1992 Telephone Calls . . . .   28

iii

iii. Urso's Statements to CW-6 . . . . . 29

iv. April Saracino's Statements to CW-5   29

II. The Recordings of 9-1-1 Calls Constitute
Exceptions to the General Bar Against Hearsay . . . . . 30

A. Present Sense Impressions . . . . . . . . . . . . 31

B. Excited Utterances . . . . . . . . . . . . . . . 32

C. The Statements Made During the 9-1-1 Call Do Not
Implicate the Confrontation Clause . . . . . . . . 33

III. The Defendants Should Be Precluded from
Referencing Gregory Scarpa Sr.'s or
Frank Sparaco's Status As Confidential Informants . . . 34

A. Scarpa's and Sparaco's Status as Informants and
Scarpa's Relationship With DeVecchio Are Not Relevant
and Any Probative Value is Substantially Outweighed
by the Danger of Unfair Prejudice . . . . . . . . . 37

1. Scarpa and Sparaco's Status as Informants and
Scarpa's Relationship with DeVecchio Are Not
Relevant . . . . . . . . . . . . . . . . . . 37

2. Any Probative Value Is Substantially Outweighed
by the Danger of Unfair Prejudice . . . . . . 39

B. Out-Of-Court Statements By Scarpa and Sparaco
Are Admissible Even When the Declarant
Was a Confidential Source . . . . . . . . . . . . 41

IV. The Defendants Should Be Precluded From Referencing The
Existence of Certain Charges Lodged Against Cooperating
Witnesses in the Initial Charging Document . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 43

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of the government's motion <u>in limine</u> (a) to permit the government to introduce certain recordings at trial in which coconspirators of the defendants discuss the charged racketeering conspiracy; (b) to permit the government to introduce recordings of 9-1-1 calls following the June 12, 1991 murder of Frank Marasa and the August 25, 1997 murder of Ralph Dols; (c) to preclude the defendants from referring to Gregory Scarpa Sr.'s and Frank Sparaco's status as confidential informants – except insofar as to permit the defendants to impeach any offered out-of-court statements – and their relationships with the Federal Bureau of Investigation ("FBI"), and (d) to preclude the defendants from referring to certain charges initially brought against two individuals who will testify as cooperating witnesses.

For the reasons set forth herein, the government's motion <u>in limine</u> should be granted.

<u>STATEMENT OF FACTS</u>

I.   <u>The Racketeering Conspiracy Charged in Count One</u>

   A.   <u>The Racketeering Enterprise</u>

      Gioeli and Saracino are charged in Count One of the sixth superseding indictment ("Indictment" or "Ind.") with racketeering conspiracy.  The Indictment charges that from approximately January 1991 through the present, the defendants and others were employed by or associated with the Colombo organized crime family of La Cosa Nostra (the "Colombo family") and "conspire[d] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of [the Colombo family] through a pattern of racketeering activity."  Ind. ¶ 16.

      The Indictment alleges that the Colombo family operated through various "crews," which consisted of a number of "made" family members (sometimes referred to as "soldiers") as well as associates.  <u>Id.</u> ¶ 2.  Each crew was headed by a captain, who in turn reported to the family hierarchy, including the "boss," who was himself assisted by an "underboss" and a "consigliere" in supervising and protecting the family's overall activities.  <u>Id.</u> ¶¶ 3-5.

      As the Indictment alleges, the "principal purpose" of the Colombo family was "to generate money for its members and associates" through a wide range of criminal activities, "including drug trafficking, extortion, illegal gambling, and

loansharking." Id. ¶ 8. To further these criminal moneymaking activities, Colombo members and associates engaged in still other crimes, some involving the use and threatened use of "physical violence, including murder." Id. In addition, "the members and associates at times used the resources of the Colombo family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the Colombo family" and that "[f]or those purposes, . . . were asked and expected to carry out, among other crimes, acts of violence, including murder and assault." Id. ¶ 9. The Indictment also alleges that "[t]he members and associates of the Colombo family engaged in conduct designed to prevent government detection[,]" conduct that included "a commitment to murdering persons, particularly members or associates of organized crime families, who were perceived as potential witnesses against members and associates of the [Colombo family]." Id. ¶ 10.

     B.   <u>The Charged Racketeering Acts</u>

     The government expects that much of the government's evidence will come in the form of testimony by six cooperating witnesses (CW-1, CW-2, CW-3, CW-4, CW-5 and CW-6). CW-1 and CW-2 commenced their cooperation with the government at separate points after being indicted with the defendants in the first superseding indictment (S-1) in 2008. CW-3, CW-4 and CW-5, who were not charged with the defendants, were also members or

associates of the Colombo family during the time period of the charged RICO conspiracy.

Each of the defendants is charged with one or more murders in connection with his membership in and association with the Colombo family.  Gioeli, who prior to his arrest held the position of "street boss" of the Colombo family, is charged with racketeering conspiracy, including the murders of Frank Marasa, John Minerva, Michael Imbergamo, Richard Greaves, Ralph Dols and William Cutolo (Count One), and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four).  Saracino, who is a soldier in the Colombo family, is charged with racketeering conspiracy, including the murders of Greaves, Dols and Cutolo (Count One) and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four). As described below, the Indictment also alleges that Gioeli and Saracino variously committed murder conspiracy, robbery, extortion, extortionate extension and collection of credit, and witness tampering.

     1.   <u>Charged Murders</u>

         i.   <u>Murder of Frank Marasa</u>

Gioeli is charged with the 1991 murder of Frank Marasa, also known as "Chestnut."  Marasa was murdered in Brooklyn, New York on June 12, 1991.  On that date, Marasa was found by New

York City Police Department officers lying shot in the street.
Marasa later died from the gun shot wounds.

Marasa was murdered in retaliation for his perceived
involvement in the murder of Colombo family associate Ennab
Awjab, also known as "OJ," on May 30, 1991.  Gioeli, then a
Colombo family soldier, authorized the murder.  After obtaining
Gioeli's permission, CW-1 and CW-3, together with then Colombo
family associate Richard Greaves, carried out the murder,
ambushing Marasa on the street.

    ii.  <u>Murders of Michael Imbergamo and John Minerva</u>

Gioeli, together with CW-1, Colombo family associate
Frank Sparaco ("Sparaco") and others, participated in the murders
of Michael Imbergamo and John Minerva on March 25, 1992.  During
the early 1990s, the Colombo family had split into two warring
factions, one loyal to the then acting family boss Victor Orena
(the "Orena faction") and the other loyal to the then "official"
boss of the family, Carmine Persico (the "Persico faction").
Gioeli was a member of the faction loyal to Persico.

On the evening of March 25, 1992, Minerva, a soldier in
the Orena faction, and Imbergamo were killed as part of the
Colombo family war.  Imbergamo was not the intended target, but
was killed simply because he was with Minerva.  Both men were
shot inside of a car parked in front of the Broadway Café,
located at 1129C Broadway in North Massapequa, New York.

### iii. Murder of Richard Greaves

Gioeli and Saracino, together with CW-1, CW-2 and CW-4, participated in the murder of Richard Greaves.  Gioeli authorized the murder.  On or about August 3, 1995, Saracino shot Greaves, a Colombo family associate, to death in Saracino's basement apartment in Brooklyn, in the presence of Gioeli, CW-1, CW-2 and CW-4.  At the direction of Gioeli and CW-1, Saracino, CW-2, CW-4, Colombo family associate Anthony Calabro and others then cleaned up the apartment and transported Greaves' body to a wooded area in Farmingdale, Long Island, where they buried him.  Greaves' body has never been recovered.

### iv. Murder of Ralph Dols

Gioeli and Saracino, together with co-defendant Joel Cacace, CW-1 and CW-2, participated in the murder of Ralph Dols on August 25, 1997.  At the time of his murder, Dols was a New York City Police Officer assigned to Police Service Area #1 in Brooklyn, New York.  He was married to the ex-wife of Cacace, who was then a powerful and high-ranking member of the Colombo family.  Cacace ordered Dols' murder; Gioeli conveyed the order to CW-1 and participated in planning the murder.

On the night of the murder, Saracino, CW-1 and CW-2 waited for Dols to return to his home in Brooklyn.  As Dols parked his car in front of his building, Saracino and CW-1 shot him multiple times.  Police officers found Dols lying gravely

wounded on the street next to his car, and Dols died a short time later from the gunshot wounds.

v.   Murder of William Cutolo

Gioeli and Saracino, together with CW-1 and CW-2, participated in the murder of William "Wild Bill" Cutolo on or about May 26, 1999.  At the time of his murder, Cutolo was the underboss of the Colombo family.  The acting boss at the time, Alphonse Persico, and administration member John DeRoss believed that Cutolo had become too powerful, and they were concerned that he would take over the crime family.[1]

On May 26, 1999, after Gioeli lured Cutolo to the vicinity of Saracino's basement apartment, CW-1 shot Cutolo to death shortly after he entered Saracino's basement apartment. Saracino, together with CW-1 and CW-2, Anthony Calabro and others, transported Cutolo's body to Farmingdale, Long Island, where they buried Cutolo.  Cutolo's body was recovered in a wooded area on October 6, 2008.  The Suffolk County Medical Examiner determined that the cause of death was homicide.

---

[1]     In December 2007, Persico and Colombo family administration member John DeRoss were convicted, after trial, of the murder of Cutolo in-aid-of racketeering, and were subsequently sentenced to mandatory life terms of imprisonment for their roles in that murder.

2.   <u>Charged Murder Conspiracies</u>

i.   <u>Conspiracy to Murder Orena Faction Members</u>

In connection with the Colombo family war, Gioeli and Saracino, together with CW-1, CW-2, both members of Gioeli's crew, Frank Sparaco ("Sparaco") and CW-3, a member of the crew of Colombo family captain Gregory Scarpa, Sr., ("Scarpa"), and others participated in a wide-ranging conspiracy to murder members of the Orena faction.  Specifically, Saracino, CW-2 and others surveilled various locations where Orena faction members, including Joseph Scopo and John Baudanza, were perceived to reside or frequent and reported the information they obtained through their surveillance to their superiors within the Colombo family.

ii.   <u>Conspiracy to Murder Michael Burnside</u>

Following the murder of Saracino's brother, Frank Saracino, in April 1998, Saracino, CW-1 and CW-4 conspired to kill Michael Burnside, the individual who they believed was responsible for Frank Saracino's murder.  In connection with this conspiracy, Saracino sought assistance from fellow Colombo family members and associates to help him find Burnside.

3.   <u>Charged Robberies</u>

a.   <u>Robbery of Furs by Mina</u>

Gioeli, CW-1 and others, participated in a violent robbery of a fur store, Furs by Mina, located at 408 Jericho

Turnpike, in Syosset, New York, on February 11, 1991.  Gioeli,
CW-1 and another individual entered Furs by Mina, posing as a
father and two sons interested in purchasing a fur for
Valentine's Day.  Once inside the store, they drew guns and then
handcuffed and forced the owner and the owner's son to the floor.
Together with others, they then filled garbage bags with fur
coats from the store and loaded the coats into vehicles that were
waiting outside.

### b.   Attempted Robbery of Elegant Furs

Gioeli also participated in an attempted robbery of
another fur store, Elegant Furs, located on Hempstead Turnpike in
Levittown, New York, on or about January 10, 1992.  While Gioeli,
CW-2 and other Colombo family associates waited outside, CW-1 and
another entered the store, posing as customers.  After gaining
entrance, CW-1 and the other individual brandished firearms and
ultimately pistol-whipped an employee.  The group then fled the
scene.

### c.   Robbery of Chemical Bank

Saracino, together with CW-2 and Greaves, participated
in the robbery of Chemical Bank, located at 2419 Hempstead
Turnpike, East Meadow, New York, on or about June 5, 1995.  At or
about 9:00 a.m. on June 5, 1995, CW-2 and Greaves stole a money
bag containing approximately $210,000 from a bank employee who
was retrieving a bag of money from the bank's night deposit

boxes.  CW-2 and Greaves fled the scene in a vehicle driven by Saracino.

### 4.  Other Charged Crimes

#### a.  Extortionate Collection of Credit

In or about 1993, at the direction of CW-1, Saracino and CW-2 attempted to collect an outstanding debt owed by John Doe #1.  Specifically, Saracino and CW-2 went to the residence of John Doe #1, chased after him and stabbed him, resulting in serious injuries to the victim.

#### b.  Cocaine Distribution

In or about 1998, prior to the murder of Saracino's brother, Frank Saracino, Saracino, Frank Saracino and others participated in a scheme to distribute cocaine.  Saracino fronted the money to Frank Saracino to purchase the cocaine.

#### c.  Loansharking

In or about and between 2002 and Saracino's arrest in June 2008, Saracino and CW-1 operated a lucrative loansharking business.  At the time of his arrest, Saracino had numerous customers and over $100,000 in outstanding loans.

#### d.  Extortion of John Doe #2

Saracino is charged with the extortion of John Doe #2. Members of the Colombo family, including Cacace, Saracino, CW-1 and others, have long required John Doe #2 to make monthly payments to them in exchange for their "allowing" John Doe #2 to

place and maintain joker poker machines in various Brooklyn establishments without risk of interference from other La Cosa Nostra families.

        e.   <u>Obstruction of Justice</u>

Saracino has attempted to obstruct the government's investigation of the Colombo family.  Commencing in or about January 2008, numerous subpoenas were served on Saracino's associates.  Aware that the individuals who were served with subpoenas had information that might assist the government in its investigation against Saracino, Saracino corruptly attempted to persuade these individuals not to provide the government with inculpatory information.

12

ARGUMENT

I.   The Recordings Offered by the Government
     Should be Admitted Into Evidence at Trial

     For the reasons set forth below, the excerpts of the
recordings proffered herein should be admitted at trial.[2]  The
recordings are relevant and the danger of unfair prejudice does
not substantially outweigh the recordings' probative value.  See
Fed. R. Evid. 401-403.  In addition, although the recordings
contain out-of-court statements offered for the truth of the
matter asserted therein, the statements are admissible as
statements against penal interest under Rule 804(b)(3) of the
Federal Rules of Evidence ("Rule 804(b)(3)"), and/or statements
made in furtherance of a conspiracy under Rule 801(d)(2)(E) of
the Federal Rules of Evidence ("Rule 801(d)(2)(E)").

     A.   The Proffered Recordings

     The government seeks to introduce (a) several excerpts
of certain recordings consensually made by CW-3 in or about and
between May 2009 and January 2011, (b) two excerpts of
recordings consensually made of April Saracino, the wife of the
defendant Saracino, by CW-5 on or about March 19 and June 23,
2008, (c) two excerpts of a recording consensually made by CW-6,
a cooperating witness who was a former captain in the Bonanno

---

[2]   A compact disk containing the proffered recordings is
enclosed as Exhibit A.  As set forth herein, draft transcripts of
the recordings are attached as Exhibits B to K.

organized crime family of La Cosa Nostra (the "Bonanno family"), on or about December 21, 2003, and (d) excerpts of telephone calls of CW-3 and his co-conspirators, including Richard Greaves (the individual with whose murder the defendants are charged), that were intercepted in or about and between April 1992 and June 1992 pursuant to a court-authorized wiretap.

1.   Consensual Recordings Made by CW-3

Between May 2009 and January 2011, CW-3, who was a long-time Colombo family associate and Gioeli's cousin, made numerous consensual recordings of members and associates of the Colombo family.  On the recordings consensually made by CW-3 that the government seeks to admit, Colombo family members and associates apprised CW-3 about the status of the Colombo family, the defendants' roles in the family, and the defendants' criminal activities committed in connection with the Colombo family.  Each of the excerpts the government seeks to admit is detailed below.

First, the government seeks to admit excerpts of recordings on which Colombo family members and associates told CW-3 about tribute money paid to Gioeli from illegal gambling operations.  For example, on one recording, Colombo family associate Roger Califano told CW-3 and Colombo family member Anthony Russo that prior to Gioeli's arrest in this case, Califano had routinely paid Gioeli $5,000 each Christmas (with the exception of one Christmas where he paid Gioeli $10,000 after

a particularly lucrative year), but that following Gioeli's arrest, another member of the Colombo family, then Colombo family underboss Benjamin "the Claw" Castellazzo had demanded $10,000 at Christmastime.  A draft transcript of an excerpt of the recording the government seeks to admit is attached to this memorandum as Exhibit B.  On another recording, Califano told CW-3 that Gioeli controlled the joker poker machines inside one of Califano's gambling establishments.  A draft transcript of an excerpt of this recording is attached as Exhibit C.  On two additional recordings, Colombo family member Reynold Maragni advised CW-3 that, after Gioeli's arrest, another Colombo family member, Joseph "Junior Lollipops" Carna, attempted to take proceeds from an illegal gambling business that were owed to Gioeli, and Maragni had to intervene.  Draft transcripts of these recording excerpts are attached as Exhibits D and E.

Second, the government seeks to admit a consensual recording made by CW-3 on July 31, 2009, on which recording Colombo family associate Walter Samperi advised CW-3 about a "sitdown" administered by defendant Gioeli and CW-1.  The following is an excerpt of the recording the government seeks to admit:

SAMPERI:  I went to a sitdown . . . .

* * *

CW-3:     Who went to go sit?

> SAMPERI:   Your cousin [a reference to
> defendant Gioeli] and ah... Skinny
> [a reference to CW-1]...
>
>            * * *
>
> SAMPERI:   No, I already knew Skinny [CW-1]
> and them [Gioeli].  But I told
> Skinny listen, it's gonna make a
> headache for you 'cause I know he
> has money on the street for you,
> this and that.  But it's not gonna
> do, it's not gonna un-ring the
> bell.  He already stabbed me.  If I
> beat him up, what's that gonna do?
> I said, "whatever," I said, "you
> want me to squash it?  As a favor
> to you I will squash it."  I could
> have been a dick about it [UI] this
> one and that one and make sure that
> I gave a beating for that.  I said,
> I said, to your cousin [Gioeli],
> "Listen, I respect you a lot and I
> want to respect you, I know you and
> uncle Teddy [Colombo family member
> Theodore Persico, Sr.], Teddy's
> [Colombo family member Theodore
> Persico, Jr.] father, are close
> friends and you and Teddy are [UI].
> So."  I said, "If you guys want me
> to shake his hand, I'll shake his
> hand."  I said, "I... I'm gonna be
> honest, I'm not happy about it, but
> I'll do it, because I respect the
> rules and you know, I'm a team
> player, you know."

A draft transcript of the full excerpt of this recording the

government seeks to admit is attached as Exhibit F.

Finally, the government seeks to admit two excerpts of

a recording on which Colombo family associate Anthony Calabro

told CW-3 about his, the defendants and their coconspirators'

participation in the murders of Richard Greaves and William

"Billy" Cutolo.  Anthony Calabro told CW-3 that he was going to

be in the "jackpot" because he "drove for Billy," a reference to

Cutolo's murder.  Calabro then explained "all the details" of

Greaves' murder, for which he was also present:

| | |
|---|---|
| CW-3: | Uh-huh.  But there's [UI] Joe Caves brought him there?  Joe Caves brought him there, right? |
| A CALABRO: | Yes.  I remember, I seen them coming in the 'vette. |
| CW-3: | Richie's 'vette, right? |
| A CALABRO: | [UI] remember right here, near the window.  Clear as day. "What you doing, Ant? What's going on?" |
| CW-3: | And he was walking [UI]... |
| A CALABRO: | "Take the 'vette." "Nah, I don't wanna." "Take the [UI], go ahead." "Nah, I don't want it [UI]." |
| CW-3: | And Dino and his brother were waiting for him in the house. His brother was waiting for him in the house. |
| A CALABRO: | All of them.  They were all waiting.  There were sitting down.  They were hanging out. Little D- |
| CW-3: | Uh huh |
| A CALABRO: | Joe Caves and Tommy [UI] |

A complete draft transcript of the two excerpts of the recording

that the government seeks to admit is attached as Exhibit G.

2. <u>Consensual Recordings Made By CW-5</u>

The government seeks to admit excerpts of recordings of statements of April Saracino, defendant Saracino's wife, to CW-5 on March 19 and June 23, 2008. On the first excerpt, April Saracino accepted a payment by CW-5 of money towards repayment of an extortionate loan Saracino had previously extended to CW-5. April Saracino told CW-5, regarding the payment, "do you want to just give it to me? Because he [Saracino] may not be around until Friday." The June 23, 2008 recording was made shortly after Saracino had been arrested by the FBI in connection with this case. On the excerpt the government seeks to admit, April Saracino told CW-5 that she "ha[d] no money" and told CW-5 that there [we]re people who ma[d]e payments to Saracino "each week." In particular, April Saracino told CW-5 about one particular loanshark customer who "owe[d] big" and "need[ed] to . . . come through." April Saracino further told CW-5 that she had "the book" of Saracino's loanshark customers "in [her] truck."[3] Draft transcripts of the excerpts of recorded conversations between CW-5 and April Saracino that the government seeks to admit are attached as Exhibits H and I.

---

[3]     A search warrant of a Jeep Cherokee automobile belonging to April Saracino executed on June 23, 2008 revealed a ledger of customers who had borrowed loanshark loans from Saracino.

3.  <u>Consensual Recording Made by CW-6</u>

The government also seeks to admit two excerpts of a recording made by CW-6, who at the time was a captain in the Bonanno family.  On the recording the government seeks to admit, Anthony Urso, a high-ranking Bonanno family member informed CW-6 that he had met with Gioeli the previous day and that Gioeli had provided a list of individuals proposed to be inducted into the Colombo family.[4]  Specifically, Urso told Targlione that "Tommy Shots," a reference to Gioeli, told him that "their captains" were "their administration" and that he had received "the whole list" from "the Colombos."  A draft transcript of the recording excerpts that the government seeks to admit is attached as Exhibit J.

4.  <u>Intercepted Telephone Calls of CW-3</u>

In addition, the government seeks to admit excerpts of telephone calls of CW-3 and the defendants' co-conspirators, which were intercepted pursuant to a court-authorized wiretap.  At the time of these calls, CW-3 was a co-conspirator of the defendants.  Specifically, the government seeks to introduce an excerpt of a recorded telephone call on which CW-1, then a Colombo family associate, and McLaughlin discussed the status of the Colombo family war.  On the excerpt, CW-1 and CW-3 used code

---

[4]   The list provided by Gioeli included Saracino, CW-2 and CW-4 as proposed Colombo family members.

words, "the movies," to discuss the participation by other members of the Persico faction in then recent murders as part of the war.  In another series of calls, intercepted on June 4, 1992, the day that an attempt was made on CW-3 as part of the Colombo family war.  CW-1 told CW-3 that CW-1 and the "cousin" [a reference to Gioeli] had been trying to get a hold of then Colombo family associate Richard Greaves, but had not been able to.  CW-1 and CW-3 then agreed to meet at a park, and in a call shortly thereafter, Greaves also agreed to meet CW-3 at the park. As CW-3 will testify, members of the Orena faction shot at CW-3 and Greaves in the park later that day.  A draft transcript of the excerpts of the recorded telephone calls that the government seeks to admit is attached as Exhibit K.

   B.   The Recordings are Highly Relevant and Their
        Probative Value is Not Substantially Outweighed
        by the Danger of Unfair Prejudice

        1.   The Recordings are Relevant

        The recordings the government seeks to admit are highly relevant to the charged offenses.  In analyzing relevancy, the Second Circuit has explained that "evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its

determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997). Indeed, the Federal Rules of Evidence establish a liberal standard of admissibility. Id. at 182-83.

The recordings also provide pertinent details that will assist the jury in understanding the charged crimes. For example, the recording of Saracino's wife's advisories, upon Saracino's arrest, about Saracino's loansharking business and the location of Saracino's loansharking records are plainly probative of Saracino's participation in the charged crimes, namely, the loansharking conspiracy charged in Count Five and alleged in Racketeering Act Fourteen. (See Ex. H). The recording of Anthony Calabro's admissions about his first-hand knowledge of the defendants' participation in the Greaves and Cutolo murders is directly probative of the murders charged in Counts Two and Four and alleged in Racketeering Acts Nine and Thirteen. (See Ex. F). In addition, the recording of CW-3 and CW-1 discussing the Colombo family war is probative of the existence of the Colombo family war and the defendants' participation in that war by conspiring to murder Orena faction members as alleged in Racketeering Act Three. (See Ex. J at 1 - 4). The recording on which CW-1 informed CW-3 that Gioeli and CW-1 had been trying to locate Greaves is probative of their (Gioeli, CW-1 and Greaves')

joint participation in criminal activity and thus, the
defendants' motive to murder Greaves (who they believed had the
potential to cooperate with law enforcement).  (See Ex. J at 7).

         The recordings are also probative of the defendants'
membership and roles in the charged racketeering enterprise, the
activities, purpose and means of the charged enterprise, and
proof that the alleged predicate racketeering acts constitute a
"pattern of racketeering activity."  For example, the recordings
on which Colombo family members and associates discuss tribute
payments to Gioeli will corroborate cooperating witness testimony
that Gioeli, given his position of authority in the enterprise,
received illegal proceeds generated by the enterprise.  (See Exs.
A, C - D).  The recording on which Colombo family associate
Samperi described a "sitdown" administered by Gioeli and CW-1
(referenced as "Skinny" on the recording) is probative of
Gioeli's participation in the enterprise.  (See Ex. E).  The
recording made by CW-6 is further probative of Gioeli's position
in the enterprise, i.e., a high-ranking member of the Colombo
family who had face-to-face meetings with high ranking members of
other organized crime families, and of his superior position to
defendant Saracino, CW-2 and CW-4 (whose names were included on
the list of individuals proposed to be inducted into the Colombo
family that Gioeli gave to Anthony Urso).  (See Ex. I).

For each of these reasons, the recordings the government seeks to admit at trial are relevant.

> 2.   The Probative Value of the Recordings is Not Substantially Outweighed by the Danger of Unfair Prejudice

The recordings' probative value is not outweighed by the danger of unfair prejudice to the defendants.  Rule 403 of the Federal Rules of Evidence ("Rule 403") provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Rule 403 is concerned with <u>unfair</u> prejudice, namely, an adverse effect "beyond tending to prove the fact or issue that justified its admission into evidence."  <u>United States v. Gelzer</u>, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting <u>United States v. Figueroa</u>, 618 F.2d 934, 943 (2d Cir. 1980)).  Such concerns are not implicated here.

The admission of the proffered recording excerpts, which are limited in duration, will not cause confusion or delay because they are straightforward and limited in scope.  In addition, their admission will not cause the defendants any unfair prejudice or mislead the jury because they are directly pertinent to the charged crimes.  Nor will the jury be asked to consider issues extraneous to the case as the recordings are

narrowly focused and relevant.  Therefore, their introduction

will have no adverse effect "beyond tending to prove the fact or

issue that justified [their] admission into evidence."  <u>Id.</u>

Accordingly, the probative value of the recordings substantially

outweighs any danger of unfair prejudice.

      C.   <u>The Recordings Do Not Constitute Inadmissible Hearsay</u>

      The recorded statements the government seeks to

introduce do not constitute inadmissible hearsay because they are

statements against penal interest, and/or statements in

furtherance of the charged conspiracy.

      1.   <u>Statements Against Penal Interest</u>

      Where a declarant is unavailable, statements made

against one's penal interests are admissible under Fed. R. Evid.

804(b)(3).  Rule 804(b)(3) excepts from the hearsay rule "[a]

statement which . . . at the time of its making . . . so far

tended to subject the declarant to civil or criminal liability

. . . that a reasonable person in the declarant's position would

not have made the statement unless believing it to be true."

      Admission of such statements "hinges on 'whether the

statement was sufficiently against the declarant's penal interest

that a reasonable person in the declarant's position would not

have made the statement unless believing it to be true.'"  <u>United</u>

<u>States v. Williams</u>, 506 F.3d 151, 155 (2d Cir. 2007) (quoting

<u>Williamson v. United States</u>, 512 U.S. 594, 603-04 (1994) (quoting

Rule 804(b)(3))) (internal quotation marks omitted).  "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context," and "[t]hus, this determination must be made on a case-by-case basis."  Id. (citations omitted).

The statements on the recordings the government seeks to admit reveal the speakers' intimate knowledge of the structure of the Colombo family, and the particular illegal activities in which certain members are involved, or the speakers' own participation in criminal activity.  Accordingly, they are plainly statements against their penal interest.[5]  See Fed. R. Evid. 804(b)(3).

2.  Coconspirator Statements

In the alternative, the recorded statements the government seeks to admit are admissible as coconspirator statements under Rule 801(d)(2)(E).

a.  Applicable Law

Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the

---

[5]    Because CW-1, CW-3, CW-6 and Anthony Russo are available to testify at trial the government does not seek to admit their statements as admissions against penal interest.  The government submits that the remaining speakers are unavailable.  Specifically, the government anticipates that Roger Califano, Reynold Maragni, Walter Samperi and Anthony Calabro would each assert their privilege against self-incrimination if subpoenaed to testify, and accordingly are unavailable.  Greaves was murdered by the defendants in 1995.

course and in furtherance of the conspiracy."  To be admissible
under Rule 801(d)(2)(E), the court must make two findings by a
preponderance of the evidence: "'first, that a conspiracy existed
that included the defendant and the declarant; and second, that
the statement was made during the course of and in furtherance of
that conspiracy.'"  United States v. Desena, 260 F.3d 150, 157-58
(2d Cir. 2001) (quoting United States v. Gigante, 166 F.3d 75, 82
(2d Cir 1999)).  "In determining whether a conspiracy existed,
the district court may consider the hearsay statement itself, but
there must be some independent corroborating evidence of the
defendant's participation in the conspiracy."  Id. at 158
(internal citations and quotation marks omitted).

        "As to the second requirement, statements made during
the course and in furtherance of a conspiracy 'must be such as to
prompt the listener . . . to respond in a way that promotes or
facilitates the carrying out of a criminal activity.'"  Gigante,
166 F.3d at 82 (quoting United States v. Maldonado-Rivera, 922
F.29 934, 958 (2d Cir. 1990)).  "This can include those
statements 'that provide reassurance, or seek to induce a
coconspirator's assistance, or serve to foster trust and
cohesiveness, or inform each other as to the progress or status
of the conspiracy.'"  Gigante, 166 F.3d at 82 (quoting Maldonado-
Rivera, 922 F.29 934 at 959).  See also United States v. Russo,
302 F.3d 37, 46 (2d Cir. 2002) (statements which "inform . . .

[coconspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of 801(d)(2)(e)").

        b.   <u>Analysis</u>

            i   Statements to CW-3 on the
               <u>Consensual Recordings</u>

Colombo family members Reynold Maragni and Anthony Russo and Colombo family associates Roger Califano, Walter Sampieri and Anthony Calabro's statements to CW-3 on consensual recordings all constitute statements in furtherance of the Colombo family conspiracy. <u>See</u> Fed. R. Evid. 801(d)(2)(E). The first requirement is satisfied because, at the time the respective statements were made, the defendants and the declarants were all members of a conspiracy, namely the Colombo family. <u>See</u>, <u>e.g.</u>, <u>United States v. Imbrieco</u>, No. 02 CR 47 (ILG), 2003 WL 1193532, at *4 (E.D.N.Y. Jan. 13, 2003) (finding that the declarant, a Genovese crime family captain, and the defendants, Genovese crime family associates, belonged to the same conspiracy because it necessarily followed that "[h]aving associated themselves with that enterprise, . . . they [the Genovese crime family associates] agreed to abide by its rules and to participate in its activities and further its objectives").

Additionally, their statements were made in furtherance of the Colombo family, thereby satisfying the second requirement.

Specifically, Maragni, Russo, Calabro, Califano and Samperi's statements to CW-3 were made to apprise CW-3, who the declarants ostensibly held in high regard due to CW-3's familial relationship with Gioeli, the former street boss of the Colombo family, of the status of the Colombo family conspiracy.  As the Second Circuit observed in Russo:

> [T]he defendant and the declarant were involved together in a conspiracy to maintain an organized crime syndicate, and the declarant's statement furthered the maintenance of the syndicate by giving associated persons information about its membership.  Such an organization cannot function properly unless its members and persons who do business with it understand its membership, leadership and structure. The operation of such a syndicate requires that information be passed among interested persons, advising them of the membership and its hierarchy.

302 F.3d at 46 (footnotes omitted).

As CW-3 will testify, the declarants enlightened CW-3 as to the affairs of Colombo family in part in an effort for CW-3 to pass on the information to Gioeli, who in his capacity as the former street boss could then intervene on the declarants' behalf.  For example, in an effort to reduce the amount of the Christmastime tribute payment Califano was required to make to the Colombo family in connection with Califano's illegal gambling business, Califano repeatedly told CW-3 and Anthony Russo, a member of the Colombo family, that he wanted a message passed to

"Tommy" [Gioeli].[6]  (See Ex. A at 2, 8).  Similarly, the declarants advised CW-3 about the rackets in which particular members, including the defendants, engaged (e.g., the defendants' participation in illegal gambling and loansharking businesses), ostensibly so that CW-3 could keep Gioeli apprised and the declarants could be rewarded for their efforts.  For example, Anthony Calabro told CW-3 that he was "in the jackpot" and was prepared to be incarcerated for his participation in the Greaves murder (i.e., he had no intention of cooperating with law enforcement).  (See Ex F at 2 - 3).  Accordingly, the declarants' statements to CW-3 on the recordings the government seeks to admit are admissible as coconspirator statements in furtherance of a conspiracy.

ii.  CW-1, CW-3 and Greaves' Statements
    in the 1992 Telephone Calls

The statements made by Greaves, CW-1 and CW-3 during the intercepted telephone calls are similarly admissible as co-conspirator statements.  During the calls, CW-1, CW-3 and Greaves (both Colombo family associates at the time) were members of the Colombo family conspiracy, and made statements in furtherance of conspiracy.  Specifically, they apprised the others about the status of the Colombo family war, including

---

[6]     Califano and Russo's statements on Exhibit B were in furtherance of the Colombo family conspiracy also in that they were designed to minimize the next annual tribute payment that Califano would be forced to pay.

recent murders committed in connection with the war (for which CW-1 and CW-3 used the code word "the movies").  (See Ex. J).

### iii. Urso's Statements to CW-6

Urso's statements to CW-6 during a conversation on December 21, 2003, in which Urso informed CW-6 that "Tommy Shots," a reference to Gioeli, who Urso said he had seen the prior day, told him that "their captains" were "their administration" and that he had received "the whole list" from "the Colombos" are similarly admissible as coconspirator statements.  (See Ex. I).  First, Urso and Gioeli were members of the same conspiracy – i.e., La Cosa Nostra, and specifically, a conspiracy to only induct as members individuals who had been approved by all of the New York City-based organized crime families of La Cosa Nostra.  While the Second Circuit has made clear that there must exist "a specific criminal conspiracy beyond the general existence of the Mafia[,] . . . this is not to say that there can never be a conspiracy comprising many different Mafia families[.]"  Gigante, 166 F.3d at 83. Rather, as there is here, there "must be a conspiracy with some specific criminal goal in addition to a general conspiracy to be members of the Mafia."  Id. at 83.

### iv. April Saracino's Statements to CW-5

April Saracino's statements to CW-5 are similarly admissible as co-conspirator statements.  April Saracino was not

only the defendant Saracino's wife, she was also a co-conspirator engaged in criminal activity with the Colombo family, namely assisting and knowingly profiting from defendant Saracino's loansharking business in connection with the Colombo family. Among other things, as CW-5 and CW-3 will testify, April Saracino (a) arranged for individuals to collect criminal proceeds for the defendant Saracino and (b) secreted records of the defendant Saracino's loansharking business.  In addition, April Saracino's statements to CW-5 on the day of Saracino's arrest constitute statements in furtherance of the charged conspiracy since she made those statements to apprise CW-5 of the status of the conspiracy and, more specifically, the location where the defendant Saracino maintained his loansharking records so that CW-5 could assist in light of Saracino's arrest that day.

II. The Recordings of 9-1-1 Calls Constitute
    Exceptions to the General Bar Against Hearsay

        The government seeks to admit two recordings of calls placed to 9-1-1 immediately following the June 12, 1991 murder of Frank Marasa and the August 25, 1997 murder of Ralph Dols.  Draft transcripts of the 9-1-1 calls, along with a compact disc containing recordings of the calls, are attached as Exhibits L and M and Exhibit N.  As detailed below, the 9-1-1 recordings the government seeks to admit constitute exceptions to the general bar against hearsay.  Specifically, with one exception, the recordings constitute present sense impressions under Rule 803(1)

of the Federal Rules of Evidence ("Rule 803(1)"), and, alternatively, excited utterances under Rule 803(2) of the Federal Rules of Evidence ("Rule 803(2)").

    A.   <u>Present Sense Impressions</u>

       Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

> The theory behind this exception is essentially twofold.  First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant.  Secondly, immediacy also greatly reduces the likelihood that the declarant will have inaccurately remembered the event in question.
>
> By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be "substantially contemporaneous" with the event in question.

<u>United States v. Mejia-Valez</u>, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).

       Because "in many, if not most, instances precise contemporaneity is not possible, . . . a slight lapse is allowable between the event perceived and the declarant's statement."  <u>Id.</u> (internal quotation marks and citation omitted).

"[T]here is no per se rule indicating what time interval is too long." Id. (citation and internal quotation marks omitted).

The statements made by the 9-1-1 callers are classic present sense impressions and courts have routinely admitted similar statements under that hearsay exception. See id. (admitting 911 call placed 18 minutes after murder); United States v. Blakey, 607 F.2d 779, 785-86 (7th Cir. 1979) (applying rule where interval was potentially 23 minutes); United States v. Obayagbona, 627 F. Supp. 329 (E.D.N.Y. 1985) (Weinstein, J.) (applying the hearsay exception where interval was 14 minutes and 25 seconds). Indeed, during the telephone calls, each of which was made within minutes of observing the respective murder, the callers described to the operator what they had perceived to occur just minutes earlier. (See Exhibit N (compact disc containing recordings)). Therefore, the 9-1-1 calls the government seeks to admit are admissible present sense impressions.

B.   Excited Utterance

The statements during the 9-1-1 calls are also admissible as excited utterances under Rule 803(2). An excited utterance is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2).

> The rationale for this hearsay exception is
> that the excitement of the event limits the
> declarant's capacity to fabricate a statement
> and thereby offers some guarantee of its
> reliability.  An excited utterance need not
> be contemporaneous with the startling event
> to be admissible under Rule 803(2).

United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998)

(citation omitted).  "The length of time between the event and

the utterance is only one factor to be taken into account in

determining whether the declarant was, within the meaning of rule

803(2), 'under the stress of excitement caused by the event or

condition.'"  United States v. Scarpa, 913 F.2d 993, 1017 (2d

Cir. 1990) (quoting Fed. R. Evid. 803(2)).

In the present case, the callers, each of whom had just

witnessed a murder, were clearly still under the stress of

excitement caused by their witnessing the murders.

C.   The Statements Made During the 9-1-1 Call
     Do Not Implicate the Confrontation Clause

Finally, introduction of the 9-1-1 calls does not

offend the Confrontation Clause of the Sixth Amendment.

"Statements admitted as excited utterances or present sense

impressions are nontestimonial and thus do not implicate the

Confrontation Clause." United States v. Harper, 2009 WL 140125,

at *4 (W.D.N.Y. Jan. 20, 2009) (citing Davis v. Washington, 547

U.S. 813, 821 (2006)) (statements made in 9-1-1 call "to describe

current circumstances requiring police assistance" were not

testimonial); United States v. Cadieux, 500 F.3d 37, 41-42 (1st

Cir. 2007) ("the statements recorded during the 911 call are nontestimonial"); <u>United States v. Thomas</u>, 453 F.3d 838, 843-44 (7th Cir. 2006) (anonymous caller's statements to the 9-1-1 operator, that "'[t]here's a dude that just got shot . . .,' and that 'the guy who shot him is still out there,'" were nontestimonial and did not implicate defendant's right to confrontation)). <u>See</u> <u>e.g.</u>, <u>Coleman v. Squilliante</u>, No. 06 Civ. 13518, 2008 WL 4452351 at *8-9 (S.D.N.Y. Oct. 2, 2008) (admission of 9-1-1 recording where caller stated "a man just jumped out and beat on his, a, another man and his wife. He beat her with a cane" did not implicate the Confrontation Clause); <u>Jackson v. Senkowski</u>, No. 03 Civ. 1965 (JG), 2007 WL 2275848, at *10 (E.D.N.Y. Aug.7, 2007) (admission of 9-1-1 recording identifying defendant as murderer did not violate Confrontation Clause).

III. The Defendants Should Be Precluded From Referencing Gregory Scarpa Sr.'s or Frank Sparaco's Status As Confidential Informants

In connection with the allegations in Racketeering Acts Five and Six, the government will establish at trial that the defendant Gioeli participated in the murders of John Minerva and Michael Imbergamo as part of the internecine war between two factions of the Colombo family in the early 1990s, one loyal to the "official" boss Carmine Persico and the other loyal to the "acting" boss Victor Orena. As detailed above, Minerva was initially aligned with members of the Persico faction but

subsequently decided to ally himself with the Orena faction,
leading members of the Persico faction, including Gioeli, to seek
revenge.  In connection with the allegations in Racketeering Act
Three, the government will introduce evidence that Gioeli and
Saracino participated in an overarching conspiracy to murder
members of the Orena faction during the Colombo family war.

     As part of the proof of the existence of the Colombo
family war and the defendants' participation in the charged
murder conspiracy and/or murders, the government may elicit
testimony from cooperating witnesses about out-of-court
statements by the late Gregory Scarpa, Sr., and Frank Sparaco.
Scarpa and Sparaco both participated in Colombo family war as
members of the Persico faction, and also served as confidential
informants of the FBI during the time of the Colombo family war.
While serving as confidential informants, both Scarpa and Sparaco
lied to the FBI about and/or misrepresented to the FBI their
involvement in murders during the Colombo family war, and Sparaco
specifically lied to the FBI about, among other things, his
participation in the Minerva and Imbergamo murders.  In addition,
there have long been allegations that Scarpa's handling agent,
Supervisory Special Agent Lindley DeVecchio, may have acted
improperly in his handling of Scarpa as an informant.

     Statements posted on a blog maintained by Thomas Gioeli
indicate that the defense may attempt to raise the

Scarpa/DeVecchio issue during trial.  The defendants may also seek to raise Sparaco's status as an informant, which to date had not been publicly disclosed.  Specifically, Scarpa is mentioned in four separate places.  See, e.g., Thomas Gioeli, "The Truth about Vincent Basciano's Trial," Alleged Mob Boss Tommy Gioeli's Voice,

http://tommygioelisvoice.blogspot.com/2011_04_01_archive.html (April 14, 2011) (last visited Sept. 12, 2011) (a redacted copy is attached as Exhibit O).  In the posts, Gioeli outlines several conspiracy theories involving Scarpa and DeVecchio and noted FBI General Counsel Valerie Caproni's alleged involvement with the matter.  See, e.g., Thomas Gioeli, "Does the FBI need any more power?," Alleged Mob Boss Tommy Gioeli's Voice,

http://tommygioelisvoice. blogspot.com/2011_07_01_archive.html (July 12, 2011) (last visited Sept. 12, 2011) ("[m]uch more of Ms. Caproni's shady exploits will be revealed at my trial.") (attached as Exhibit P).  Given the implication on the Gioeli blog that the defendants will seek to use evidence of Scarpa's relationship with DeVecchio, the government seeks an order from the Court precluding the defendants from referencing Scarpa and Sparaco's status as confidential informants during the Colombo family war, except to impeach any out-of-court statements introduced through cooperating witnesses under Federal Rule of Evidence 806.  The government also seeks an order precluding the

defendants from making any reference to Scarpa and/or Sparaco's relationships with the FBI.

   A.    Scarpa and Sparaco's Status as Informants and
         Scarpa's Relationship with DeVecchio Are Not Relevant
         and Any Probative Value is Substantially Outweighed
         by the Danger of Unfair Prejudice

As set forth below, any reference to Scarpa or Sparaco's status as confidential informants or any alleged improprieties in the relationships between Scarpa and Sparaco and the FBI has no relevance to the facts at issue and, in any event, any arguable relevance is substantially outweighed by the danger of unfair prejudice.

        1.    Scarpa and Sparaco's Status as Informants
              and Scarpa's Relationship with DeVecchio
              Are Not Relevant

Scarpa and/or Sparaco's status as confidential informants during the Colombo family war and their relationships with the FBI have no bearing on facts at issue in the trial of Gioeli and Saracino. See F.R.E. 401 (defining evidence as "relevant" only where it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). In United States v. Malpeso, 115 F.3d 155, 162 (2d Cir. 1997), a case in which members of the Orena faction were charged with war-related crimes, the Second Circuit considered the relevance of Scarpa's status as an informant and his relationship with DeVecchio, and found that the only aim in

introducing this material would be to "divert the jury's
attention from the defendants' conduct to the conduct of Scarpa."
 The Second Circuit also observed that this distraction would
serve only to "discredit the government and obtain an acquittal
based on jury nullification." Id. Accordingly, the court
ultimately found that "the Scarpa/DeVecchio evidence is of little
or no relevance to the crimes charged in [that] case." Id.

The Scarpa/DeVecchio evidence (and similarly any
evidence regarding Sparaco's relationship with the FBI) has even
less bearing in this case, where the defendants were members of
the Persico faction. That is, in prior cases, including Malpeso,
Orena faction members tried to portray the war as a personal
vendetta initiated by Scarpa with the help of then Special Agent
DeVecchio and sought to use the Scarpa/DeVecchio evidence to
prove that the Orena faction members were acting largely out of
self-defense. No similar line of attack is available here where
the defendants, who were themselves members of the Persico
faction, were on the same side as Scarpa and Sparaco, and cannot
similarly make a claim of self-defense.

In United States v. Monteleone, 257 F.3d 210 (2d Cir.
2001), three members of the Persico faction were charged with the
Colombo war related crimes, including the murders of John Minerva
and Michael Imbergamo. After their trial, Scarpa's status as a
confidential informant and his the alleged improprieties in his

relationship with DeVecchio came to light and the defendants all moved for new trials.  In considering their motions, the district court identified various arguments that may be pursued with the admission of the Scarpa/DeVecchio evidence, including casting doubt on the reliability of the investigation, denying the existence of the Colombo family war, blaming it on the government and discrediting witnesses.  <u>Monteleone</u>, 257 F.3d at 217. However, the district court only found that statements made by Scarpa to his FBI handler could be used to impeach out-of-court statements admitted pursuant a hearsay exception.  The Court should similarly so find here.[7]

> 2.   Any Probative Value is
>      Substantially Outweighed by the
>      <u>Danger of Unfair Prejudice</u>

In any event, any arguable probative value in Scarpa and Sparaco's status as confidential sources during the Colombo family war and any allegations of improprieties about the FBI's handling of Scarpa and/or Sparaco is substantially outweighed by the danger of unfair prejudice.  Rule 403's concerns about unfair

---

[7]   In that vein, the government disclosed in a letter dated October 13, 2009 that Sparaco (identified in the letter as a confidential informant) had informed the FBI about the Minerva and Imbergamo murders, and that his information was memorialized in two reports.  One report indicated that Sparaco had informed the FBI that Robert Tarantola was a shooter in the Minerva and Imbergamo murders and another report detailed that Sparaco identified Thomas Gioeli and Joseph Monteleone and two others as the shooters in double murder.  A copy of the government's October 13, 2009 letter is attached, under seal, as Exhibit Q.

prejudice – that which promotes and adverse effect "beyond
tending to prove the fact of issue that justified its admission,"
Gelzer, 50 F.3d at 1139 (see supra p. 22) – would be implicated
by references to such information.

Such references would also cause confusion and delay,
and will result in unfair prejudice to the government and mislead
the jury.  Indeed, in Malpeso and other cases, courts have not
permitted any reference to Scarpa's status as confidential
informants and the alleged improprieties as to his handling by
the FBI.  Malpeso, 115 F.3d at 163 (affirming district court's
exclusion of the evidence and finding that the "likely (and
presumably intended) effect of admitting evidence of the
Scarpa/DeVecchio issue would have been to shift the focus away
from the relevant evidence of the defendants' wrongdoing to the
tangentially related misdeeds of one government agent"); United
States v. Cutolo, 868 F. Supp 39, 41 (E.D.N.Y. 1994) (precluding,
in a case involving Orena faction defendants, reference to
whether Scarpa received information from DeVecchio as it would
have "require[d] a diversionary trial of issues of no critical or
substantial probative value in this case").  Given that the
evidence has been prohibited even at Orena faction members'
trials, members of the Persico faction like the defendants have
an even less of a basis to admit evidence regarding Scarpa,
Sparaco and the FBI.

Accordingly, any arguable probative value in Scarpa and Sparaco's status as confidential sources during the Colombo family war and any allegations of improprieties about the FBI's handling of Scarpa and/or Sparaco is substantially outweighed by the danger of unfair prejudice.

B.   Out-Of-Court Statements By Scarpa and Sparaco
      Are Admissible Even When the Declarant
      Was A Confidential Law Enforcement Source

Scarpa and Sparaco's statements to individuals who are now cooperating witnesses, notwithstanding their simultaneous status a confidential government informants, are still admissible as statements by a co-conspirator in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E).  The Second Circuit has expressly held that "statements of a government informant may still be admissible as co-conspirator non-hearsay." Monteleone, 257 F.3d at 221 (citing United States v. DeSapio, 435 F.2d 272, 282. (2d Cir. 1970)).

Indeed, in analyzing whether Scarpa's statements were properly admitted as co-conspirator statements, the Second Circuit observed:

> Membership in a criminal conspiracy and
> rendering services to the government as an
> informant are not necessarily mutually
> exclusive roles.  The status as a
> co-conspirator of one who is passing
> information to the government turns on
> whether his efforts as an agent of the
> government supplant his efforts as an agent
> of his co-conspirators.  We draw a
> distinction between a co-conspirator who

> exchanges information with the government
> while still pursuing the conspiracy's
> criminal objectives, and one whose conduct as
> a "co-conspirator" is shaped and directed by
> the desires of the government.  Scarpa falls
> squarely into the former category.

Monteleone, 257 F.3d 210 at 221-22.  Similarly, Sparaco's

objectives and actions during the Colombo family war cannot be

said to have been shaped and directed by the government.

Accordingly, the Court should allow the government to elicit at

trial statements made by Sparaco and Scarpa in furtherance of the

Colombo family war.

IV.   The Defendants Should Be Precluded From Referencing
      The Existence of Certain Charges Lodged Against
      Cooperating Witnesses In The Initial Charging Document

      The government seeks an order from the Court precluding

the defendants from referencing the fact that CW-1 and CW-3 were

respectively initially charged with the murders of Carlos Pagan

and Frank Marasa.  Specifically, the indictment in which CW-1 and

CW-3 were initially charged in federal court charged CW-1 with

the January 9, 1992 murder of Carlos Pagan and charged CW-3 with

the June 12, 1991 murder of Frank Marasa.  Upon their

cooperation, CW-1 and CW-3 denied their participation in those

respectively murders and the government thereafter entered into

cooperation agreements with each.  Because a charge in an

indictment does not itself constitute evidence, the government

respectfully submits that the defendants should not be permitted

to reference the existence of these charges.  See, e.g., United

43

<u>States v. Juwa</u>, 508 F.3d 694, 701 (2d Cir. 2007).  Such a

limitation will not prejudice the defendants because the

defendants would still be permitted to cross-examine the

defendants as to their participation in the murders - just not

the fact that the defendants were initially charged.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the

government's motion <u>in limine</u>.

Dated: Brooklyn, New York
       September 12, 2011

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

                        By:   <u>/s/Elizabeth A. Geddes</u>
                              Elizabeth A. Geddes
                              James D. Gatta
                              Cristina M. Posa
                              Assistant U.S. Attorneys