NMA:EAG/JDG/CMP
F.#2008R00530

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                         08 CR 240 (S-6)(BMC)

THOMAS GIOELI and
DINO SARACINO,

           Defendants.

- - - - - - - - - - - - - - - X

REPLY MEMORANDUM OF LAW IN SUPPORT OF
GOVERNMENT'S MOTION IN LIMINE TO ADMIT CERTAIN
EVIDENCE AND PRECLUDE CERTAIN REFERENCES AT TRIAL

                                                LORETTA E. LYNCH
                                                United States Attorney
                                                Eastern District of New York
                                                271 Cadman Plaza East
                                                Brooklyn, New York 11201

Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this reply to the memoranda filed by defendants Thomas Gioeli and Dino Saracino in opposition to the government's motion <u>in limine</u> (a) to permit the government to introduce certain recordings at trial; (b) to preclude the defendants from referring to Gregory Scarpa, Sr.'s and Frank Sparaco's status as confidential informants – except insofar as to permit the defendants to impeach any offered out-of-court statements - and their relationships with the Federal Bureau of Investigation ("FBI"), and (c) to preclude the defendants from referring to certain charges initially brought against two individuals who will testify as cooperating witnesses (<u>see</u> Gioeli Mem. of Law in Opp'n, filed Oct. 27, 2011 (Docket Entry No. 1292) ("Gioeli Br.") and Ltr. from Sam Braverman, Esq., to the Court, dated Oct. 31, 2011 (Docket Entry No. 1293) ("Saracino Br.")), and in further support of the government's <u>in limine</u> motion, which is incorporated herein by reference. (<u>See</u> Gov't Mem. of Law in Supp., filed Sept. 12, 2011 (Docket Entry No. 1249) ("Gov't Br.")). In their papers, the defendants do not oppose the government's motion to admit either the proffered recordings of telephone calls of CW-3 intercepted pursuant to a court-authorized wiretap or the proffered recordings of the 9-1-1 calls, but oppose the government's motion in all other respects.[1]

---

[1] Saracino joins in Gioeli's motion in all respects. (Saracino Br. at 1 (Saracino "incorporates all arguments and positions posited by co-counsels in their response")).

For the reasons set forth herein and in the government's opening brief, the government's motion in limine should be granted in its entirety.

ARGUMENT

I.   The Recordings Offered by the Government Should be Admitted Into Evidence at Trial

For the reasons set forth herein and in the government's motion in limine, the recorded statements proffered by the government in its moving papers constitute coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) ("Rule 801(d)(2)(E)") and/or admissions against penal interest under Federal Rule of Evidence 804(b)(3) ("Rule 804(b)(3)").[2]  The defendants' arguments to the contrary should be rejected.

---

[2]   The text of Rule 804(b)(3) quoted in Gioeli's opposition brief (see Gioeli Br. at 7), is the text of the proposed amended version of the rule, which will take effect December 1, 2011, absent action by Congress.  Under the current text of Rule 804(b)(3), "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement" are only required to admit an admission against one's penal interest offered to exculpate the accused.  In any event, the defendants are incorrect in their assertion that such corroborating circumstances are necessary to avoid offending the Confrontation Clause.  (See id.).  It is well-established that the Confrontation Clause jurisprudence does not apply to non-testimonial statements such as admissions to confidential informants.  See Crawford v. Washington, 541 U.S. 36 (2004); Davis v. Washington, 547 U.S. 813, 823-26 (2006); United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008) ("Whatever the contours of the definition of 'testimonial,' it seems clear . . . that statements against penal interest [made by a declarant to a co-conspirator] do not fall within them." (citation omitted)).

A.   Consensual Recordings Made By CW-3

    1.   Recording of Anthony Calabro

        a.   The Statements Constitute Admissions
            under Rule 804(b)(3)

In opposition to the government's motion to introduce Anthony Calabro's statements to CW-3, the defendants argue that the statements were not against Anthony Calabro's penal interest because "[Anthony Calabro] does not admit to participating in Greaves' murder other than knowledge of it, apparently after the fact."[3] (Gioeli Br. at 12). Their argument lacks merit. As set forth below and in the government's moving brief, Anthony Calabro's statements to CW-3 expose him to potential federal and state charges, including murder in-aid-of racketeering, in violation of 18 U.S.C. §§ 1959 and 2; racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); and murder, in violation of N.Y. Penal Law §§ 125.25(1) and 20.00. In addition, the statements expose Anthony Calabro to substantial potential civil liability because of his participation in the previously cited criminal charges and in obstructing justice,[4] in violation of,

---

[3] The defendants in their response do not advance an argument opposing the admission of Anthony Calabro's statement that he "drove for Billy," a reference CW-3 understood to mean that Anthony Calabro had a role in transporting the body of William Cutolo to Farmingdale, New York, where Cutolo was buried. In any event, there can be no dispute that this statement of Anthony Calabro is admissible under Rule 804(b)(3).

[4] Although the statute of limitations has passed for those crimes, Anthony Calabro is still subject to civil liability

among other statutes, 18 U.S.C. § 1503(a) and N.Y. Penal Law § 205.65.[5]  See <u>Fossyl v. Milligan</u>, 317 Fed. Appx. 467, 476-77 (6th Cir. March 18, 2009) (holding that an out-of-court statement establishing declarant's "mere presence" at a murder crime scene was properly admitted under Rule 804(b)(3) because declarant "faced potential [civil] liability . . . , which could have affected her pecuniary interests" and she "could have been charged [with] obstruction of justice, complicity, and failure to aid law enforcement").

First, Anthony Calabro's participation in criminal activity, specifically the murders of Richard Greaves and William Cutolo, is made clear by his acknowledgment that he was "in the jackpot" and was preparing to go to jail, references CW-3 understood to mean the perceived legal troubles that awaited the Colombo family, in light of the fact that, among other things, it was known by the Colombo family at the time of Anthony Calabro's statement that CW-1, CW-2 and CW-4 were cooperating with the government.  Additionally, in response to CW-3's express

---

for his actions.  <u>See</u>, <u>e.g.</u>, <u>Stubbs v. Pirzada</u>, 865 N.Y.S.2d 326 (2d Dep't 2008) (defendant is estopped from asserting statute of limitations as defense where he has wrongfully induced plaintiff to refrain from timely commencing action by deception, concealment, or other misconduct).

[5]     N.Y. Penal Law § 205.65 provides that a person is guilty of hindering prosecution in the first degree, a class D felony, "when he renders criminal assistance to a person who has committed a class A felony, knowing or believing that such person has engaged in conduct constituting a class A felony."

question, "You had nothing to do with Richie," Anthony Calabro initially misconstrued CW-3's question as asking whether CW-4 – not Anthony Calabro – was involved in the Greaves murder, but then answered, "Me?" and lowered his voice, uttering something that is not audible on the consensual recording.  The government anticipates that CW-3 will testify that CW-3 understood Anthony Calabro's statements, including those statements that are not audible on the recording, to be unequivocal admissions by Anthony Calabro that he (i) aided and abetted the Greaves murder by acting as a lookout, and (ii) played a role in transporting Cutolo's body to the site where Cutolo was buried.  For example, CW-3 understood that Anthony Calabro refused Greaves' offer to take Greaves' car because his role was to facilitate the murder by ensuring that no one entered Saracino's residence, where the murder was to be committed.  In addition, CW-3 will testify that Anthony Calabro spoke cryptically and intentionally lowered his voice when discussing the Greaves and Cutolo murders – facts that are corroborated by the recording of the conversation – which is further evidence that he was admitting his participation in serious crimes.  Moreover, Anthony Calabro also admitted that he observed then-Colombo family associate Joseph Competiello strangling Greaves and that he kicked Greaves' body,[6] statements

---

[6]     Anthony Calabro's admission to CW-3 that he observed Competiello strangling Greaves is not audible on the consensual recording.  However, the government anticipates that CW-1 and

which place Anthony Calabro not just outside the Saracino residence where Greaves was killed, but also at the murder scene itself.  Second, the government anticipates that CW-3 will testify that he understood Anthony Calabro's statements as admissions that Anthony Calabro also obstructed justice by participating in the disposal of Greaves' body and the cleanup of the residence where the murder was committed.  See United States v. Patriarca, 912 F. Supp. 596, 627 (D. Mass. 1995) (holding that "being an accessory after the fact to murder relates closely to murder" and thus, 18 U.S.C. § 1961(1) makes the crime a RICO predicate).

Furthermore, the statements are against Anthony Calabro's penal interest in that they expose him to criminal liability for his criminal association with several members and associates of the Colombo family.  Specifically, the statements clearly establish his criminal association with Greaves (a Colombo associate prior to his murder), Dino Calabro (his brother and a participant in the murder according to Anthony Calabro), Dino Saracino (his cousin and the one who fatally shot Greaves according to Anthony Calabro), Sebastiano Saracino (his cousin and a participant in the murder according to Anthony Calabro), Competiello (a participant in the murder according to Anthony

_____

CW-2 will each testify that after defendant Saracino shot Greaves, Competiello strangled Greaves.

Calabro), and Gioeli (a participant in the murder according to
Anthony Calabro), all members or associates of the Colombo
family, and his willingness to further their interests by not
disclosing to law enforcement that they had just killed Greaves.
See, e.g., United States v. Persico, 645 F.3d 85 (2d Cir. 2011)
(upholding admission of declarant's statements that he routinely
met with another high-ranking Colombo family member and that they
met at a certain location to evade surveillance by the FBI
despite the fact that "those statements would not have been
sufficient, standing alone, to convict [the declarant] of any
crime," because "they would have been probative in a criminal
trial against [the declarant] to show his membership in the
Colombo Crime Family and to support an inference that criminal
messages were passed when he and [the other member] met at that
spot.").

       b.    Defendants' Request for An Audibility Hearing

      The government acknowledges that some portions of the
recordings are not clearly audible and thus does not object to
the defendants' request for an audibility hearing. However, as
the Second Circuit explained in United States v. McDonald:

> A tape recording is not inadmissible merely
> because portions of it are inaudible. See
> United States v. Arango-Correa, 851 F.2d 54,
> 58 (2d Cir. 1988). "Unless the
> unintelligible portions are so substantial as
> to render the recording as a whole
> untrustworthy the recording is admissible,
> and the decision should be left to the sound

discretion of the judge." <u>United States v.
Bryant</u>, 480 F.2d 785, 790 (2d Cir. 1973)
(quoting <u>Monroe v. United States</u>, 234 F.2d
49, 55 (D.C. Cir. 1956)) (internal quotation
marks omitted).  If a tape recording is
probative,[7] it is preferable to admit it
even if parts are inaudible.  <u>See
Arango-Correa</u>, 851 F.2d at 58; <u>Bryant</u>, 480
F.2d at 790.

198 F.3d 235 (2d Cir. 1999).  The government respectfully submits

that the Court should review <u>in camera</u> the recording, a copy of

which was provided as the file named "Exhibit G" on Exhibit A to

the government's motion <u>in limine</u>.  <u>See also United States v.

Chiarizio</u>, 525 F.2d 289, 293 (2d Cir. 1975) ("Before either tapes

or transcripts are submitted to the jury, the judge should listen

to the tapes and examine the transcripts <u>in camera</u>, receiving

both sides' objections to the proposed evidence . . . .").

Should the Court conclude that the unintelligible portions of the

recording are not so "substantial as to render the recording as a

whole untrustworthy," <u>Bryant</u>, 480 F.2d at 790, "the proper

procedure is for the jury to receive transcripts of both sides'

versions." <u>Chiarizio</u>, 525 F.2d at 293.

    B.   <u>Remaining Consensual Recordings Made by CW-3</u>

       In opposition to the government's motion to admit the

remaining consensual recordings made by CW-3, the defendants

---

      7    The defendants do not – because they cannot – dispute
that the recording is probative as the recording will strongly
corroborate CW-3's testimony that Anthony Calabro admitted his
participation in the Greaves murder and described the way in
which the murder was committed.

primarily argue that the statements on the remaining recordings were not made in furtherance of the conspiracy. (See Gioeli Br. at 9-11). They are wrong.

In several instances, the declarant's statements were made to engender loyalty from CW-3, a longtime Colombo family associate and reputed cousin of Gioeli. For example, as the government anticipates CW-3 will testify, Maragni advised CW-3 that he did his best to assist Gioeli financially after Gioeli was incarcerated. The government anticipates that CW-3 will testify that he understood that Maragni told CW-3 about Maragni's efforts to assist Gioeli in an attempt to impress CW-3 and gain his loyalty should Maragni call on CW-3 in the future (which he did). See United States v. Maldonado-Rivera, 922 F.2d 934, 959 (2d Cir. 1990) (the standard permits introduction of a coconspirator's statements "that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy"); United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987) (coconspirator statements may be found to be "in furtherance" of the conspiracy if they "prompt the listener to respond in a way that facilitates the carrying out of criminal activity"); United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988) (noting that the standard also permits the introduction of any statement that "reasonably [can] be

interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy"). Maragni's statements also furthered the conspiracy in that Maragni was implicitly educating CW-3 on the proper respect to afford Colombo family members who are incarcerated. See id.

Contrary to Gioeli's claim (see Gioeli Br. at 9), Califano's statements to Anthony Russo, Giovanni Galluzzo and CW-3 are also plainly admissible as coconspirator statements in furtherance of the Colombo family conspiracy. As the government anticipates CW-3 will testify, Califano operated a lucrative sports-betting operation and provided a portion of the proceeds to the Colombo family in exchange for their protection. Califano advised Russo about the amount that he paid Gioeli in an attempt to limit the amount that he would have to pay Gioeli's replacement in order to continue to receive protection from the Colombo family.

C.  Consensual Recording Made by CW-5

In his opposition to the government's motion to admit the consensual recording made by CW-5 of April Saracino, the defendant Saracino states, in conclusory fashion, that "no evidence exists" that April Saracino was a co-conspirator. (Saracino Br. at 1). To the contrary, the recordings made by CW-5 of April Saracino on March 19, 2008 and June 23, 2008

10

demonstrate that April Saracino was directly involved in Dino
Saracino's loansharking operation (charged in Counts One
(Racketeering Act 14) and Five of the indictment) by assisting in
the collection of loanshark debts, and that she knowingly
profited from Saracino's loansharking business, which, in turn,
was facilitated by Saracino's Colombo family membership.

During the March 19, 2008 recording, April Saracino
accepted a payment from CW-5 in Saracino's absence, telling CW-5
that Saracino had told her what to do in case "anything
happen[ed]."  Following Saracino's arrest, on the June 23, 2008
recording, April Saracino informed CW-5 which loanshark customers
of Saracino would continue to pay their debt, inquired whether
CW-5's brother was still a loansharking customer and told CW-5
about a particular customer who "owe[d] big . . . he's got
to . . . come through."  On the same recording, April Saracino
told CW-5 that she had possession of the ledger of Saracino's
loanshark customers, so that CW-5 could assist her in collecting
Saracino's loanshark debts.

While April Saracino's statements to CW-5 on the
recordings will be corroborated by evidence such as Saracino's
loanshark ledger, the recordings by themselves demonstrate, by at
least a preponderance of the evidence, that April Saracino's
statements were in furtherance of Saracino's loansharking
business.  Accordingly, they should be admitted against Saracino

11

at trial, and, contrary to the defendant's assertion (see Saracino Br. at 2), no hearing is necessary to determine their admissibility.  See United States v. Heatley, 994 F. Supp. 483, 490 (S.D.N.Y. 1998) (Sotomayor, J.) ("the Second Circuit has expressly approved the practice of admitting [coconspirator] statements at trial subject to the government's introduction of evidence which will support the required finding [that the offered statements were made in furtherance of a conspiracy of which the defendant was part by a preponderance of evidence] under [Bourjaily v. United States, 483 U.S. 171 (1987)]").

     D.   Consensual Recording Made by CW-6

       Nor is there merit to the defendants' argument that the recording made by CW-6 of Anthony Urso and Vincent Basciano amounts to inadmissible hearsay.[8]  First, the government expects to elicit testimony from various witnesses that individuals may be inducted into an organized crime family only with the approval of the remaining New York City-based crime families and that at the time of the recording, in December 2003, Urso and Gioeli were high-ranking members of their respective crime families and thus participated in the process to approve or reject potential candidates for induction.  Thus, there is a solid factual basis

---

[8]   The defendants misidentified Salvatore Vitale as CW-6. (See Gioeli Br. at 12).  Vitale was not a party to this conversation.

for the government's contention that Urso and Gioeli were members of the same conspiracy.

Second, the narrow conspiracy to vet associates proposed for membership hardly approaches, as the defendants claim (see Gioeli Br. at 12-13), the bounds of the general conspiracy of all five New York City-based organized crime families that was rejected in United States v. Gigante, 166 F.3d 75 (2d Cir. 1999). In Gigante, the Second Circuit warned that such a broad conspiracy "would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia." The narrow conspiracy proposed by the government does not carry such risks.

Finally, the conspiracy is intertwined with the charged Colombo family conspiracy in that it directly relates to the admission into the Colombo family of Gioeli's closest associates, including Saracino and several cooperating witnesses expected to testify against Gioeli. Indeed, by passing on the proposed induction list to CW-6, part of the leadership of the Bonanno family, Urso was furthering the Colombo family criminal enterprise by enabling its growth and expansion. Thus, there is no merit to the defendants' summary allegation that the charged conspiracy "throws into question the government's allegation that, in fact, he was also involved in a different conspiracy with other alleged crime families." (Gioeli Br. at 13).

13

Moreover, even assuming <u>arguendo</u> that the statements do not constitute coconspirator statements, the statements by Urso and Basciano constitute admissions against their penal interests because they squarely implicate Urso and Basciano in a racketeering enterprise.  <u>See</u> <u>supra</u> at pp. 6-7 (citing <u>Persico</u>, 645 F.3d at 85).

II.  References to Greg Scarpa, Sr., and Frank Sparaco as
     <u>Confidential FBI Informants Should Be Precluded</u>

In their opposition to the government's motion to preclude references to Greg Scarpa, Sr.'s or Frank Sparaco's prior status as confidential informants and the relationship of each to the FBI, the defendants assert that such references should be permitted because "the jury must be made aware that Scarpa and Sparaco, as informants, do not corroborate [CW-1] and [CW-3]."  (Gioeli Br. at 19).  Moreover, the defendants contend that the defendants should also be permitted to reference the role of Scarpa's handling agent, Supervisory Special Agent Lindley DeVecchio, as well as alleged improprieties about DeVecchio's handling of Scarpa.  (<u>Id.</u> at 19-20).  Additionally, the defendants request that the Court order the government to produce any reports reflecting interviews of Sparaco.  (<u>Id.</u> at 14-15). Each of the defendants' arguments lacks merit.

The defendants claim that information about Scarpa's and Sparaco's status as informants "goes directly to assessing the credibility" of the government's trial witnesses,

specifically CW-1 and CW-3.  (Id. at 19).  The defendants state
that they do not seek to introduce such evidence "for the purpose
of arguing some attention-diverting Scarpa/DeVecchio War" (id. at
19), and summarily claim that the information is necessary for
the jury to "fully assess the facts" of the charged crimes,
including the murder of Frank Marasa, the John Minerva and
Michael Imbergamo double murder, and the conspiracy to murder
members of the Colombo family's Orena faction during the Colombo
family war.  (Id. at 17).[9]  Yet, the defendants do not set forth
a single reason why the fact that Scarpa and/or Sparaco served as
FBI confidential informants while continuing to commit crimes
such as murder without the FBI's knowledge, or how DeVecchio's
alleged improprieties in handling Scarpa could assist the jury in
assessing these charged crimes.[9]  Indeed, as set forth more fully
in the government's opening brief, such information is wholly
irrelevant and any probative value it may have is substantially

_____

[9]     As noted in the government's moving papers, defendant
Gioeli has previously made a number of statements on an internet
blog he maintains suggesting that he will seek to inject the
Scarpa/DeVecchio issue into trial in this case.  (See Gov't Br.
at 35-36).

[9]     Gioeli's suggestion that he should be permitted to
elicit evidence in support of an argument that DeVecchio may have
suppressed evidence of Scarpa's involvement in the Marasa murder
in order to shift blame from Scarpa to Gioeli (Gioeli Br. at
19-20), is baseless.  There is no evidence about which the
government is aware indicating that DeVecchio ever placed any
blame on Gioeli for the Marasa murder and a review of the
information provided by Scarpa to the FBI revealed that Scarpa
did not provide any information about the Marasa murder.

outweighed by undue prejudice, as the Second Circuit held when upholding Judge Dearie's decision to exclude evidence of the relationship between Scarpa and DeVecchio in <u>United States v. Malpeso</u>, 115 F.3d 155, 162-63 (2d Cir. 1997) ("even if the evidence were of some marginal relevance, that relevance is far outweighed by the risk of prejudice. . . . [t]he likely (and presumably intended) effect of admitting evidence of the Scarpa/DeVecchio issue would have been to shift the focus away from the relevant evidence of the defendants' wrongdoing"). Accordingly, to the extent that the defendants seek to use information provided by Scarpa and/or Sparaco in cross-examining CW-1, CW-3, or any government witness,[10] they may do so, subject to the evidentiary rules,[11] but the government respectfully submits that general references to Scarpa's and/or Sparaco's status as confidential informants (or the role of DeVecchio in handling Scarpa) beyond that circumstance should be prohibited.

---

[10]     The government disclosed certain information provided by Scarpa and/or Sparaco to the defendants pursuant to the government's obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

[11]     For example, Gioeli claims that he should be able to elicit that the information provided by Scarpa and Sparaco as confidential informants contradicts CW-1's and CW-3's anticipated testimony. (Gioeli Br. at 19). Gioeli of course may cross-examine those individuals with the information provided by Scarpa and Sparaco. Pursuant to Rules 609(b) and 802 of the Federal Rules of Evidence, he may not, however, introduce the fact that Scarpa or Sparaco made or did not make a particular statement.

16

In any event, contrary to Gioeli's claim (see Gioeli Br. at 18), Sparaco's versions of what transpired on the nights of the Minerva and Imbergamo murders are largely consistent with CW-1's anticipated testimony.  Both Sparaco and CW-1 have advised that on the night of the murders, Sparaco and CW-1 picked up the two individuals who had fatally shot Minerva and Imbergamo, while Gioeli and others were overseeing the night's events in close proximity to the scene of the murders.[12]

Finally, the defendants' contention that the government should be required to provide any recorded statements of Sparaco, ostensibly so that the defendants can impeach statements made by Sparaco to CW-1 and/or CW-3 (see Gioeli Br. at 14-15 ("the government should also be required to produce reports of its debriefing of Sparaco so the defense can determine if both [CW-1] and [CW-3] fail to corroborate additional information provided by Sparaco"), should be denied.  Rule 806 of the Federal Rules of Evidence provides that the credibility of a hearsay declarant may

_____

[12]     At trial, the government will establish the identities of those two shooters, one of whose first name is Robert.  The government notes that although one FBI written report provides that a Colombo family associate and criminal associate of Sparaco whose first name is "Robert" (hereinafter, "John Doe") was one of the two individuals who shot Minerva and Imbergamo (see Gioeli Br. at 18 (citing an October 2009 disclosure by the government to the defendants)), another written report of information provided by Sparaco during the same time frame describes this individual as "Robert LNU," i.e., Robert "Last Name Unknown."  The government respectfully submits that Sparaco likely never implicated John Doe but rather that the FBI agent who drafted the report inadvertently mischaracterized the "Robert" as John Doe.

be attacked when that declarant's hearsay statement – such as a coconspirator statement admitted under Rule 801(d)(2)(E) – has been admitted into evidence "by any evidence which would be admissible for those purposes if [the] declarant had testified as a witness."  The Second Circuit has explicitly found, however, that the disclosure obligations of the Jencks Act do not extend to require production of notes or reports for non-testifying declarants whose co-conspirator statements the government intends to introduce into evidence at trial pursuant to Rule 801(d)(2)(E).  See United States v. Shyne, 617 F.3d 103, 106-08 (2d Cir. 2010) ("[b]y its own terms the Jencks Act applies to a 'witness' who 'has testified on direct examination.'"); see also United States v. Williams-Davis, 90 F.3d 490, 513 (D.C. Cir. 1996) (same).  Accordingly, the defendants' request for recorded statements of Sparaco, a non-testifying hearsay declarant, should be denied.

III. The Defendants' Request to Inspect
     Grand Jury Minutes Is Without Merit

In opposition to the government's motion to preclude references to the fact that CW-1 and CW-2 were respectively charged previously with the murders of Carlos Pagan and Frank Marasa, the defendants request that the Court conduct an in camera inspection of the grand jury minutes supporting those

charges.[13]  (See Gioeli Br. at 22).  Stating that "it is apparent
. . . that the government has abandoned its original plan of
calling certain witnesses at trial" because they have "received
[in Section 3500 material disclosures to date] no grand jury
testimony from any witness(es) who implicate [CW-1] or [CW-2] in
the Pagan and Marasa murders," the defendants state that they are
left with the "indisputable conclusion that purportedly perjured
testimony was presented in support of the [previous superseding]
indictment" in which CW-1 and CW-2 were charged respectively with
the Pagan and Marasa murders.  (Id. at 21).  The defendants
further assert that "it is incumbent upon the government to
demonstrate to the Court that there was no misconduct – either
intentional or unintentional – associated with the grand jury
proceedings" supporting these charges or, "[a]lternatively, the
government must demonstrate that abandoning these charges has not
been for the purpose of conferring a benefit" on either
cooperating witness.  (Id. at 22).  The defendants' arguments are
without merit.

---

[13]     The government's opening brief mistakenly identified
the cooperating witnesses at issue as CW-1 and CW-3, (see Gov't'
Br. at 42-43), and the defendants' opposition papers accordingly
track that error.  (See Gioeli Br. at 20-22).  In fact, as a
review of the relevant prior superseding indictments and the
Section 3500 material provided to the defendants thus far makes
clear, CW-2 was initially charged with the Marasa murder and,
upon his cooperation, denied his participation in that murder.
CW-3, who participated in the Marasa murder, was never charged
previously in this case.

As the Supreme Court observed in <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956), "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of charge on the merits." Accordingly, review of a facially valid indictment is extremely circumscribed, <u>United States v. Williams</u>, 504 U.S. 36, 54 (1992), and "a review of grand jury minutes should not be permitted without concrete allegations of Government misconduct." <u>United States v. Leung</u>, 40 F.3d 577, 584 (2d Cir. 1994). Indeed, grand jury proceedings – which are secret and closed – "carry a presumption of regularity," <u>United States v. King</u>, No. 10 Cr. 122 (JGK), 2011 WL 1630676, at *5 (S.D.N.Y. April 27, 2011) (citing <u>Hamling v. United States</u>, 418 U.S. 87, 139 n. 23 (1974), <u>In Re Grand Jury Subpoena</u>, 103 F.3d 234, 239 (2d Cir. 1996) and Fed. R. Crim. P. 6(e)), and defendants bear the burden of proving any irregularity. <u>United States v. Corbin</u>, No. 09 CR 354 (SJF), 2009 WL 4505513, at *4 (E.D.N.Y. Dec. 1, 2009) (citations omitted). This presumption can only be overcome by "the defendant's strong showing of 'particularized need.'" <u>King</u>, 2011 WL 1630676, at *5 (quoting <u>Dennis v. United States</u>, 384 U.S. 855, 871-72 (1966)).

The defendants have not made such a strong showing of particularized need here. Indeed, the defendants do not move for any relief past <u>in camera</u> review of the grand jury minutes, and they have made no showing that the government engaged in any

misconduct, such as knowingly presenting perjurious testimony to the grand jury, and have made no claim at all regarding the underpinnings of superseding indictment S-6, which is the operative indictment in this case.  Moreover, the defendants' assertion that the government bears a burden to "demonstrate" that there was no "intentional or unintentional" misconduct in the presentation of evidence to the grand jury supporting prior indictments in this case is unsupported by case law. Accordingly, the defendants' motion for in camera inspection of the grand jury minutes supporting the previous charges faced by CW-1 and CW-2 should be denied.[14]

---

[14]     In addition, the defendants' assertion that the government must "demonstrate" that the fact that CW-1 and CW-2 have not pleaded guilty to the Pagan and Marasa murders, respectively "has not been for the purpose of conferring a benefit" on either cooperating witness, is similarly baseless. The government is aware of, and continues to comply with, its Giglio obligations with regard to each anticipated government witness and will continue to disclose all appropriate impeachment information consistent with those obligations.

CONCLUSION

For the reasons set forth above and in the government's initial moving papers, the government's motion in limine should be granted.

Dated:      Brooklyn, New York
            November 23, 2011

                                Respectfully submitted,

                                LORETTA E. LYNCH
                                United States Attorney

                        By:    /s/Elizabeth A. Geddes
                                Elizabeth A. Geddes
                                James D. Gatta
                                Cristina M. Posa
                                Assistant U.S. Attorneys