UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                  :

UNITED STATES OF AMERICA,          :

                    Plaintiff,       :      **MEMORANDUM**
                                    :      **DECISION AND ORDER**

          - against -         :      CR-08-240-2 (BMC)

                                    :

THOMAS GIOELI,                   :

                                    :

                    Defendant.      :

                                    :
-------------------------------------------------------------- X

**COGAN,** District Judge.

        Defendants Thomas Gioeli and Dino Saracino are alleged to be members of the Colombo

organized crime family of La Cosa Nostra, also known as the Mafia. They are both charged with

one count of engaging in a racketeering conspiracy and three counts of committing murder in-

aid-of racketeering. Saracino is also charged with conspiring to make an extortionate extension

of credit, prevention of testimony, withholding of testimony and records, and obstruction of

official proceeding. This Decision and Order consolidates and rules on defendants' joint motion

for sanctions and the Government's motion in limine to admit certain evidence and preclude

certain references at trial. Familiarity with the facts underlying the charges is assumed.

**I.**      **Defendants' Joint Motion for Sanctions**

        On March 10, 2010, I ordered the Metropolitan Detention Center ("MDC") to preserve

and deliver to the Clerk of the Court certain recorded telephone conversations made by inmates

Dino Calabro and Nicholas Bova. The MDC subsequently provided the Court with all the

Calabro and Bova recordings it had in its possession. For Calabro, the recordings began on

September 12, 2009 and ended on January 24, 2010; for Bova, the recordings began on September 13, 2009 and ended on March 2, 2010.

The MDC previously represented to the Court that its standard procedure is to retain audio recordings of phone calls made by its inmates for a six month period. After six months, the MDC purges the audio recordings from its system. Accordingly, the MDC purged its system of all pre-September 2009 recordings prior to receiving my March 10, 2010 Order. Gioeli and Saracino have moved for sanctions for the MDC's failure to preserve the pre-September 2009 recordings. The motion is DENIED for the following reasons.

First, the "prosecution team" did not have any constitutionally or statutorily imposed duty to preserve the Bova and Calabro recordings because it never had possession of them. The MDC, the governmental entity that possessed and subsequently destroyed the recordings, is not a member of the prosecution team. And it did not record the conversations as part of the investigation into Gioeli, Saracino, or any of their alleged conspirators. Thus, its act of purging the recordings from its system is not attributable to the prosecution. See United States v. Galestro, 06-CR-285 (ARR), 2008 U.S. Dist. LEXIS 53834, at *55-56 (E.D.N.Y. July 15, 2008); Chandras v. McGinnis, 01 Civ. 2519 (LBS), 2002 U.S. Dist. LEXIS 25188, at *20-26 (E.D.N.Y. Nov. 13, 2002); see also United States v. Merlino, 349 F.3d 144, 154-55 (3d Cir. 2003).

Second, even assuming the MDC's destruction of the recordings is attributable to the prosecution team, no sanctions are warranted. This type of claim is treated as a claim for the loss or destruction of evidence. See United States v. Bakhtiar, 994 F.2d 970, 975 (2d Cir. 1993); see also United States v. Tyree, 279 F. App'x 31, 33 (2d Cir. 2008) (summary order). And it will only rise to the level of a constitutional violation if: (1) the Government acted in bad faith when it destroyed the evidence, see Arizona v. Youngblood, 488 U.S. 51, 56-58, 109 S. Ct. 333

(1988); (2) "the evidence . . . possess[ed] an exculpatory value that was apparent before [it] was destroyed," California v. Trombetta, 467 U.S. 479, 489, 104 S. Ct. 2528 (1984); and (3) the defendant is "unable to obtain comparable evidence by other reasonably available means," id.

Here, there is nothing to suggest that the MDC acted in bad faith when it purged the Calabro and Bova recordings from its system. In destroying the recordings, the MDC acted pursuant to standard procedures, which are based on its interpretation of AAG/A Order No. 261-2002 (the "AAG Order"). See 67 Fed. Reg. 16762. I see nothing unreasonable about the MDC's interpretation of the AAG Order. As an initial matter, a "majority of [Bureau of Prisons ('BOP')] facilities" adhere to the same procedures. And, even if the MDC incorrectly interpreted its obligations under the AAG Order, a BOP-wide misinterpretation of an internal order of the Department of Justice is insufficient, without more, to demonstrate bad faith on the part of the MDC. See Youngblood, 488 U.S. at 56 n.*, 109 S. Ct. 333 (noting that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed"). In other words, the MDC's general policy and its application of that policy do not evidence bad faith.

Similarly, there is nothing to suggest that the recordings possessed an exculpatory value that was apparent before they were destroyed. This was not a situation where the MDC engaged in targeted monitoring of its inmates phone activities for the purposes of furthering a criminal investigation. The MDC had no reason to suspect that the Bova and Calabro recordings contained exculpatory information.[1]

---

[1] In this regard, it is important to note that, although defendants' motion addresses both the Calabro and Bova recordings, defendants are primarily interested in Bova's recordings as it is their position that Calabro surreptitiously used Bova's phone account to engage in criminal activities while incarcerated. There is nothing to suggest that the MDC was, or reasonably should have been, aware of Calabro's unauthorized use of Bova's phone account.

Finally, defendants' rights under the Confrontation Clause have not been violated. They are free to cross-examine Calabro about his surreptitious use of Bova's phone account to the extent permitted by the Federal Rules of Evidence.[2] And, even assuming the recordings did contain exculpatory or impeachment evidence,[3] their destruction does not rise to the level of a Confrontation Clause violation. See Pennsylvania v. Ritchie, 480 U.S. 39, 53, 107 S. Ct. 989 (1987) (four-Justice plurality) (noting that "the right to confrontation is a trial right," not "a constitutionally compelled rule of pretrial discovery"); but see id. at 61 (Blackmun, J., concurring in part and concurring in judgment) (rejecting notion that "the Confrontation Clause protects only a defendant's trial rights and has no relevance to pretrial discovery"); id. at 66-67 (Brennan, J., dissenting) (same).

## II.   The Government's Motion In Limine To Admit Certain Evidence

The Government moves to admit 14 recordings at trial: six consensual recordings made by CW-3, two consensual recordings made by CW-5, one consensual recording made by CW-6, three intercepted phone calls obtained as a result of a wiretap on CW-3's telephone, and two 911 calls. It seeks to admit these recordings as either (1) direct evidence of the charged crimes; or (2) proof of "defendants' membership and roles in the charged racketeering enterprise, the activities, purpose and means of the charged enterprise, and proof that the alleged predicate racketeering acts constitute a 'pattern of racketeering activity.'"

---

[2] Gioeli has provided the Court with a good faith basis to believe that Calabro used Bova's and an unidentified inmate's phone account to engage in criminal activities. Specifically, he relies on recently disclosed § 3500 material, in which Calabro told the government that he used Bova's account to call his wife, that he also called his brothers and other individuals, and that his wife would send money to other inmates' commissary accounts in exchange for them allowing Calabro access to their phone accounts. These notes, in addition to demonstrating defendants good faith basis to question Calabro during trial, also support my holding that the MDC's act of destroying the recordings in the first instance cannot be imputed to the prosecution team. The notes are dated June 4, 2010. There is nothing to suggest that the prosecution team was aware of Calabro's use of other inmates' phone accounts during the relevant time period – pre-September 2009.

[3] I again reiterate that no such showing has been made.

Gioeli opposes the admissibility of the six consensual recordings made by CW-3 and the one consensual recording made by CW-6. He does not challenge the admissibility of the other recordings. Saracino joins Gioeli's opposition. He also separately opposes the admissibility of the two consensual recordings made by CW-5.[4]

Gioeli and Saracino do not dispute that the challenged recordings are relevant, nor do they claim that they should be excluded under Rule 403 of the Federal Rules of Evidence. Rather, they argue that the challenged recordings are inadmissible hearsay that do not fit within any of the recognized exemptions or exceptions to the hearsay rule. The Government variously contends that the recordings are admissible pursuant to the exemption to the hearsay rule for coconspirator statements or the exception to the hearsay rule for statements against penal interest.

### A. Coconspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence excludes from the definition of hearsay statements offered against a party if they were "made by the party's coconspirator during and in furtherance of the conspiracy." For a statement to fit within this exemption, "a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy."[5] United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999). Pursuant to the Rule, "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). Although the party offering the statement bears the burden of proof, "statements proffered as

---

[4] Because neither Gioeli nor Saracino oppose the admissibility of the three intercepted phone calls or the two 911 calls, the government is allowed to introduce those recordings at trial.

[5] These two requirements are sometimes broken down into four. See United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993).

coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence." United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993).

"The gist of conspiracy is, of course, agreement." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989). To support its claim that defendants and the declarants were engaged in a conspiracy, the Government must establish that they "entered into a joint enterprise with the consciousness of its general nature and extent." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 137-38 (2d Cir. 2008) (internal quotation marks omitted). This does not require "evidence of an explicit agreement; proof of a tacit understanding will suffice." United States v. Vargas, 986 F.2d 35, 39 (2d Cir. 1993) (internal quotation marks omitted). And, although a conspiracy must have a common purpose, the participant's goals do not need to be congruent; they cannot, however, have "cross purposes." Beech-Nut Nutrition Corp., 871 F.2d at 1191-92 (internal quotation marks omitted).

Statements are "in furtherance of a conspiracy" when they "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001) (internal quotation marks omitted). "The statements need not be commands, but are admissible if they provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id. (internal quotation marks omitted). Similarly, "statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994). Nevertheless, to be "in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." Desena, 260 F.3d at 158; see

also Thai, 29 F.3d 813 (noting that "statements that are merely 'idle chatter' or that are 'entirely retrospective' are not in furtherance of the conspiracy").

## B. **Statements Against Penal Interest**

Rule 804(b)(3)(A) provides an exception to the hearsay rule for "statement[s] that a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to . . . criminal liability." A particular statement meets the "tendency" requirement "if it would be probative in a trial against the declarant." United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted).[6] Although courts can only determine "[w]hether a challenged statement is sufficiently self-inculpatory . . . by viewing it in context," United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007), it is clear that "non-self-inculpatory statements" are not admissible as statements against penal interest "even if they are made within a broader narrative that is generally self-inculpatory," Williamson v. United States, 512 U.S. 594, 600-01, 114 S. Ct. 2431 (1994).

In addition, where, as here, the statement "is offered in a criminal case as one that tends to expose the declarant to criminal liability," it must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).[7] The proponent of the statement bears the burden of demonstrating sufficient corroboration. See United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006). Specifically, the Government "must

---

[6] Persico interpreted Rule 804(b)(3) as it was written prior to the 2010 amendments. Although the 2010 amendments slightly changed the wording of the Rule, the quoted language is still controlling. See Fed. R. Evid. 804, Notes of Advisory Committee on 2010 amendments.

[7] This is the text of the current version of Rule 804(b)(3)(B), which became effective on December 1, 2010. Prior to that amendment, the corroborating circumstances requirement only applied when a defendant offered a hearsay statement under this exception to exculpate himself in a criminal case; the amendment modified this lopsided approach and made the requirement applicable "to all declarations against penal interest offered in criminal cases." Rule 804, Notes of Advisory Committee on 2010 amendments.

point 'to evidence that corroborates both the declarant's trustworthiness and the truth of the statement.'" Id. (quoting United States v. Lumpkin, 192 F.3d 280, 287 (2d Cir. 1999)).

Finally, the applicability of this exception is contingent on the declarants being unavailable as witnesses. See Fed. R. Evid. 804. A witness is unavailable if he has died, see Fed. R. Evid. 804(a)(4), or if he invokes his Fifth Amendment privilege against self-incrimination, see United States v. Jackson, 335 F.3d 170, 177 (2d Cir. 2003).[8]

## C. General Observations

Before discussing the individual recordings, I must make three general observations about the Government's motion. First, as noted above, the contents of the alleged coconspirator statements are insufficient, on their own, to support a finding that Rule 801(d)(2)(E) applies to the challenged recordings. Because I only have the recordings before me, I am unable, at this time, to make sufficient findings that would warrant application of the coconspirator exemption to the hearsay rule. Accordingly, the purpose of this Decision and Order is to exclude statements under this exemption that I find clearly do not meet the requirements of the Rule and to identify those statements that I believe, with the proper showing, will ultimately be admissible as coconspirator statements. Those latter statements are therefore deemed admissible "on a conditional basis, subject to the later submission of the necessary evidence." Tracy, 12 F.3d at 1199.[9]

---

[8] Gioeli correctly notes that the statements made on the recordings are not "testimonial" within the meaning of Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). Accordingly, the Confrontation Clause is not implicated by their introduction. See Davis v. Washington, 547 U.S. 813, 823-26, 126 S. Ct. 2266 (2006); see also United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008).

[9] I decline to grant defendants' request to hold a pre-trial hearing to definitively determine the admissibility of some of the recordings offered under this exemption. Such a proceeding would likely amount to a truncated version of the government's anticipated eight-week trial and would unduly delay the current schedule, which has already been adjourned twice at the behest of defendants.

Second, in its opening memorandum, the Government claimed that the following declarants are unavailable based on its anticipation that, if called to testify, they would invoke their privilege against self-incrimination: (1) Roger Califano; (2) Reynold Maragni; (3) Walter Samperi; and (4) Anthony Calabro. Although they did not explicitly concede this point, defendants did not argue that Califano, Maragni, Samperi, or Calabro were available to testify, thereby implicitly acknowledging their status as unavailable witnesses. I have therefore assumed, for purposes of this Decision and Order, that defendants concede Califano, Maragni, Samperi, and Calabro's unavailability. Should defendants seek to subsequently challenge any of the declarants' unavailability, I note that the Government will have to make some type of showing to support its current position. See United States v. Williams, 927 F.2d 95, 99 (2d Cir. 1991). The parties should be able to work this out because it would be a waste of time to conduct a closed hearing in which a witness was called for the sole purpose of establishing that he would invoke.

Third, as discussed above, before it can rely on the penal interest exception to the hearsay rule, the Government bears the burden of demonstrating sufficient corroboration. Except in one instance noted below, I do not believe that showing has been properly made on the current motion. Thus, to the extent that I deem certain statements admissible as against the declarant's penal interest, such rulings are conditioned on the Government providing sufficient corroboration. This must be done outside the hearing of the jury and before the statements are admitted. Defendants will, of course, be given an opportunity to be heard further if and when the Government makes its showing.

### D. **Consensual Recordings Made By CW-3**

CW-3 is an associate of the Colombo family and Gioeli's relative. The Government seeks to admit six consensual recordings he made between November 4, 2009 and December 14, 2010. Both Gioeli and Saracino were already incarcerated at the time these recordings were made. The recordings variously capture Roger Califano (an alleged Colombo family associate), Anthony Russo (an alleged Colombo family member), Reynold Maragni (an alleged Colombo family member), Walter Samperi (an alleged Colombo family associate), and Anthony Calabro (an alleged Colombo family associate).

### 1. **Exhibit B**

In Exhibit B, Califano is talking about an operation he runs, which the Government claims involves illegal gambling. According to Califano, prior to Gioeli's arrest in June 2008, Califano used to pay Gioeli $5,000 every Christmas from the proceeds of the operation. The year before Gioeli was arrested, however, Califano had a lucrative year, so he paid Gioeli $10,000, essentially as a gift or a bonus. After Gioeli's arrest, his replacement (Benjamin "the Claw" Castellazzo) found out that Califano had paid Gioeli $10,000 the year before and demanded $10,000 in 2008. Califano paid the $10,000 that year and was complaining to Russo and CW-3 about having to do so again in 2009. Russo told Califano that he would try to take care of the problem – i.e., he would try to make it so that Califano only had to pay Castellazzo the customary $5,000 that year.

It appears as if the Government will be able to prove that Califano, Gioeli, and Russo were all members of a gambling conspiracy – Califano ran the operation, Gioeli benefitted by receiving an annual payment from the operation's proceeds, and Russo inserted himself into the conspiracy by offering to intercede on Califano's behalf. Moreover, the statements appear to be

in furtherance of that conspiracy in two respects. First, according to the Government, CW-3 will testify that Califano told him about his problems with Castellazzo so that CW-3 could pass a message about the situation along to Gioeli, who would be able to intercede on Califano's behalf. If CW-3 so testifies, and I find him to be a credible witness on this issue, then Califano's statements to CW-3 would be in furtherance of the gambling conspiracy between Gioeli and Califano because Califano would be seeking to use CW-3 as a conduit to update Gioeli on the status of the conspiracy and to potentially obtain a benefit from Gioeli. See Thai, 29 F.3d at 813-14.

Second, even if Califano was not seeking to have CW-3 pass a message to Gioeli, it appears from the recording that Califano was seeking Russo's help, or, at least, that upon hearing of Califano's troubles, Russo decided to offer his assistance in the matter. This affected and advanced the successful functioning of the gambling conspiracy and therefore furthered that conspiracy. Nevertheless, the draft transcript provided by the Government contains superfluous statements that have nothing to do with this conspiracy. Thus, only the following portions of the recording are admissible as coconspirator statements: page 2, line 1 through page 7, line 19 and page 8, lines 7 through 23.[10]

In so ruling, I reject Gioeli's vague contention that the statements cannot concern a conspiracy of which he was a part because they were made after his arrest.[11] To be sure, "once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within this exemption." United States v. Nerlinger, 862 F.2d 967, 974 (2d Cir. 1988). But to withdraw from a conspiracy, a conspirator must take "affirmative action . . . to disavow or defeat the

---

[10] All references to page and line numbers are references to the government's draft transcripts of the recordings, which it annexed to its motion.

[11] Gioeli makes a cursory reference to this issue once in his argument section (but only when arguing against the admissibility of Exhibit C) and once in his preliminary statement.

purpose of the conspiracy." Id. (internal quotation marks omitted).  In other words, the mere fact

that a conspirator is arrested does not ipso facto mean that he has withdrawn from the

conspiracy.  See United States v. Massino, 546 F.3d 123, 137 (2d Cir. 2008); see also United

States v. Flaharty, 295 F.3d 182, 192-93 (2d Cir. 2002).  Rather, "whether a coconspirator's

imprisonment constitutes a withdrawal must be decided . . . in light of the length and location of

the internment, the nature of the conspiracy, and any other available evidence."  Flaharty, 295

F.3d at 192-93 (internal quotation marks omitted); see also United States v. Persico, 832 F.2d

705, 715-16 (2d Cir. 1987).

Here, it certainly seems plausible that the Government will be able to adduce evidence

showing Gioeli's continued participation in the conspiracy even after his arrest.  Notably,

Califano asks why no one is "go[ing] to [Gioeli]" to find out the truth – i.e., that he normally

pays $5,000 per year.  Similarly, the Government claims that CW-3 will testify that Califano

wanted him to pass a message to Gioeli.  This suggests that Gioeli still played a role in the

conspiracy even from prison, or, at the very least, that he had not taken any affirmative action to

withdraw from the conspiracy.

Alternatively, the following statements made by Califano are also admissible as

statements against his penal interest:

- I went and got more.  They turned around, they put me.  Junior's telling me,
  bro, this is not enough.  This is what it is.  I'm telling Junior, I told him
  straight to his face.  Go get Tommy.  Get a message to Tommy.  Get a
  message to Tommy.

- He turns around.  He tells me, they're nothing to talk about no more.  He's
  gone.  I said, get a message to Tommy.

- Now it's written in stone that I gotta give the ten.

- But I wanna know, when I gave them the 10 . . . When I gave them the ten and
  they took the five and sent it upstairs.  Where'd the other five go?

- The fact of the matter remains.  Why don't nobody in this picture, why don't nobody in this picture stop making choices and go to the guy that knows. . . . Tommy.[12]

- So there you go, there's your answer.  You know what, that's fine, that's fine.  I'll pay this because no one wants to hear the truth . . . .

- I will – I'll carry this, I'll carry this on my shoulder forever, I'm never going to make a dollar so they won't make a dollar.  I'll never do more.  I'm just letting, I'm just letting you know.

These statements are against Califano's penal interest because he admits that he participated in an illegal gambling operation – i.e., that he received proceeds from running the operation and that he paid a portion of those proceeds to Gioeli (at first) and Castellazzo (after Gioeli's arrest).

Moreover, the corroborating circumstances clearly have sufficient indicia of trustworthiness.  Califano is talking to Russo, someone with whom he obviously has a close relationship.[13]  See United States v. Guillette, 547 F.2d 743, 754 (2d Cir. 1976); see also United States v. Shukri, 207 F.3d 412, 417 (7th Cir. 2000); United States v. Watts, No. 09 Cr. 62, 2011 U.S. Dist. LEXIS 3976, at *9 (S.D.N.Y. Jan. 11, 2011).  And Califano had no incentive to lie about his upcoming payment to Castellazo.  To the contrary, he had every motivation to openly discuss the issue with Russo, especially after Russo indicated his willingness to help him reduce the amount of his upcoming payment.

In arguing that these statements are unreliable, defendants note that Califano "is referencing Gioeli as an example of how [Castellazo], not Gioeli, [was] taking financial advantage of [him]."  And according to defendants, this shows that "Califano's statements are

---

[12] In the omitted portion of this statement, Russo asks Califano who he is referring to.  This question is not hearsay and is admissible regardless of whether the government relies on the coconspirator exemption or the penal interest exception to admit Califano's responsive statement.  See United States v. Oguns, 921 F.2d 442, 448-49 (2d Cir. 1990); see also 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence, § 801.11(2).

[13] At one point during the conversation, Califano says to Russo: "I swear to god 'til the day I die, whatever I do with you, I'll always do, I'll always take care of you because I happen to have a love for you and you treat me, you treat me like the way I'm supposed to get treated."

not inherently truthful because they may simply be false representations to advance Califano's own economic interests." Defendants miss the point. These statements are against Califano's penal interest because he acknowledges his participation in an illegal gambling operation, not merely because he is paying Castellazo protection money. Califano clearly made payments to someone before he had to start make payments to Castellazo. Although Califano had an incentive to lie about the amount of the payments he made before Castellazo became involved, he had no similar incentive to lie about the identity of the person he paid – i.e., Gioeli. To the contrary, his financial interests were served by accurately identifying Gioeli as the recipient of his illicit funds because, as Califano himself stressed, only the true recipient would be in a position to confirm that the customary rate was $5,000.

### 2. Exhibit C

In Exhibit C, Califano tells Giovanni Galluzo and CW-3 about a gambling establishment that he operated with Gioeli's permission. Califano informed CW-3 that, although Gioeli never shared in the proceeds from this particular game, after Gioeli was arrested, other individuals began demanding a share. Califano did, however, acknowledge that Gioeli owned the "place" and "the machines." The Government claims that Califano is referring to joker poker machines that Gioeli controlled, which were presumably set up in the establishment.

These statements are not admissible as coconspirator statements. There is nothing to suggest that they were made in furtherance of a conspiracy between Gioeli and Califano. Unlike with Exhibit B, the Government has not asserted that Califano shared this information with CW-3 so that CW-3 would pass it along to Gioeli. And the statements themselves do not suggest this purpose.

At most, Califano is updating CW-3 and Galluzo about the status of a gambling conspiracy. Although it is true that statements made to update coconspirators on the status of a conspiracy are in furtherance of that conspiracy, see Desena, 260 F.3d at 158, implicit in that rule is the assumption that the listeners – i.e., the people being updated – are themselves members of the conspiracy. Members of a conspiracy need to be updated on the status of their criminal enterprises. Non-conspirators do not share this need for information. Thus, where the "listeners" receiving the "update" are not shown to be members of the conspiracy, the update does not further its objectives. It is merely idle chatter. And as there is nothing here suggesting that CW-3 or Galluzo was involved in the gambling conspiracy, Califano's statements to them were not in furtherance of that conspiracy.

Portions of this recording may, however, ultimately be admissible as statements against Califano's penal interest.[14] Specifically, in these statements, Califano appears to be acknowledging that he participated in an illegal gambling operation with Gioeli's backing. Thus, assuming the Government can make a proper preliminary showing demonstrating corroboration, the following statements are admissible under Rule 804(b)(3):

- When we had the game . . . you know how that game started? The game started with your uncle here, when we had the game here.

- Never asked for one dollar. All of a sudden – then when everybody started asking for money was when Tommy got pinched, and they did that whole thing with Junior, Junior came here. 'Member he started, he wanted 200, 400 here . . .

- I told him, I said, what are you talking about? I says, Tommy is the one that told me [UI]. I said, as a matter of fact, I got one better for you. Tommy told me that the place belongs to our people, that he wants me to be comfortable in my own place to open stuff that belongs to us.

---

[14] The government has not claimed that Galluzo is unavailable to testify at trial.

- [UI] this place . . . this place, the machines and everything belong to Tommy. .
  . . And Tommy used to make Dino come here.  Tommy used to make Dino
  come here.

### 3. Exhibit D and Exhibit E

In Exhibit D, Maragni is talking to CW-3 about a $600 per month payment that was owed

to Gioeli. The Government claims that the payment was proceeds from an illegal gambling

operation. It appears from the recording that, after Gioeli's arrest, the monthly payments were

supposed to go to Gioeli's wife.  But someone (the Government proffers that this "someone" is

Joseph "Junior Lollipops" Carna) was taking 20% of the payments for himself.  Maragni tells

CW-3 that this is going to stop and that Gioeli's wife will get the whole $600.  Maragni then

goes on to talk about how Gioeli needs all the money he can get because he is in jail and that

everyone should have to spend time in jail so that they know what it is like (presumably so that

they understand the financial and familial burdens that come with prolonged incarceration).

Similarly, in Exhibit E, Maragni is again talking to CW-3 about the $600 per month

payment.  Here, Maragni is recounting a conversation he had with an unidentified third-party.

He tells CW-3 that he told this third-party: "Since you have that working relationship with him

and you know him.  Why don't you handle him for me? . . . This way Tommy gets the 600

dollars a month and nobody gets 20 percent in mine.  I'm not gonna take it . . . ."  According to

Maragni, the third-party replied: "Oh, Okay."

According to the Government, "Maragni's statements . . . furthered the conspiracy

[because] Maragni was implicitly educating CW-3 on the proper respect to afford Colombo

family members who are incarcerated."[15]  The coconspirator exemption applies when "the

---

[15] The government also argues that Maragni's statements furthered the conspiracy because CW-3 will testify that
"Maragni told him about his efforts to assist Gioeli in an attempt to impress CW-3 and gain his loyalty should
Maragni call on CW-3 in the future (which he did)." Assuming this is true, the government has not shown how this

defendant and the declarant [are] involved together in a conspiracy to maintain an organized crime syndicate, and the declarant's statement[s] further[] the maintenance of the syndicate." United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002).

Members or associates of an organized crime syndicate consistently run the risk of being arrested for crimes they commit as part of their criminal associations. Incarceration will, of course, prevent them from providing for their families and loved ones; the pressure or incentive to cooperate with the Government will therefore be great when an individual member is facing serious charges that will keep him from his family for an extended period of time. This in turn threatens the effective functioning of the crime syndicate, which necessarily relies on a high level of loyalty among its members. Thus, although no such showing has yet been made, it requires no stretch of imagination to assume that membership in the Colombo family comes with a promise (either implicit or explicit) that a member's family will be taken care of financially if the member is unable to provide for them due to incarceration.[16] And where, as here, one member is updating an associate about the particulars of how this process is playing out in a specific situation, he is advancing the overall interests of the Colombo family.

Based on the foregoing, and assuming the Government can prove that this was Maragini's purpose in telling CW-3 about the payments to Gioeli, portions of Exhibit D and Exhibit E are admissible as coconspirator statements. For Exhibit D, the statements that begin on page 2, line 1 and end on page 2, line 27 may be admitted. For Exhibit E, the statements that begin on page 3, lines 8 through 21 and page 3, line 27 through page 4, line 14 may be admitted.

purpose furthered a conspiracy of which Gioeli and Maragni were involved. Thus, the government cannot rely on this rationale to show that Maragni's statements satisfy the "in furtherance" requirement.

[16] In fact, Maragni himself suggests that there are rules governing the disbursement of such financial assistance. Specifically, he acknowledges that someone (presumably Carna) had a right to take 20% off the top of the payments he was making to Gioeli's wife. But Maragni stresses that, if it was him, he would not have taken the 20% because Gioeli's family needed the money more than him.

Page 17 of 31

The remaining portions of the recordings have nothing to do with the payments being made to Gioeli and are therefore not admissible under this rationale.

### 4. Exhibit F

In Exhibit F, Samperi tells CW-3 about an incident that had occurred in the past with an unidentified third-party. This third-party had stabbed Samperi and, as a result, Samperi went to a "sitdown" with "Skinny" and Gioeli (the Government claims "Skinny" is a reference to Dino Calabro, a former member of the Colombo family). Apparently, the third-party was a "friend" of some important people and Samperi "squashed" his problem with the third-party as a favor to "Skinny" – i.e., he decided not to retaliate against the third-party for stabbing him.

Exhibit F is not admissible as coconspirator statements or as statements against Samperi's penal interest. There is nothing to suggest that these statements were anything more than idle chatter about a past event. And Samperi does not admit to doing anything illegal. To the contrary, he merely tells CW-3 that he was stabbed and that he had a meeting with Gioeli and Calabro, at which point he decided not to seek retaliation against the individual who stabbed him.

### 5. Exhibit G

In Exhibit G, CW-3 and Anthony Calabro discuss the murders of William Cutolo and Richard Greaves. (Gioeli and Saracino are both charged with murder in-aid-of racketeering for their alleged roles in Cutolo and Greaves' murders; those murders are also charged as racketeering acts for the racketeering conspiracy.) In the first part of this recording, Calabro discusses Greaves' murder. In the second part, in a response to a question posed by CW-3, Calabro acknowledges that he "drove[] for Billy," which the Government claims is a reference to Cutolo's murder. Calabro goes on to state his belief that his brother told the Government about

his role in Cutolo's murder. And, again in response to a question posed by CW-3, Calabro also acknowledges that he is going to "be in the jackpot," which the Government claims is a reference to jail; that he had spoken to his wife about his going to jail; and that he had obtained a lawyer. Finally, in the third part of the recording, Calabro again discusses the circumstances surrounding Greaves' murder.

This recording is not admissible under the coconspirator exemption. The most that can be said about Calabro's statements is that he is updating CW-3 about the status of the Greaves and Cutolo murder conspiracies – i.e., he is re-assuring CW-3 that he is not going to cooperate with the Government because he is preparing to go to jail should he be arrested for his role in those murders. Like with Exhibit C, there is nothing to suggest that CW-3 was involved in the Greaves or Cutolo murder conspiracies, these statements are therefore more accurately characterized as idle chatter rather than statements in furtherance of those conspiracies.

Nevertheless, several of Calabro's statements are admissible as statements against his penal interest. As an initial matter, defendants do not contest that the following exchange is admissible under this exception:

> CW-3:         So you don't think your brother told him that you drove, for Billy?
>
> A CALABRO:   I don't know. It's gotta be, I mean, he can't lie. He can't lie.

Nor could they, as Calabro's statement, in which he implicitly implicates himself as a participant in William Cutolo's murder and subsequent cover-up (CW-3 will testify that Calabro transported Cutolo's body to its burial site in Farmingdale), is clearly against his penal interest. And CW-3's question to Calabro is not an assertion and therefore outside the definition of hearsay. See Oguns, 921 F.2d at 448-49.

Defendants do, however, contend that Calabro's remaining statements (regarding Greaves' murder) are not against his penal interest because "[h]e does not admit to participating in Greaves' murder other than knowledge of it, apparently after the fact."  Contrary to defendants' contention, Calabro does more than merely admit his knowledge of the murder. Rather, he tells CW-3 that he saw "Joe Caves" (identified by the Government as Joseph Competiello) and Greaves immediately prior to the murder and that he refused Greaves' offer to take Greaves' car.  According to the Government, Calabro served as a lookout for the murder and refused to take Greaves' car because he wanted to make sure that he remained in position so he could ensure that no one entered Saracino's residence (where the murder occurred).  In addition to acknowledging his role as lookout, Calabro also places himself inside the apartment at the time of (or shortly after) the murder.  Specifically, he tells CW-3 that Saracino, Gioeli, and Competiello were waiting inside for Greaves and that he himself kicked Greaves (the Government contends that this act occurred after Saracino shot Greaves).  These statements would all be probative in a potential trial for Calabro's role in Greaves' murder.  Thus, the following exchanges are admissible as statements against Calabro's penal interest:

| | |
|---|---|
| CW-3: | You had nothing to do with Richie, with them? |
| A CALABRO: | No, he's admitted it. |
| CW-3: | Oh. |
| A CALABRO: | No.  Me?  [UI].  You know, whatever.  I kicked him in the head.  Good for you, you [expletive omitted], so. |
| . . . . | |
| CW-3: | Uh-huh.  But there's [UI] Joe Caves brought him there?  Joe Caves brought him there, right? |
| A CALABRO: | Yes.  I remember, I seen them coming in the 'vette. |

| CW-3: | Richie's 'vette, right? |
|---|---|
| A CALABRO: | [UI] remember right here, near the window.  Clear as day. "What you doing, Ant?  What's going on?" |
| CW-3: | And he was walking [UI] . . . |
| A CALABRO: | "Take the 'vette." "Nah, I don't wanna." "Take the [UI], go ahead." "Nah, I don't want it [UI]." |
| . . . | |
| A CALABRO: | All of them.  They were all waiting.  They were sitting down.  They were hanging out.  Little D – |
| CW-3: | Uh huh. |
| A CALABRO: | Joe Caves and Tommy [UI]. |

Finally, defendants have requested, and the Government has not opposed, an audibility hearing for this recording.  I have reviewed the recording in camera and find that it is not inadmissible simply because portions of it are inaudible.  See United States v. Arango-Correa, 851 F.2d 54, 58 (2d Cir. 1988).  The portions of the tape that are audible are clearly probative and the portions that are "inaudible . . . are [not] so substantial as to render the remainder more misleading than probative."  United States v. Bryant, 480 F.2d 785, 790 (2d Cir. 1973).

Although defendants style their request as one for an audibility hearing, I believe they are actually challenging a discrete portion of the Government's draft transcript.  In the last exchange quoted above, Calabro tells CW-3 that "Little D" (a reference to Saracino) and "Tommy" (a reference to Gioeli) were inside waiting for Greaves.  Defendants assert that these two references are inaudible.[17]  Thus, it appears as if they are really requesting that the two references be omitted from the Government's transcript.  Calabro's alleged references to Little D and Tommy

---

[17] Saracino does not explicitly challenge the reference to "Little D" as being inaudible.  But, because he joined Gioeli's motion and Gioeli challenged the reference to "Tommy," I assume that Saracino is likewise challenging the reference to "Little D."

are difficult to make out, but I find that they are arguably audible on the recording. Thus, the Government is free to argue to the jury that the references are there and defendants are free to argue that they are not. I also note that defendants have not submitted their own transcript interpreting Calabro's statements to CW-3. Should they wish to do so, the jury will be provided with both versions when the recording is played. See United States v. Chiarizio, 525 F.2d 289, 293 (2d Cir. 1975).

**E. Consensual Recordings Made By CW-5**

Saracino is charged with conspiring to make an extortionate extension of credit; this conspiracy is also charged as a racketeering act for the racketeering conspiracy. According to the Government, April Saracino (Saracino's wife) was a coconspirator in this conspiracy because she assisted Saracino in operating his loansharking business and knowingly profited from it. Exhibit H and Exhibit I are two consensual recordings made by CW-5. According to the Government, CW-5 is either a member or associate of the Colombo family and he was also one of Saracino's loansharking customers. In Exhibit H, April accepts a payment from CW-5 on behalf of Saracino. In Exhibit I, which was made shortly after Saracino's arrest, April asks CW-5 if his brother still owed Saracino money and she tells CW-5 about one customer who "owes big." According to April, this customer has "got to [expletive omitted] come through for this."

Saracino's bald assertion to the contrary, it is plausible, based on these two recordings, that the Government will be able to establish April's participation in Saracino's loansharking conspiracy. Portions of Exhibit H may therefore be admissible because they appear to be in furtherance of that conspiracy – April tells CW-5 to give her money that he owes Saracino as payment on an extortionate loan. But only the portion of the recording that begins on page 1, line 11 and ends on page 2, line 7 is admissible. The remaining portions of the recording do not

appear to have anything to do with Saracino's loansharking activities and are thus not admissible as coconspirator statements.

As for Exhibit I, the Government appears to take the position that CW-5 is a participant in Saracino's loansharking conspiracy as well as a victim. Thus, it argues, April's statements in Exhibit I are in furtherance of the conspiracy because April is updating CW-5 on its status "so that CW-5 could assist [her] in light of Saracino's arrest that day." Assuming the Government will be able to prove that CW-5 is also a participant in the loansharking conspiracy, portions of Exhibit I will be admissible under that rationale. See Desena, 260 F.3d at 158. Specifically, everything from page 2, line 29 through page 3, line 19 may be admissible. None of the other statements in Exhibit I relate to the conspiracy; they are therefore not admissible as coconspirator statements.

F. **Consensual Recording Made By CW-6**

Exhibit J is a consensual recording made by CW-6. Along with CW-6, Anthony Urso and Vincent Basciano are captured on the recording. The Government proffers that CW-6, Urso, and Basciano are or were members of the Bonanno crime family. In the recording, Urso tells CW-6 and Basciano that he got a "list" from the Colombos, that "[the Colombos] got the okay from the other families," that he was "waiting one more shot to find out if it's okay," and that, at the time, the Colombos were being run by their captains.

According to the Government, "individuals may be inducted into an organized crime family only with the approval of the remaining New York City-based crime families," and the "list" Urso refers to was a list of individuals proposed to be inducted into the Colombo family. (The Government proffers that Saracino, CW-2, and CW-4 were included on that list.) Thus, the Government argues, these families are in a conspiracy with one another to only induct approved

members into their respective families. Assuming the Government can prove the existence of this inter-family conspiracy and Gioeli, Saracino, Urso, Basciano, and CW-6's participation in it, Urso's statements related to the list would be in furtherance of that conspiracy because Urso would have been updating CW-6 and Basciano of its status – i.e., he would have be informing them that the Colombo family had proposed members to be inducted, that the other families have given those members the okay, and that he was considering whether to do the same. But the second part of the conversation, regarding the current state of the Colombo family's administration, has nothing to do with the identified conspiracy. Accordingly, all of the statements after page 1, line 9 must be omitted before this Exhibit may be admitted at trial.

In so ruling, I reject defendants' contention that Gigante forecloses admitting the entire recording under the exemption for coconspirator statements. In Gigante, the Second Circuit held that the district court erred when it admitted out-of-court statements under the coconspirator exemption "based solely" on its "finding that 'there is a general overriding conspiracy among [the five New York City-based organized crime families that together make up the] Mafia.'" 166 F.3d at 83. The Court, however, stressed that it was not foreclosing the possibility that a conspiracy could be made up of multiple Mafia families. See id. And, as it subsequently made clear in Russo, defendants and declarants can be members "in a conspiracy to maintain an organized crime syndicate," in which case a declarant's statement that "further[s] the maintenance of the syndicate by giving associated persons information about its membership" would be admissible as a coconspirator statement. 302 F.3d at 46.

Here, the Government is not alleging that Gioeli and Saracino were engaged in a general conspiracy with Urso, Basciano, and CW-6 merely because they are all members of the Mafia, the practice condemned in Gigante. To the contrary, it is the Government's position that, in

addition to their individual criminal activities, members of the Mafia are engaged in an inter-family conspiracy to only allow approved individuals to be inducted into their respective families. Thus, the "the conspiratorial objective being furthered by [Urso's] statement[s]" was the expansion and management of the Colombo family and the Mafia. Under these circumstances, Urso's statements to CW-6 and Basciano are potentially in furtherance of a joint conspiracy between those individuals and defendants and may therefore be admissible against defendants as coconspirator statements.[18]

I similarly reject defendants' argument that this recording is inadmissible under the coconspirator exemption because the conspiracy advanced in the out-of-court statements is not factually intertwined with the charged crimes. See United States v. Stratton, 779 F.2d 820, 829 (2d Cir. 1985). The Government alleges that Gioeli and Saracino are members of the Colombo family. As part of this membership, they are charged with committing a litany of crimes with each other and with the Government's cooperating witnesses. Thus, this conspiracy – which demonstrates Gioeli's position of authority within the Colombo family (the Government proffers that he was the one providing the list of potential inductees) and Saracino, CW-1, and CW-4's induction into the Colombo family (they were allegedly on the list Gioeli provided Urso) – are clearly factually intertwined with the charged crimes.

## III. Gregory Scarpa Sr. and Frank Sparaco

In the early 1990s, the Colombo family was split into two rival factions: one faction was loyal to the "official" boss of the family, Carmine Persico, while the other faction was loyal to

---

[18] I recognize that the "crime syndicate" involved in Russo was the Colombo family specifically (rather than the Mafia generally). But the reasoning in Russo – namely that the Colombo family "cannot function properly unless its members and persons who do business with it understand its membership, leadership and structure," 302 F.3d at 46 – is equally applicable to the Mafia as a whole – i.e., members of the Bonanno family need to understand the membership, leadership, and structure of the Colombo family so that the Mafia can function effectively. This is especially true considering the fact that members of the Bonanno family partially control who will become members of the Colombo family.

the "acting" boss of the family, Victor Orena.  As part of the charged racketeering conspiracy, the Government alleges that the two factions engaged in an intra-family war (the "Colombo family war" or the "war"), and that Gioeli and Saracino participated in a conspiracy to murder members of the Orena faction.  Gioeli is also alleged to have participated in the murders of John Minerva and Michael Imbergamo, both of which were carried out as part of the Colombo family war.

During the war, Gregory Scarpa Sr. and Frank Sparaco were confidential FBI informants and members of the Colombo family.  Despite their status as FBI informants, Scarpa and Sparaco both participated in the war (as members of the Persico faction) and lied to the FBI about their involvement in war-related murders.  Moreover, it has long been publicized that Special Agent Lindley DeVecchio engaged in several acts of misconduct while acting as Scarpa's FBI handler.  See, e.g., United States v. Sessa, 92-CR-351 (ARR), 97-CV-2079 (ARR), 2011 U.S. Dist. LEXIS 7090, at *29-51 (E.D.N.Y. Jan. 25, 2011).  (There is nothing to suggest that DeVecchio also handled Sparaco or that Sparaco's unidentified FBI handler also engaged in improper conduct.)

The Government has moved in limine for an order precluding "defendants from referencing Scarpa and Sparaco's status as confidential informants during the Colombo family war, except to impeach any out-of-court statements introduced through cooperating witnesses under Federal Rule of Evidence 806."[19]  In addition, "the Government also seeks an order precluding the defendants from making any reference to Scarpa and/or Sparaco's relationships with the FBI."  According to the Government, Scarpa and Sparaco's status as informants and

---

[19] The government simultaneously moves in limine for an order allowing it "to elicit at trial statements made by Sparaco and Scarpa in furtherance of the Colombo family war."  The government has not identified any specific statements it intends to introduce.  Despite this lack of specificity, defendants concede that certain unidentified out-of-court statements made by Scarpa and Sparaco will be admissible as coconspirator statements.

Scarpa's relationship with DeVecchio are not relevant to the charges against defendants. And, to the extent that this evidence may be arguably relevant, the Government contends that its minimal probative value is substantially outweighed by the danger of undue prejudice.

Defendants contest the Government's motion. The basis for their opposition comes from the § 3500 material the Government has turned over in this case, as well as Scarpa-related material that is available in the public domain.[20] As an initial matter, defendants broadly argue that "[t]he jury is entitled to know that Scarpa and Sparaco were ernment informants" when they participated in the Colombo family war.

I agree with defendants within the following parameters. Defendants will only be allowed to inquire about Scarpa and Sparaco's status as government informants during the Colombo family war if the Government introduces out-of-court statements made by Scarpa or Sparaco at trial. Should the Government do so, defendants would be entitled to attack Scarpa and Sparaco's credibility. See Fed. R. Evid. 806. And one permissible way of doing this is by inquiring, within the Court's discretion, about "[s]pecific instances of conduct" that are "probative of . . . untruthfulness." Fed. R. Evid. 608(b). An informant committing murder and then lying about it to the Government is certainly probative of untruthfulness.[21]

---

[20] Defendants' motion seeking disclosure of the government's Sparaco-related reports is denied. I am interpreting this motion as a request for § 3500 material relating to Sparaco, a potential non-testifying declarant. Because "the disclosure requirements of . . . § 3500[] do not apply to non-testifying declarants," the government is under no obligation to disclose Sparaco's prior statements, as memorialized in its debriefing reports. United States v. Shyne, 617 F.3d 103, 105, 106-08 (2d Cir. 2010) (per curiam).

[21] Defendants are reminded that there are limits to the manner in which they can impeach witnesses, including out-of-court declarants. See Fed. R. Evid. 608(b), 806. Defendants have not pointed to any specific examples of extrinsic evidence that they intend on offering to prove that Scarpa and/or Sparaco participated in the Colombo family war and lied about it to the government. I therefore assume, for purposes of this Decision and Order, that they intend on probing this point by cross-examining the government's witnesses. This is permissible under the Federal Rules of Evidence. See Fed. R. Evid. 608(b), 806; see also United States v. White, 116 F.3d 903, 920 (D.C. Cir. 1997). Nothing in this Decision and Order should be construed as a ruling on whether defendants will be permitted to offer extrinsic evidence on this point, an issue that is unresolved in this Circuit and will be taken up (either in limine or during trial) should the need arise. Compare White, 116 F.3d at 920 (noting that Rule 608(b)'s general ban on using extrinsic evidence is not modified by Rule 806), with United States v. Friedman, 854 F.2d 535,

Moreover, defendants argue that evidence relating to Scarpa, DeVecchio, and Sparaco is variously admissible to impeach CW-1 and CW-3. Although not at all clear, defendants appear to contend that because certain statements CW-1 and CW-3 made to Government agents are uncorroborated or contradicted by Scarpa and Sparaco's prior statements, defendants should be allowed to impeach CW-1 and CW-3 with those "inconsistencies." For example, CW-3 told Government agents that he informed Scarpa about a plan to murder Frank "Chestnut" Marasa;[22] none of the publicly available Scarpa-related material, however, indicates that Scarpa ever informed DeVecchio of this plan. Similarly, Sparaco previously identified Robert Tarantola as one of the two shooters involved in the Minerva and Imbergamo murders. And, although CW-1 gave the Government details about these murders, he never mentioned Tarantola. Thus, defendants argue, Scarpa does not corroborate CW-3, Sparaco does not corroborate CW-1, and this information should be given to the jury so that it can properly pass on CW-1 and CW-3's credibility.

As the Government concedes, defendants are of course free to use Scarpa and Sparaco's prior statements to impeach CW-1 and CW-3. They must, however, do so within the confines of the Federal Rules of Evidence. Although they have made vague references (discussed above) to some alleged inconsistencies, they have not identified the particular method by which they intend to probe these inconsistencies. I do not believe that an Order approving or disproving a non-disclosed method of impeachment is warranted at this time. That being said, there is no basis for admitting evidence about DeVecchio's alleged Scarpa-related improprieties to impeach either CW-1 or CW-3. Thus, defendants are precluded from inquiring into those improprieties for the

---

570 n.8 (2d Cir. 1988) (suggesting, in dicta, that Rule 806 may serve as an exception to Rule 608(b)'s ban on extrinsic evidence).

[22] Gioeli is charged with Marasa's murder as part of the racketeering conspiracy charge.

Page 28 of 31

purposes of impeachment. And as defendants have not identified any other purpose for using this evidence, they are precluded from introducing it entirely.

## IV.  Charges Previously Filed Against Cooperating Witnesses

Prior to their cooperation, CW-1 and CW-2 were initially charged in the same indictment as defendants. In the original indictment, CW-1 was charged with the murder of Carlos Pagan and CW-2 was charged with the murder of Frank Marasa. While they were seeking cooperation agreements, CW-1 and CW-2 denied their involvement in those respective murders. Because an indictment is not evidence of guilt, see United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007), the Government moves for an order precluding defendants from referencing the existence of these charges. (It acknowledges that defendants will be able "to cross-examine [CW-1 and CW-2] as to their participation in the murders.")

In opposition, defendants raise a three-fold argument as to why they should be allowed to develop this evidence at trial. First, they start with the non-controversial proposition that, because CW-1 and CW-2 were indicted for the respective murders, a grand jury found that there was probable cause to believe that they committed those murders. Second, they make the similarly non-controversial assumption that the Government called witnesses before the grand jury to testify as to CW-1 and CW-2's involvement in the murders. Based on these two facts, defendants assert that either (1) the witnesses the Government initially relied on were later determined to be lying; or (2) the Government agreed to dismiss the charges against CW-1 and CW-2 in return for their cooperation (thus, according to defendants, they may have "already received a benefit for their cooperation, which is relevant and admissible"). According to defendants, before ruling on the Government's motion, I should therefore "conduct an in camera inspection of the underlying testimony which led to the [CW-1 and CW-2] murder charges with

respect to Pagan and Marasa as well as subsequent testimony justifying the abandonment of these charges as to [CW-1 and CW-2]."

I do not entirely follow defendants' argument, nor do I understand what purpose they hope to advance by my in camera review of the grand jury minutes. If, as they speculate, the Government dropped these murder charges as part of CW-1 and CW-2's cooperation agreements, the Government would have to disclose that information pursuant to Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972). And, as the Government notes in its reply, it "is aware of, and continues to comply with, its Giglio obligations." Conversely, if the Government subsequently determined that the witnesses it called to testify before the grand jury perjured themselves, that alone is not grounds for reviewing the minutes of those proceedings. See United States v. Leung, 40 F.3d 577, 582 (2d Cir. 1994).

That being said, I do not agree that defendants should be completely precluded from questioning CW-1 and CW-2 about the fact that they were initially charged with these murders. Although an indictment is not itself evidence, the fact that the Government initially charged CW-1 and CW-2 with these murders and then dropped the charges after CW-1 and CW-2 agreed to cooperate could lead to a plausible inference that CW-1 and CW-2 have a motive to lie – i.e., they provided the Government with false information about themselves and about defendants in an effort to obtain benefits for themselves, namely, dismissal of the murder charges and cooperation agreements from the Government. This is a proper method of impeachment.

## CONCLUSION

Defendants' [1242] motion for sanctions is DENIED.  The Government's [1259] motion

in limine to introduce certain evidence and preclude certain references is GRANTED IN PART

AND DENIED IN PART.

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated: Brooklyn, New York
      December 6, 2011