

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/JDG/CMP                         *271 Cadman Plaza East*
F.#2008R00530                       *Brooklyn, New York  11201*

February 16, 2012

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Thomas Gioeli, et al.
           Criminal Docket No. 08-240 (S-6) (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in opposition to defendant Dino Saracino's motion, dated February 13, 2012, for two separate juries to determine the guilt of Saracino and co-defendant Thomas Gioeli.  (See Ltr. from Sam Braverman, Esq. to the Court, dated Feb. 13, 2012 (Docket Entry No. 1360) (the "motion" or "Mot.")).  For the reasons set forth below, the motion should be denied.

## BACKGROUND

      Saracino and Gioeli are both charged with multiple murders in connection with their membership in and/or association with the Colombo organized crime family of La Cosa Nostra (the "Colombo family").  Gioeli, who prior to his arrest held the position of "street boss" of the Colombo family, is charged with racketeering conspiracy, including the murders of Frank Marasa, John Minerva, Michael Imbergamo, Richard Greaves, Ralph Dols and William Cutolo (Count One), and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four).  Saracino, who is a soldier in the Colombo family, is charged with racketeering conspiracy, including the murders of Greaves, Dols and Cutolo (Count One) and three counts of murder in-aid-of racketeering for the murders of Greaves (Count Two), Dols (Count Three) and Cutolo (Count Four).  As described below, Gioeli and Saracino are also variously

The Honorable Brian M. Cogan
February 16, 2012
Page 2

charged with murder conspiracy, robbery, extortion, extortionate extension and collection of credit and witness tampering.

    A.    <u>Charged Murders</u>

        1.    <u>Murder of Frank Marasa</u>

Gioeli is charged with the 1991 murder of Frank Marasa, also known as "Chestnut." Marasa was murdered in Brooklyn on June 12, 1991. On that date, Marasa was found by New York City Police Department officers lying shot in the street. Marasa later died from the gun shot wounds.

Marasa was murdered in retaliation for his perceived involvement in the murder of Colombo family associate Ennab Awjab, also known as "OJ," on May 30, 1991. Gioeli, then a Colombo family soldier, authorized the murder. After obtaining Gioeli's permission, Colombo family associates, two of whom are now cooperating witnesses (hereinafter, "CW-1" and "CW-2"), carried out the murder, ambushing Marasa on the street. (Years later, CW-1 was inducted into the Colombo family and was subsequently elevated to the position of captain.)

        2.    <u>Murder of Michael Imbergamo and John Minerva</u>

Gioeli, together with CW-1 and others, participated in the murders of Michael Imbergamo and John Minerva on March 25, 1992. During the early 1990s, the Colombo family had split into two warring factions, one loyal to the then acting family boss Victor Orena and the other loyal to the then "official" boss of the family, Carmine Persico. Gioeli was a member of the faction loyal to Persico.

On the evening of March 25, 1992, Minerva, a soldier in the Orena faction, and Imbergamo were killed as part of the Colombo family war. Imbergamo was not the intended target, but was killed simply because he was with Minerva. Both men were shot inside of a car parked in front of the Broadway Café, located at 1129C Broadway in North Massapequa, New York.

        3.    <u>Murder of Richard Greaves</u>

Gioeli and Saracino, together with CW-1 and two other cooperating witnesses (hereinafter, "CW-3" and "CW-4") participated in the murder of Richard Greaves, a Colombo family associate. Gioeli authorized the murder. On or about August 3,

The Honorable Brian M. Cogan
February 16, 2012
Page 3

1995, Saracino fatally shot Greaves, a Colombo family associate, in Saracino's basement apartment in Brooklyn, in the presence of Gioeli, CW-1, CW-3 and CW-4.  At the direction of Gioeli and CW-1, Saracino, CW-3, CW-4 and others then transported Greaves' body to a wooded area in Farmingdale, Long Island, where they buried him.  Greaves' body has never been recovered.

   4. <u>Murder of Ralph Dols</u>

   Gioeli and Saracino, together with CW-1 and CW-3 and co-defendant Joel Cacace, participated in the murder of Ralph Dols on August 25, 1997.  At the time of his murder, Dols was a New York City Police Officer and was married to the ex-wife of Cacace, then a powerful and high-ranking member of the Colombo family.  Cacace ordered Dols' murder; Gioeli conveyed the order to CW-1.

   On the night of the murder, Saracino, CW-1 and CW-3 waited for Dols to return to his home in Brooklyn.  As Dols parked his car in front of his building, Calabro and Saracino shot him multiple times.  Police officers found Dols lying gravely wounded on the street next to his car, and Dols died a short time later from the gun shot wounds.

   5. <u>Murder of William Cutolo</u>

   Gioeli and Saracino, together with CW-1 and CW-3 and tohers, participated in the murder of William "Wild Bill" Cutolo in-aid-of racketeering on or about May 26, 1999.  At the time of his murder, Cutolo was underboss of the Colombo family.  The acting boss at the time, Alphonse Persico, and administration member John DeRoss believed that Cutolo had become too powerful and were concerned that he would take over the crime family.[1]

   On May 26, 1999, after Gioeli lured Cutolo to the vicinity of Saracino's basement apartment, CW-1 shot Cutolo to death shortly after he entered Saracino's basement apartment.  Saracino, together with CW-1 and CW-3 and others, transported Cutolo's body to Farmingdale, Long Island, where they buried

---

[1] In December 2007, Persico and Colombo family administration member John DeRoss were convicted, after trial, of the murder of Cutolo in-aid-of racketeering, and were subsequently sentenced to mandatory life terms of imprisonment for their roles in that murder.

The Honorable Brian M. Cogan
February 16, 2012
Page 4

Cutolo. Cutolo's body was recovered in a wooded area on October 6, 2008. The Suffolk County Medical Examiner determined that the cause of death was homicide.

    B.    <u>Charged Murder Conspiracies</u>

        1.    <u>Conspiracy to Murder Orena Faction Members</u>

In connection with the Colombo family war, Gioeli and Saracino, together with CW-1, CW-2 and CW-3, participated in a wide-ranging conspiracy to murder members of the Orena faction. Among other things, Saracino, CW-1, CW-3 and others performed surveillance on various locations where Orena faction members were known to reside or frequent and reported the information they obtained to superiors within the Colombo family.

        2.    <u>Conspiracy to Murder Michael Burnside</u>

Following the murder of Saracino's brother Frank Saracino in April 1998, Saracino, CW-1, CW-3 and CW-4 conspired to kill Michael Burnside, the individual who they believed was responsible for Frank Saracino's murder. In connection with this conspiracy, Saracino sought assistance from fellow Colombo family members and associates to help him find Burnside.

    C.    <u>Charged Robberies</u>

        1.    <u>Robbery of Furs by Mina</u>

Gioeli participated in an armed robbery of a fur store, Furs by Mina, located at 408 Jericho Turnpike, in Syosset, New York, in February 1991 with CW-1 and others. Gioeli, CW-1 and another entered the store posing as individuals interested in buying a fur for a family member. Once inside the store, they drew guns and then handcuffed the store's owner and the owner's son. They then fled with garbage bags filled with fur coats from the store.

        2.    <u>Attempted Robbery of Elegant Furs</u>

Gioeli and others also participated in an attempted robbery of another fur store, Elegant Furs, located on Hempstead Turnpike in Levittown, New York, in January 1992. While Gioeli waited outside, CW-1 and a Colombo family member entered the store posing as customers. CW-1 and the Colombo family member brandished firearms and the Colombo family member pistol-whipped

The Honorable Brian M. Cogan
February 16, 2012
Page 5

an employee. The group then fled the scene without any merchandise.

### 3. Robbery of Chemical Bank

Saracino and others participated in the robbery of Chemical Bank, located at 2419 Hempstead Turnpike, East Meadow, New York, on or about May 30, 1995. At or about 9:00 a.m. on that day, CW-3 and another Colombo family associate stole a money bag containing approximately $210,000 from a bank employee who was retrieving a bag of money from the bank's night deposit boxes. CW-3 and the other Colombo family associate gave the money to Saracino, who was waiting in a vehicle nearby, and then fled in their vehicle.

### D. Other Charged Crimes

#### 1. Extortionate Collection of Credit

In or about 1993, at the direction of CW-1, Saracino and CW-3 attempted to collect an outstanding debt owed by John Doe #1. Specifically, Saracino and CW-1 went to the residence of John Doe #1, chased after him and stabbed him, resulting in serious injuries.

#### 2. Cocaine Distribution

In or about 1998, prior to the murder of Frank Saracino, Saracino, Frank Saracino and others participated in a scheme to distribute cocaine. Saracino fronted the money to purchase the cocaine.

#### 3. Loansharking

In or about and between 2008 and Saracino's arrest in June 2008, Saracino and CW-1 operated lucrative loansharking businesses. At the time of his arrest, Saracino had numerous customers and over $100,000 in outstanding loans.

#### 4. Extortion of John Doe #2

Saracino is charged with the extortion of John Doe #2. Members of the Colombo family, including Joel Cacace, Saracino, CW-1 and others, have long required John Doe #2 to make monthly payments to it in exchange for their "allowing" John Doe #2 to place and maintain joker poker machines in various Brooklyn

The Honorable Brian M. Cogan
February 16, 2012
Page 6

establishments without risk of interference from other La Cosa Nostra families.

### 5. Obstruction of Justice

Saracino has attempted to obstruct the government's investigation of the Colombo family. Commencing in early 2008, numerous subpoenas were served on Saracino's associates. Aware that the individuals who were served with subpoenas had information that might assist the government in its investigation against Saracino, Saracino corruptly attempted to persuade these individuals not to provide the government with inculpatory information.

## ARGUMENT

In moving to empanel two separate juries, Saracino in essence is moving for a modified severance, and as a result, the legal standards applicable to severance apply. See United States v. Yousef, 327 F.3d 56, 149-50 (2d Cir. 2003) ("Within this framework, the fashioning of remedial steps to minimize prejudice to a defendant is committed to the sound discretion of the district court. Various remedies short of severance are available to the district court, including, inter alia, . . . empaneling separate juries . . . .").

### I. Legal Standard

There is a strong preference for joint trials in the federal system. Joint trials "promote judicial and prosecutorial efficiency, prevent inconsistent verdicts, and deny those defendants tried second the arbitrary advantage of gaining a preview of the government's case." United States v. Bin Laden, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) (citations omitted). Consequently, defendant seeking severance or empanelment of two separate juries must meet an imposing standard. These legal principles are well-established:

> Since 1993, determinations of severance motions have been informed by Zafiro v. United States, 506 U.S. 534 (1993). . . . [J]oint trials are favored in the federal courts and should be held unless "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

The Honorable Brian M. Cogan
February 16, 2012
Page 7

> making a reliable judgment about guilt or
> innocence." [Zafiro,] 506 U.S. at
> 538-39 . . . .

United States v. Bellomo, 263 F. Supp. 2d 561, 578 (E.D.N.Y. 2003) (internal citation omitted) (emphasis added).

While joint trials before a single jury may invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that a joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). In that vein, "it is well-settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540. Similarly, a defendant is not entitled to the empanelment of two separate juries simply because he believes he may stand a better chance of acquittal.

Although "mutually antagonistic or irreconcilable defenses may be so prejudicial in some circumstances as to mandate severance under Rule 14(a)", a defendant first "must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other." United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998) (internal citation omitted). It is well-settled, however, that mere finger pointing between co-defendants falls short of the showing necessary to establish mutually antagonistic defenses. Zafiro at 540-41 (rejecting petitioners' theory that "when two defendants both claim they are innocent and each accuses the other of the crime," the jury will assume at least one is guilty). As the Second Circuit has explained:

> [A]n adversarial stance by a codefendant
> clearly does not, alone, require trials to be
> severed. Were this true, a virtual ban on
> multidefendant conspiracy trials would ensue
> since co-conspirators raise many different
> and conflicting defenses.

United States v. Cardascia, 951 F.2d 474, 484-85 (2d Cir. 1991). Rather, to make a showing of "mutually antagonistic defenses," the defendant must make a factual demonstration that acceptance of "one defense requires that the jury must of necessity convict a second defendant." United States v. Yousef, 327 F.3d 56, 151

The Honorable Brian M. Cogan
February 16, 2012
Page 8

(2d Cir. 2003) (internal quotation marks and citations omitted) (emphasis added).

    As noted above, the same legal standard applies in deciding motions for severance and for empanelment of two juries. As in the severance scenario, empaneling two juries might be warranted if there were a particular piece of prejudicial evidence that was admissible only as to one defendant. But also as with severance, two-jury trials severely burden judicial resources and pose significant logistical problems. The Southern District of New York considered it as an option in Bin Laden, but rejected it, noting that:

> [a]lthough most appellate courts, it seems, have found the procedure to be constitutionally permissible, many have expressed reservations about its use. See, e.g., United States v. Lewis, 716 F.2d 16, 19 (D.C. Cir. 1983) (acknowledging warnings about the procedure articulated by state courts) (citations omitted). We find particularly persuasive the qualification expressed by the court in State v. Corsi, 86 N.J. 172, 430 A.2d 210, 213 (1981), which recommended that if the procedure is to be used at all, "it should be in relatively uncomplicated situations which will not require the excessive moving of juries in and out of the courtroom . . . ."

As described below, given the sheer number of anticipated government witnesses, the above-captioned trial, too, is far from "relatively uncomplicated." Id.

II. Saracino Is Not Entitled To A Separate Jury

    Saracino argues that the empanelment of two juries is warranted because of the risk of prejudice stemming from what he anticipates will be Gioeli's defense. (Mot. at 1). Specifically, Saracino anticipates that Gioeli will argue at trial that Saracino committed the charged crimes without Gioeli. (Id.). Notably, Saracino does not explain how – or why – Gioeli would make such an argument, which would tend to inculpate Gioeli insofar as the government's cooperating witnesses are expected to testify that Gioeli approved and/or directed the very same murders with which Saracino is charged.

As an example of Gioeli's anticipated defense, Saracino expects Gioeli argue that "Richard Greaves is dead and thus the testimony surrounding Greaves' killing is substantially true, whereas Saracino will argue that Greaves is alive, and that all the testimony surrounding Greaves' killing is false[.]" (Id.). Even if Gioeli does present this defense to the Greaves murder, such a defense would not "require[] that the jury must of necessity convict" Saracino. Yousef, 327 F.3d at 151. Rather, presented with both defense theories, the jury could conceivably find that Greaves is dead, even killed by the government witnesses, but not by Saracino.

In Cardascia, the Second Circuit upheld the district court's denial of severance where one defendant claimed – similarly to what Saracino anticipates as Gioeli's defense theory – "that he was not a part of the conspiracy, but rather an innocent and unknowing bystander implicated only by the uncorroborated assertions of his codefendants." 951 F.2d at 485. In upholding the denial of severance, the Court explained that the appellants "failed to establish that due to the conflicting defenses, the jury could not have determined that the other defendants — and their unindicted co-conspirators, the witnesses who served as the government chief witnesses at this trial — defrauded [the bank president defendant] and the bank, and implicated [the second defendant] without his knowing it." Id. Concluding, the Second Circuit observed, "[t]hus, the essence of both defenses — that each defendant was not involved in the conspiracy — plainly is typical of co-conspirator trials and does not warrant severance." Id. The defenses that Saracino anticipates for himself and Gioeli are no different. Finally, to the extent that Gioeli's arguments to the jury or in his cross-examination become prejudicial, the Court may give the routine limiting instruction to the jury that a lawyer's statement is not evidence. Zafiro, 506 U.S. at 539 (in those rare instances when a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice").

Finally, empaneling two separate juries for trial in this case would present an immense logistical challenge. First, even assuming, arguendo, that the Court could find a courtroom that could simultaneously seat two juries, Saracino's motion appears to contemplate that the jury determining his guilt or innocence would not hear any of the jury addresses by Gioeli or Gioeli's cross-examination of the witnesses. As noted above, in light of the number of government witnesses, including many whose

The Honorable Brian M. Cogan
February 17, 2012
Page 10

testimony will be very limited, the juries would have to be continually shuttled in and out of the courtroom, significantly prolonging what is already expected to be a lengthy trial.  The process would be further complicated by the fact that the Court has granted the government's motion for an anonymous jury.

## CONCLUSION

For the reasons set forth above, Saracino's motion for empanelment of two juries should be denied.

    Respectfully submitted,

    LORETTA E. LYNCH
    UNITED STATES ATTORNEY

By:  /s/Elizabeth A. Geddes
      Elizabeth A. Geddes
      James D. Gatta
      Cristina M. Posa
      Assistant U.S. Attorneys

cc:  Defense Counsel (by ECF)
     Clerk of the Court (BMC) (by ECF)