UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                  :
UNITED STATES OF AMERICA,                          :
                                                  :     **MEMORANDUM**
                              Plaintiff,           :     **DECISION AND ORDER**
                                                  :
              - against -                          :     08 Cr. 240 (BMC)
                                                  :
THOMAS GIOELI and DINO SARACINO,                   :
                                                  :
                              Defendants.          :
                                                  :
--------------------------------------------------------- X

**COGAN,** District Judge.

Before me is the Government's third motion in limine to admit certain evidence at trial

against defendants Thomas Gioeli and Dino Saracino.  In the instant motion, the Government

requests permission to introduce testimony of a cooperating witness (the "CW") regarding five

meetings between the CW and purported Colombo family soldier Vincent Manzo.  Additionally,

the Government seeks to introduce excerpts of consensual recordings made by the CW of four of

these meetings.  Gioeli and Saracino have each opposed the Government's motion.  For the

reasons stated below, the Government's motion in limine is granted in part and denied in part.

## BACKGROUND

Gioeli and Saracino are alleged to be members of the Colombo organized crime family of

La Cosa Nostra, also known as the Mafia.  They are both charged with one count of engaging in

a racketeering conspiracy and three counts of committing murder-in-aid-of-racketeering,

including the murder of William "Wild Bill" Cutolo on May 26, 1999.  Saracino is also charged

with conspiring to make an extortionate extension of credit, prevention of testimony, withholding

of testimony and records, and obstruction of official proceeding.  Although familiarity of the
facts underlying the charges in this case is assumed, special attention to the charged murder of
Cutolo, and Manzo's statements regarding that murder, are necessary for the purpose of this
Order.

      The Government alleges that in May 1999, Cutolo was the underboss of the Colombo
crime family.  Acting boss Alphonse Persico apparently believed that Cutolo had become too
powerful, and arranged to have Cutolo murdered.[1]  On May 26, 1999, Gioeli and Saracino, along
with Dino Calabro, Joseph Competiello, and others allegedly took part in Cutolo's murder.
Gioeli is alleged to have lured Cutolo to the vicinity of Saracino's residence, and Dino Calabro
shot Cutolo to death after he entered Saracino's home.  Saracino, Gioeli, Calabro, Competiello,
and Manzo then buried Cutolo in Farmingdale, Long Island.  His body was recovered on October
6, 2008.

      On November 18, 2010, Manzo and his son met with the CW at a Staten Island cafe.  A
special agent with the FBI had apparently told Manzo's son that Manzo had "something to do"[2]
with Cutolo's murder, and the father and son wanted to talk with the CW to see what he thought.
The CW responded that "you could bet your life that somebody said something," and wondered
aloud whether Joey Caves (identified by the Government as Joseph Competiello) or Dino
(presumably Calabro) could have "told em."  Manzo responded that "Joey Caves was there," but
that "Dino's the main guy."  He further stated that "[t]he only ones that really knew I had
anything to do with that are me, Joey Caves and the other guy Dino.  The two Dinos, Joey Caves,

---

[1] Persico was convicted of murdering Cutolo in aid of racketeering in 2007, and was sentenced to life in prison.  See
United States v. Persico, 645 F.3d 85, 89-90 (2d Cir. 2011).

[2] The quoted passages in this decision are taken from the Government's draft transcript of the recorded
conversations.  Neither Gioeli nor Saracino have objected to the accuracy of the transcript.

and Tommy." Finally, he stated "Jesus Christ all mighty. [UI]. No. I didn't, I didn't even touch it, just threw it in the car [UI]. [UI] and followed them, [expletive deleted]." [3] The CW recorded this conversation, and the Government seeks to offer excerpts from this recording, including the portions quoted above, into evidence.

The CW also recorded a second meeting between Manzo, Manzo's son, the CW, and Luca DiMatteo, who the Government alleges was an acting captain in the Colombo family at the time of the meeting. The three met at a pier in Brooklyn, New York, on November 23, 2011. The conversation began with the CW explaining that DiMatteo was representing Ralph Lombardo, and that Manzo would now report to DiMatteo. The CW then explained to DiMatteo that Manzo's son had received a subpoena to speak with the FBI and that the FBI had discussed Cutolo's murder. DiMatteo responded by advising Manzo that the FBI might "come knocking on your door," but that "we're used to that," and that "[y]ou have a lawyer, I'm sure." DiMatteo stated to Manzo that he was there for him, and the conversation proceeded as follows:

| | |
|---|---|
| DIMATTEO: | Exactly. Exactly. You gotta let me know what we are talking about. |
| MANZO, SR.: | Of course I do. |
| DIMATTEO: | Okay, are we talking about? Were you involved? And they're involved? |
| CW: | That's what I'm saying. |
| DIMATTEO: | I have to ask. |
| CW: | Yeah, you have to tell him. Tell him what you gotta tell him. |
| MANZO, SR.: | Oh yeah. I'm involved. |
| DIMATTEO: | You're involved in that situation, okay. |
| CW: | He was, he was, uh. |
| DIMATTEO: | A driver? |

---

[3] The Government's draft transcript contains various expletives, but the specific words are omitted as they are not relevant for the purpose of this Order.

| | |
|---|---|
| MANZO, SR.: | I drove, I drove. |
| DIMATTEO: | Okay. He's still, he's still, you're still involved. This [expletive deleted], that dirty [expletive deleted]. |
| CW: | Let me ask you something. You didn't use your vehicle? |
| MANZO, SR.: | Yeah, it's gone. |
| CW: | Oh. |
| MANZO, SR.: | The vehicle's gone a long time ago. |
| CW: | [UI] my legs started to get weak. |
| MANZO, SR.: | Right after that. |

The conversation ended with DiMatteo stating that he would have to discuss Manzo's situation with Lombardo. The CW and Manzo then clarified that Gioeli, rather than Lombardo, was Manzo's "skipper" at the time of Cutolo's murder.

Manzo and the CW met at the same Staten Island cafe on November 30, 2011, and the CW recorded this conversation as well. The conversation began with the CW explaining that he spoke to his lawyer regarding Manzo's potential criminal liability for his role in Cutolo's murder. The CW then questioned Manzo on the particulars of Manzo's involvement, and asked who would be able to implicate him. However, the majority of Manzo's tape-recorded statements are unintelligible. Nevertheless, the Government proffers that the CW will testify that Manzo reiterated during this conversation that he (Manzo) participated in the disposal of Cutolo's body, that Gioeli had called him prior to his involvement, and that Gioeli, Saracino, Calabro, and Competiello were present when he arrived. Manzo allegedly stated that he then drove the body to Long Island, and returned home. The CW responded to Manzo's account by stating that he would meet with his lawyer to discuss Manzo's involvement and his potential criminal exposure.

Manzo met with the CW at the cafe again on December 7, 2011. The CW attempted to record the conversation, but his recording device malfunctioned. The Government has proffered

that the CW will testify that Manzo again described his participation in the disposal of Cutolo's body with the defendants. Manzo allegedly stated that he picked up the body at Saracino's residence, and that while he drove to Long Island by himself, he met Gioeli at a bowling alley once he arrived. Gioeli then directed him to the burial location.

Manzo and the CW met for their fifth and final conversation at issue here on December 8, 2011, outside a Macy's Department Store in Brooklyn, New York. The CW recorded this conversation, which began with the CW explaining that he had met with his attorney and that the attorney had agreed to meet with Manzo. The conversation proceeded as follows:

| | |
|---|---|
| CW: | But he asked me specifically he says, "Who called, who called?" |
| MANZO, SR.: | They called me. |
| CW: | They? You don't remember which one of them? |
| MANZO, SR.: | Which one it was. |
| CW: | Okay. All right. They called you. And you went, then you went to Dino's. |
| MANZO, SR.: | Right. Almost sure it was his house. |
| CW: | Dino's? Little Dino, not Big Dino. |
| MANZO, SR.: | Little Dino. Little Dino. |
| CW: | Was Tommy there or not there? |
| MANZO, SR.: | Tommy was there. |
| CW: | Tommy was there. I thought Tommy was at the bowling alley. |
| MANZO, SR.: | [UI] we met him there. |
| CW: | Then you met him there, all right. Okay. So we had Dino, Little Dino and Joey Caves. |
| MANZO, SR.: | Right. They put him in the car. |

Manzo's subsequent statements indicate that he then drove alone to a bowling alley in Long Island where he met "Tommy," and "Tommy" directed him to the location where they would bury Cutolo. After one or more of the men removed the body from Manzo's car, Manzo

and "Tommy" drove back to the bowling alley. When "Little Dino," "Big Dino," and "Joey Caves" returned, "Big Dino" and "Joey Caves" drove home with Manzo, while "Little Dino" stayed with "Tommy." The conversation concluded with the CW explaining that he was worried about Manzo, but that he would do what he could because Manzo would not be seeing DiMatteo or Lombardi. Manzo told the CW that he loved him, and stated "[d]on't ever forget about me."

## DISCUSSION

The Government contends that the recordings and proffered testimony regarding Manzo's statements should be admitted at trial because the statements: 1) are admissible as statements against penal interest and/or are statements in furtherance of the charged conspiracy; 2) are highly probative of defendants' participation in the Cutolo murder; and 3) are not unfairly prejudicial.

Saracino counters that Manzo's statements are inherently unreliable and therefore unfairly prejudicial, that the Government has failed to meet its burden that Manzo is an unavailable witness, and that the Government has failed to provide sufficient corroborating evidence of the existence of a conspiracy between Manzo and Saracino or that the statements were made in furtherance of that conspiracy. Gioeli also contends that Manzo's statements were not in furtherance of a conspiracy in which he was a member, and that Manzo is an available witness. He further adds that Manzo's statements were not against penal interest because the statute of limitations has expired for the criminal charges to which he is exposed, and that the probative value of these recordings are substantially outweighed by the danger of unfair prejudice because critical portions of Manzo's recorded statements are inaudible and inconsistent.

I will address each of these arguments in turn, beginning with whether Manzo's statements fall under an exemption or exception to the hearsay rule.

## I.    Coconspirator Statements

Federal Rule of Evidence 801(d)(2)(E) excludes from the definition of hearsay statements offered against a party if they were "made by the party's coconspirator during and in furtherance of the conspiracy." For a statement to fit within this exemption, a district court must find by a preponderance of the evidence that both the defendant and the declarant were part of a single conspiracy, and that the statement at issue was made during the course of and in furtherance of that conspiracy. See In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 137 (2d Cir. 2008); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999). Pursuant to the Rule, "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2). Although the party offering the statement bears the burden of proof that the statement falls within this exemption, "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence." United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993).

To support its claim that defendants and the declarant were engaged in a conspiracy, the Government must establish that they "entered into a joint enterprise with the consciousness of its general nature and extent." In re Terrorist Bombings, 552 F.3d at 137-38 (internal quotation marks omitted). This does not require "evidence of an explicit agreement; proof of a tacit understanding will suffice." United States v. Vargas, 986 F.2d 35, 39 (2d Cir. 1993) (internal quotation marks omitted). Additionally, while a conspiracy must have a common purpose, the

participants' goals need not be congruent, as long as they are not "cross purposes." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192 (2d Cir. 1989).

Statements are "in furtherance of a conspiracy" when they "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001) (internal quotation marks omitted). "The statements need not be commands, but are admissible if they provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." Id. (internal quotation marks omitted). Similarly, "statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994). Nevertheless, to be "in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." Desena, 260 F.3d at 158. If the statements are merely "idle chatter" or are "entirely retrospective," they are not in furtherance of a conspiracy. See Thai, 29 F.3d at 813.

The Government contends that Manzo's statements are admissible under Rule 801(d)(2)(E) because each of the Rule's two requirements is met here. First, according to the Government, Manzo, Gioeli, and Saracino are all members of the Colombo crime family racketeering conspiracy. Second, the Government asserts that "many" of Manzo's statements were made in furtherance of this conspiracy, as Manzo's statements apprised the CW and DiMatteo of the status of that conspiracy. Relying on United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002), for the proposition that organized crime syndicates "cannot function properly unless its members and persons who do business with it understand its membership," the Government argues that Manzo's statements satisfy the in-furtherance requirement because

Manzo was informing the CW and DiMatteo about the risk that he may be incarcerated, as well as the risk that Gioeli and Saracino may remain incarcerated. Because these statements implicitly concerned the membership of the Colombo family, the Government argues that they furthered that conspiracy.

### A. Statements on November 18, November 30, December 7, and December 8, 2011

The Government is correct that the coconspirator exemption to the hearsay rule may apply "when the defendant and the declarant are involved in a conspiracy to maintain an organized crime syndicate." Russo, 302 F.3d at 46. However, even assuming that the Government can show that Manzo and the defendants were part of this conspiracy when Manzo made the statements, the Government's contention that many of Manzo's statements were made in furtherance of that conspiracy and therefore can be attributed to defendants reflects a misunderstanding of Russo. The Second Circuit's decision in Russo relied on the fundamental principle that "[a]dmissibility depends on the nature of the statement offered – in particular what objective it sought to advance – and whether the defendant was jointly engaged with the declarant in a conspiracy seeking that objective." Id. There, the Court was faced with out-of-court statements concerning the defendants' actual positions within the organized crime family. Specifically, a witness testified to hearing that defendant Russo had become captain and that defendant Hickey was "with the Colombo family." Id. at 44. Because an organized crime syndicate cannot function without its members understanding the organizations' "membership, leadership, and structure," the Court concluded that these statements furthered the maintenance of the Colombo family by providing associates of the family with information about the identities of other family members. See id. at 46.

However, the evidence here indicates that Manzo approached the CW and discussed his involvement in the Cutolo murder with the specific objective of obtaining advice. Manzo and his son described to the CW that the FBI had approached Manzo's son regarding Manzo's involvement in Cutolo's murder, and Manzo asked the CW what he thought. The parties then discussed over the course of several meetings the events surrounding the murder, with the apparent purpose of determining who may be able to implicate Manzo and evaluating Manzo's potential criminal liability. Further, they discussed Manzo's need to retain a lawyer, and the CW mentioned speaking with his lawyer or arranging a meeting between his lawyer and Manzo on several occasions. Thus, Manzo's statements on November 13, November 30, December 7, and December 8 appear to have been driven by his trust in, and relationship with, the CW. At no point did Manzo discuss the Cutolo murder in the context of the Colombo family's membership, organization, or leadership. His statements simply did not evince that objective.

Moreover, the Government's request to admit statements regarding the defendants' involvement in the charged Cutolo murder based solely on their alleged association with Manzo in the Colombo family ignores the limitations placed on the admission of coconspirator statements in Russo and United States v. Gigante, 166 F.3d at 83. Beginning with Gigante, the Circuit recognized that for a statement to be admissible under the coconspirator exemption, "a district court must find the existence of a specific criminal conspiracy beyond the general existence of the Mafia." 166 F.3d at 82; see also United States v. Coppola, No. 10-0065-cr, 2012 U.S. App. LEXIS 2854, at *64-65 (2d Cir. Feb. 14, 2011). Russo, in turn, clarified that involvement in a criminal organization could satisfy the conspiracy element of the coconspirator exemption, and held the statements at issue there to be admissible as made in furtherance of that conspiracy. However, the court emphasized that the admissible statements merely evidenced the

membership and structure of the criminal organization, and distinguished those facts from the "problem we noted in Gigante – the use of hearsay to identify a person as a participant in a crime justified solely by the declarant's membership together with the defendant in a criminal organization." Russo, 302 F.3d at 47.

The Government's rationale for the admission of Manzo's statements under the coconspirator exemption presents the same "problem" recognized in Gigante and Russo. The Government seeks to introduce Manzo's statements implicating defendants in the murder of Cutolo based solely on Manzo's and defendants' association with the Colombo crime family. Furthermore, the Government's theory, if taken to its logical conclusion, would open the door to any and all statements implicating other members of a Mafia family in past crimes. After all, any statement about a family member's prior criminal activity would, on some level, inform the listener about that member's potential risk of arrest or incarceration. This attenuated benefit to the crime family as a whole cannot justify admitting out-of-court statements that implicate a defendant in a charged crime. Accordingly, Manzo's statements during the meetings on November 18, November 30, December 7, and December 8 may not be admitted under the coconspirator exemption to the hearsay rule.

### B. Statements on November 23, 2011

In contrast to the meetings discussed above, the circumstances surrounding the conversation between Manzo, the CW, and DiMatteo on November 23, 2011 make clear that Manzo was not seeking the advice of a friend, but rather was complying with his obligation to inform his superior that he was under investigation by the FBI. Specifically, the CW introduced DiMatteo as Manzo's acting captain, and explained to Manzo that he should report to DiMatteo from now on. The CW and DiMatteo then told Manzo that he needed to explain his situation to

DiMatteo, to which Manzo replied, "[o]f course I do." At that point, Manzo discussed his role in

Cutolo's murder. Further, DiMatteo stated that he would need to discuss the situation with

Ralph Lombardi, presumably because DiMatteo was acting on Lombardi's behalf. The CW then

clarified that Gioeli, rather than Lombardi, was Manzo's "skipper at the time," and Manzo

agreed.

This dialogue establishes that Manzo's objective in the conversation was to report to

DiMatteo that the FBI suspected that Manzo took part in Cutolo's murder, and that he in fact had

been involved. Manzo's statements informed DiMatteo of potential risks to the Colombo family,

including not only the economic and organizational harm that could result from Manzo being

investigated or incarcerated, but also the risk that other family members could become the targets

of an FBI investigation based on their association with Manzo. DiMatteo and Lombardi in fact

appear to have avoided Manzo after this meeting. Manzo's statements therefore furthered the

Colombo family racketeering conspiracy by alerting his captain to these threats, who in turn

communicated them up the chain of command.

Further, Manzo's statements to DiMatteo only address Manzo's personal involvement in

Cutolo's murder, and do not implicate Gioeli or Saracino. The admission of these statements

therefore does not present the "problem" of identifying defendants as participants in Cutolo's

murder based solely on their membership with Manzo in the Colombo family. Thus, provided

that the Government offers sufficient evidence at trial that Manzo and the defendants were

members of the Colombo family racketeering conspiracy on November 23, 2011, Manzo's

statements to DiMatteo are admissible under Rule 801(d)(2)(E).

## II. Statements Against Penal Interest

Rule 804(b)(3)(A) provides an exception to the hearsay rule for a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to . . . criminal liability." A particular statement meets this "tendency" requirement "if it would be probative in a trial against the declarant." United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted).[4] Although courts can only determine "[w]hether a challenged statement is sufficiently self-inculpatory . . . by viewing it in context," United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007), the law is clear that "non-self-inculpatory statements" are not admissible as statements against penal interest "even if they are made within a broader narrative that is generally self-inculpatory," Williamson v. United States, 512 U.S. 594, 600-01, 114 S. Ct. 2431 (1994).

In addition, where, as here, the statement "is offered in a criminal case as one that tends to expose the declarant to criminal liability," it must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B). The proponent of the statement bears the burden of demonstrating sufficient corroboration. See United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006). Specifically, the Government "must point 'to evidence that corroborates both the declarant's trustworthiness and the truth of the statement.'" Id. (quoting United States v. Lumpkin, 192 F.3d 280, 287 (2d Cir. 1999)). Courts evaluating the trustworthiness of a declarant and his statements commonly consider the following factors: (1) the time of the declaration and the party to whom the declaration was

---

[4] Persico interpreted Rule 804(b)(3) as it was written prior to the 2010 amendments. Although the 2010 amendments changed the wording of the Rule slightly, the quoted language is still controlling. See Fed. R. Evid. 804, Notes of Advisory Committee on 2010 amendments.

made; (2) the existence of corroborating evidence; (3) the extent to which the declaration is really against the declarant's penal interest; and (4) the availability of the declarant as a witness. See United States v. Guillette, 547 F.2d 743, 754 (2d Cir. 1976); United States v. Watts, No. 09 Cr. 62, 2011 U.S. Dist. LEXIS 3976, at *9 (S.D.N.Y. Jan. 11, 2011).[5]

Despite defendants' arguments to the contrary, I find that certain of Manzo's statements are admissible under Rule 804(b)(3)(A). First, Manzo's statements are sufficiently self-inculpatory to fall within this exception. Gioeli correctly notes that the statute of limitations has likely expired on two potential crimes for which Manzo could be charged: an accessory after the fact in violation of 18 U.S.C. § 3, and hindering a prosecution in violation of New York Penal Law § 205.65. However, Manzo's statements also expose him to potential criminal liability for RICO conspiracy in violation of 18 U.S.C. § 1962(d), which has a five-year statute of limitations that does not begin to run until the purposes of the conspiracy have been either accomplished or abandoned. See United States v. Yannotti, 541 F.3d 112, 123 (2d Cir. 2008).

To be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of the joint enterprise. See Salinas v. United States, 522 U.S. 52, 64, 118 S. Ct. 469 (1997); Yannotti, 541 F.3d at 121-22. Manzo's statements undoubtedly exposed him to potential liability for this crime, as they support a finding that he agreed to aid defendants and other alleged Colombo members in the criminal act of disposing of Cutolo's body in 1999. Further, Manzo's discussion of the Cutolo murder with purported members or associates of the

---

[5] The applicability of this exception is also contingent on the declarant being unavailable as witnesses. See Fed. R. Evid. 804. A witness is unavailable if he invokes his Fifth Amendment privilege against self-incrimination, see United States v. Jackson, 335 F.3d 170, 177 (2d Cir. 2003), which the Government anticipates with regard to Manzo. The defendants have challenged the Government's assertion, and Saracino requests that the Court require the Government to bring Manzo to court so that he may assert his privilege. As I stated in my Order dated December 6, 2011, I believe the parties can reach an agreement on how the Government will support its position that Manzo is unavailable. If we have to conduct a hearing outside of the jury's presence to establish this, then we will, but it should not be necessary to take the jury's time for this.

Colombo family in November and December 2011 suggest that that he had continued to associate himself with the Colombo family. Although such statements may not be sufficient on their own to convict Manzo of RICO conspiracy, they certainly are probative of whether he agreed to a conspiracy's general criminal objectives. See Persico, 645 F.3d at 102-03 (finding no abuse of discretion in admitting statements under Rule 804(b)(3) because declarant's statements that he routinely met defendant at a location that allowed them to evade surveillance would be "probative in a trial to show [defendant's] membership in the Colombo family and to support inference that criminal messages were passed"); see also Williamson, 512 U.S. at 603 (noting that statements can be against penal interest if they link the declarant to a conspiracy). Thus, a reasonable person in Manzo's position would not have made such statements unless he believed them to be true.[6]

Second, I find that the circumstances in which Manzo communicated with the CW, and the Government's proffered testimony of other cooperating witnesses, provide sufficient corroboration of Manzo's statements. As an initial matter, Manzo appears to have had a close relationship with the CW and to have openly implicated himself in the disposal of Cutolo's body because he was looking for advice from someone he trusted. The existence of a close relationship between the declarant and the listener is one factor commonly relied on to support a finding of trustworthiness. See Watts, No. 09 Cr. 62, 2011 U.S. Dist. LEXIS 3976, at *9; Shukri, 207 F.3d at 417; see also Guillette, 547 F.2d at 754 (2d Cir. 1976). Further, the fact that Manzo discussed with the CW a twelve-year-old murder and that Manzo made certain of his

---

[6] Alternatively, I am not persuaded that Manzo's various confessions do not qualify as statements against penal interest merely because the most obvious crimes he committed have statutes of limitations that likely have expired. Defendants have not pointed to any evidence that even remotely suggests that Manzo was aware of this potential defense. To the contrary, Manzo's statements establish that he was deeply concerned that he could be held criminally liable for helping to dispose of Cutolo's body. I therefore find that a potential statute of limitations defense unknown to Manzo at the time he made the statements does not negate the fact that a reasonable person in Manzo's shoes would only confess his role in the Cutolo murder if the confession was true.

statements regarding the involvement of defendants in response to the CW's questions does not suggest that Manzo fabricated his story. As previously noted, Manzo approached the CW in direct response to an FBI agent's statement that Manzo was involved in Cutolo's murder. Thus, Manzo had a newfound concern that he might be arrested, and he discussed with the CW the involvement of others in the disposal of Cutolo's body with the understandable goal of determining who could implicate him. Finally, the Government has proffered that two cooperating witnesses will testify that they directly participated in disposing of Cutolo's body with Manzo and the defendants. Based on these facts, I conclude that the Government has provided sufficient evidence of Manzo 's trustworthiness and the trustworthiness of his statements at issue here.

Nevertheless, not all of Manzo's statements offered by the Government are admissible under Rule 804(b)(3)(A). As explained by the Supreme Court in <u>Williamson</u>, 512 U.S. at 600-01, each statement admitted under the penal interest exception must itself inculpate the declarant. Thus, I will specifically identify the statements that are admissible under this exception with citations to the Government's draft transcript. I will also note which statements are admissible pursuant to the coconspirator exemption, as discussed above.

**III.    Portions of the Recordings Admissible Under Rule 804(b)(3) and 801(d)(2)(A)**

With regard to the November 18, 2011 recording, Manzo's statements from page 3 line 27 to page 6 line 3 are admissible as statements against penal interest. Considered in context, these statements support a finding that Manzo was at the scene of the crime and that members of the Colombo family could implicate him for his role in disposing of Cutolo's body.

Regarding the November 23, 2011 recording, Manzo's statements from page 5 line 34 to page 6 line 22, and page 7 lines 1 to 3, are admissible as statements against penal interest. These

statements are self-inculpatory as they demonstrate that Manzo transported Cutolo's body in his own car and that he was associated with the Colombo family both at the time of Cutolo's murder and at the time he made the statements to DiMatteo. Further, Manzo's statements from page 3 line 46 to page 5 line 3 and page 5 line 46 to page 6 line 22 are admissible as coconspirator statements. These statements were made in furtherance of the Colombo family racketeering conspiracy because they informed Manzo's superiors about the FBI's interest in Manzo and the collateral risks to the Colombo family.

Regarding the December 8, 2011 recording, Manzo's statements from page 3 line 12 to page 4 line 39, page 5 lines 14 to 28 and lines 39 to 48, page 6 lines 8 to 14, page 6 line 30 to page 7 line 11, and page 7 line 23 to page 10 line 1 are all admissible as statements against penal interest. The majority of these passages directly implicate Manzo in the disposal of Cutolo's body. Additionally, statements that describe the involvement of defendants and third parties support a finding that Manzo was part of a criminal conspiracy with defendants and other alleged associates of the Colombo family. However, I have excluded self-serving statements that appear to limit Manzo's involvement and shift the blame, as such statements are not properly admitted under Rule 804(b)(3).

Regarding the November 30, 2011 recording, the portions identified by the Government do not contain any admissible statements. As previously noted, the overwhelming majority of Manzo's statements that the Government wishes to offer from this conversation are inaudible. As a result, the recording is predominantly a one-sided conversation comprised of the CW's questions and purported characterizations of Manzo's answers. Such characterizations do not constitute Manzo's statements and thus cannot be admitted as statements against Manzo's penal interest. Cf. United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (stating that "a 'third

Page 17 of 19

party's characterization' of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization."). The few audible statements that can be attributed to Manzo either do not inculpate him or tend to limit his involvement in the Cutolo murder, and therefore are not admissible under this hearsay exception either.[7]

**IV.    Rule 403**

Defendants also object to the admission of Manzo's statements on the grounds that the danger of unfair prejudice from these statements substantially outweighs their probative value. Specifically, defendants contend that Manzo's statements are inherently unreliable, both because the CW and DiMatteo pressured Manzo to falsely implicate defendants, and because Manzo's statements are at times inaudible and inconsistent. I am not persuaded by these arguments, and I find that each of the statements cited above are admissible under Rule 403.

First, the statements are highly probative, as they implicate defendants in the charged Cutolo murder. Second, the danger of unfair prejudice is minimal. As noted above, the circumstances surrounding the conversations corroborate the accuracy of Manzo's statements. Further, while defendants argue that certain of Manzo's statements are inaudible, I have held that the portions of the November 30, 2011 recording offered by the Government are not admissible as statements against penal interest primarily on that ground. The inaudible portions of the remaining conversations are not so substantial that they require the exclusion of a recording under Rule 403. See Arango-Correa, 851 F.2d at 58 ("Our decisions in this area reveal a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative."). Finally, the fact that Manzo's statements demonstrate his inability to remember certain facts or arguably are inconsistent on some issues does not justify

---

[7] This Order exclusively addresses the grounds for admission offered by the Government and does not preclude the Government from seeking to offer Manzo's statements for either a non-hearsay purpose or based on another hearsay exception or exemption.

Page 18 of 19

the wholesale exclusion of Manzo's statements.  Defendants of course are free to argue to the jury that his statements should be afforded little weight based on these grounds.

## **CONCLUSION**

The Government's [1318] motion in limine to admit certain evidence at trial is GRANTED IN PART and DENIED IN PART.

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated: Brooklyn, New York
       February 28, 2012