UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

UNITED STATES OF AMERICA

- against -

THOMAS GIOELI,

Defendant.

--------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

08-cr-240 (BMC)

**COGAN**, District Judge.

For several years, defendant has been paying court-ordered forfeiture and restitution at the rate of $25 per quarter. Now that he is about to receive a $250,000 personal injury settlement, he seeks under 18 U.S.C. § 3664(k) to modify the amount and manner in which he will pay the remaining amount of forfeiture and restitution. The Court denies his request for a modification.

## BACKGROUND

Following an eight-week jury trial, defendant was convicted of racketeering conspiracy, in violation of the RICO statute, 18 U.S.C. § 1962(d). The jury found defendant guilty of three predicate racketeering acts of which all involved multiple conspiracies to murder three individuals. On March 19, 2014, the Court sentenced him to 224 months' in prison and 3 years' supervised release, imposing a $100 special assessment penalty. Pursuant to 18 U.S.C. § 1963(a), the Court ordered defendant to forfeit the amount of $360,000. Defendant was also ordered to make restitution in the amount of $360,000 to Furs by Mina and J.P. Morgan Chase Bank. The sentence required restitution be paid "immediately and at a rate of $25 per quarter while in custody and 10% of gross income per month while on supervised release." As of

September 16, 2019, defendant has paid $450 towards his outstanding obligation and still owes the two victims $359,550.

After his trial and while incarcerated, defendant suffered a knee injury. Having reached a financial settlement with the Government for this personal injury claim, he stands to receive $250,000. The parties have agreed to withhold disbursement of the settlement payment so this Court may rule on this instant motion. Because defendant does not want the entire settlement amount to be applied towards his outstanding restitution balance, he asks the Court to do one of the following under 18 U.S.C. § 3664(k): (1) vacate the forfeiture and restitution amount; (2) decrease the forfeiture and restitution amount; or (3) change his payment schedule.

## DISCUSSION

### I. Request to Vacate Forfeiture and Restitution

Defendant contends the Court's order of forfeiture and restitution should be vacated in light of the Supreme Court's decision in Honeycutt v. United States, 137 S. Ct. 1626 (2017). He asserts this case stands for the proposition he cannot be held jointly and severally liable for property that he did not personally acquire.

#### A. Honeycutt v. United States and Forfeiture Actions

In Honeycutt, the defendant managed sales and inventory for a hardware store that was owned by his brother. The brothers were convicted for various federal crimes relating to their sale of iodine while knowing or having reason to know it would be used to manufacture methamphetamine. At sentencing, the Government sought forfeiture money judgments against each brother in the amount of $269,751.98, which represented the hardware store's profits from the sale of iodine. The Government conceded the defendant had no ownership interest in the

hardware store and did not personally gain from the sale of iodine. The statute at issue in Honeycutt, 21 U.S.C. § 853, provided for criminal forfeiture in the following three categories of property involved in drug manufacturing and distribution crimes:

> any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;
>
> any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and
>
> in the case of a person convicted of engaging in a continuing criminal enterprise in violation of section 848 of this title, the person shall forfeit, in addition to any property described in paragraph (1) or (2), any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.

The Honeycutt Court found joint and several liability to be "inconsistent with the statute's text and structure," as well as its legislative history. Foremost, section 853 was silent on whether joint and several liability was permitted under the statute. According to the Court, in section 853(a)(1), the verb "obtained" in its ordinary meaning referred to something brought into one's personal possession or use – not "property that was acquired by someone else." Id. at 1632. Also, the statute's reference to "the person's property" and "his interest in" a criminal enterprise within the other two prongs of section 853(a) reinforced the Court's reasoning that reading joint and several liability into the statute would be inconsistent with these words of limitation. Id.

The Court likewise found joint and several liability to be contrary to other provisions in section 853, which appeared to restrict the Government's ability to initiate forfeiture actions against untainted property: (1) section 853(c) allowed the Government's title to property to vest only upon the commission of the act giving rise to forfeiture; (2) section 853(e)(1) permitted pretrial freezes of a defendant's assets, but only after the Government had proven these assets

were connected to the underlying crime; and (3) section 853(d) established a rebuttable presumption of forfeiture for property acquired by the defendant "during the period of the violation" with "no likely source for such property other than the violation." Id. at 1633. The Court deemed the inclusion of these provisions to be incompatible with an interpretation that permitted joint and several liability. Id.

More importantly, interpreting section 853(a) to permit joint and several liability would render futile section 853(p), a provision that authorized the Government to confiscate "substitute property" – otherwise untainted by the crime – after the defendant had dissipated the tainted assets. Id. at 1634. This narrow provision would be pointless if the Government could circumvent the statute's carefully drafted exception by simply confiscating the untainted property of other co-conspirators through joint and several forfeiture actions.

Finally, the Honeycutt Court rejected joint and several liability under section 853 because it was inconsistent with traditional forfeiture laws. See United States v. McIntosh, 11-cr-500, 2017 WL 3396429, at *4 (S.D.N.Y. August 8, 2017) ("The legislative history confirmed that Congress intended to effect only technical improvement of forfeiture proceedings, not a significant expansion of the scope of property subject to forfeiture."). Therefore, section 853(a) limited forfeiture to "tainted property; that is, property flowing from, or used in, the crime itself." Honeycutt, 137 S. Ct. at 1632.

**B. The Statute Here: 18 U.S.C. 1963(d)**

In the instant case, the Court ordered defendant to forfeit $360,000 after he was convicted of a RICO offense. See 18 U.S.C. § 1963(d). The Second Circuit has recognized "that the statutory provisions governing forfeitures under RICO and criminal forfeiture orders imposed pursuant to [21 U.S.C. § 853] are so similar in legislative history and plain language as to

warrant similar interpretation." United States v. Awad, 598 F.3d 76, 79 (2d Cir. 2010) (citation omitted). Similar to the statute in Honeycutt, 21 U.S.C. § 853, the RICO forfeiture statute contains the phrase "the person obtained." See 18 U.S.C. § 1963(a)(3). The presence of this phrase was crucial to the holding in Honeycutt. See United States v. Sexton, 894 F.3d 787, 799 (6th Cir. 2018) (describing the phrase "the person obtained" as the "linchpin" of the Honeycutt decision).

The RICO forfeiture statute also contains similar provisions the Court in Honeycutt deemed were inconsistent with an interpretation of joint and several liability: (1) the vesting of property after the commission of the act giving rise to forfeiture; (2) seizure of property; and (3) conditions when the Government could confiscate substitute property if the tainted property was no longer available. Compare 18 U.S.C. § 1963(c), (e), and (m) with 21 U.S.C. § 853(c), (e), and (p). The presence of these similar provisions in the RICO statute suggest the statute does not permit joint and several liability. See 137 S. Ct. at 1633. Accordingly, Honeycutt's holding applies to the RICO forfeiture statute because the two statutes are "substantially similar." United States v. Gjeli, 867 F.3d 418, 427-28 (3d Cir. 2017).

**C. Honeycutt Does Not Apply Retroactively**

Although Honeycutt applies to the RICO statute upon which defendant was ordered to pay forfeiture, the Court cannot grant the relief he seeks because Honeycutt does not apply retroactively. See United States v. Bangiyev, 359 F. Supp. 3d 435, 439-40 (E.D. Va. 2019); United States v. Potts, 2018 WL 5296376, at *2 (E.D. Pa. Oct. 25, 2018), aff'd, 765 F. App'x 638 (3d Cir. April 2, 2019); Samuels v. Ortiz, 18-cv-10133, 2019 WL 2341553, at *1 (D.N.J. June 3, 2019).

Honeycutt did not address retroactivity. Under Teague v. Lane, 489 U.S. 288, 307 (1989), a new rule will be applied retroactively if it is (1) "substantive," which means that it alters the range of conduct or class of people that the law punishes, or (2) is a "watershed rule" of criminal procedure. The Court in Honeycutt did not alter the range of conduct or class of people that the law punishes. Instead, the case "decided only whether joint and several liability could be imposed as a consequence of that conduct." Bangiyev, 359 F. Supp. 3d at 439. And Honeycutt did not declare a watershed rule of criminal procedure that implicated the fundamental fairness and accuracy of a criminal procedure. See Ortiz, 2018 WL 3304522, at *8 ("The Supreme Court has stated that the decision in Gideon v. Wainwright, 372 U.S. 335 (1963), illustrates the type of rule coming within the exception to Teague for watershed rules. The rule in Honeycutt merely clarifies the interpretation of a criminal forfeiture statute, falling well short of the Gideon benchmark."). Thus, the Court cannot apply Honeycutt to defendant's case.

**D. Honeycutt Does Not Apply to a Leader Figure**

Even if Honeycutt applied retroactively, I would still find defendant jointly and severally liable for the forfeiture amounts. Honeycutt based its rationale on drawing distinctions between a mastermind who controlled the criminal operation and a lowly figure who only had access to and control over a small fraction of the tainted property directly in his possession. Bangiyev, 359 F. Supp. 3d at 440. Picking up on this distinction, the Second and D.C. Circuits have declined to apply Honeycutt in cases where the defendants were in a position of control in each respective criminal enterprise. See, e.g., SEC v. Metter, 706 F. App'x 699 (2d Cir. 2017); United States v. Leyva, 916 F.3d 14 (D.C. Cir. 2019).

In Metter, the Court distinguished Honeycutt. Unlike the employee in Honeycutt, who had no controlling interest in the store and did not profit from the criminal conduct, the

defendant in Metter was a managing officer of a publicly traded company, who had control over the enterprise and thus could control the distribution of proceeds of the offense. 706 F. App'x at 702 n.2. The Metter Court held the rule in Honeycutt was established to protect "incidental figures" from forfeiture of amounts far beyond what would be justified by their limited role in the offense. Id.

The Court is also persuaded by the D.C. Circuit's decision in Leyva. There, the defendant was one of the leaders of a drug trafficking organization and, on appeal, he argued the Government failed to show, as required by Honeycutt, that he personally acquired the entire $529.2 million allegedly earned by the drug organization. He contended the district court erred because he never "obtained, directly or indirectly" these gross profits.

Reaffirming the forfeiture amount, the Leyva Court held "property obtained indirectly [may] include property received by persons or entities that are under defendant's control, such as an employee or other subordinate to the defendant." Id. at 30 (internal quotation marks and citation omitted). Because the district court attributed to the defendant only proceeds from activities the defendant "directly supervised," the Court held the defendant's circumstances fell within an exception Honeycutt did not abrogate. Id. at 31 (citing United States v. Cano-Flores, 796 F.3d 83, 92 (D.C. Cir. 2015)). Cf. United States v. Peters, 732 F.3d 93, 102-04 (2d Cir. 2013) (holding an individual can "obtain" proceeds "indirectly" through a corporation if they exercise extensive control or dominate the organization).

Here, defendant was far from an "incidental figure" in the Colombo crime family and the "crew" responsible for these crimes. Instead, he played a major role it the organization's overall conspiracy. The mafia is a highly structured organization. "Associates" occupy the lowest rung and associates can ultimately be selected to become a formal member of the family through a

process known as getting "made." Newly minted members are commonly referred to as "soldiers." The family is organized into groups of associates and soldiers known as "crews," and each crew is run by a "captain," who is responsible for supervising the criminal activities. The captain provides the members of his crew with support and protection in exchange for a share of each member's earning. Not only was defendant the captain of the crew responsible for victimizing Furs by Mina and Chemical Bank/J.P. Morgan, he played instrumental roles in both crimes, personally receiving proceeds for each crime.

By the early 1990s, defendant was a "made" member of the Colombo family. Defendant later cultivated a crew of young associates to assist him in committing multiple robberies, profiting handsomely from these crimes. For almost two decades, defendant assisted and directed his younger associates to commit various criminal acts. More importantly, unlike the lowly employee in Honeycutt, defendant personally profited from these robberies, while exercising substantial, if not exclusive, control over his subordinates who perpetuated these two crimes for which he now owes restitution.

Specifically, in 1992, defendant participated in the armed robbery of the clothing store Furs by Mina. A made man at the time, defendant and two associates from his crew, Dino Calabro and Richard Greaves, entered the store posing as a father and two sons shopping. After restraining the store's owner, the gang proceeded to loot the store, filling garbage bags full with fur coats. The trio netted about 150 fur coats and jackets worth approximately $900,000. Defendant was the undisputed leader of the pack: he was the only "made" man and solider among the three; he planned the robbery; he held the most clout with the higher echelons of the Colombo crime family, becoming the crew's captain by the mid-1990s; and Calabro and Greaves

were mere associates under defendant's supervision and protection at the time of the robbery (through defendant's support, Calabro became a "made man" in 2000).

As in Metter, defendant could dictate how the three distributed the bounty of their criminal misdeeds. This is partially how he paid his crew's "salary," rewarding their loyalty and continued participation in the ongoing racketeering conspiracy that fueled his rise in the Colombo family hierarchy, ultimately culminating in defendant's accession to "street boss" of the Colombo crime family in the mid-2000s. Like the defendant in Leyva, defendant did personally "obtain, directly or indirectly" the proceeds of the Furs by Mina robbery. He personally profited from the crime, and the other perpetrators were his direct subordinates within the mafia hierarchy, acting pursuant to his orders.

Similarly, although defendant was never convicted of the 1995 bank heist of the Chemical Bank branch, the bank was also directly harmed by defendant's conduct in the course of the racketeering conspiracy because this robbery was an activity under his supervision. The preponderance of the evidence demonstrated Calabro consulted with defendant before the planned bank robbery, and the meeting concluded with defendant personally "authorizing" the bank heist. Defendant again personally profited from the bank robbery because two of the bank robbers, associates in defendant's crew and his subordinates, gave him a portion of their shares from the crime. The fact the bank robbers specifically sought defendant's permission before committing the crime and also subsequently paid their respects by "kicking back" to him proceeds of the crime, demonstrates how defendant controlled these individuals.

**E. Honeycutt and the MVRA**

Although defendant asks the Court to extend Honeycutt's holding to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663(A), because the texts, statutory schemes,

and rationales of the forfeiture and restitution statutes are quite distinct, the Court declines to do so.

In United States v. Rodriguez, 915 F.3d 532 (8th Cir. 2019), the defendants pled guilty to participating in a scheme to commit wire fraud. At sentencing, the district court found them jointly and severally liable for the acts of other conspiracy members, ordering them to pay restitution comparable to the total loss involved in the scheme. On appeal, the defendants cited Honeycutt, arguing that they could not be held jointly and severally liable when they did not personally gain much from the scheme. However, the Rodriguez Court declined to extend Honeycutt's holding to the MVRA:

> The forfeiture statute is meant to prevent a defendant from keeping his "ill gotten gains," to return property to those deprived of it, and to serve as a deterrent to the economic power of criminal activity. While some aspects of mandatory restitution statutes are punitive, the primary purpose of such statutes are remedial or compensatory.

Id. at 536 (internal quotation marks and citations omitted).

Unlike the statute in Honeycutt, the MVRA, upon which defendant was ordered to pay restitution, explicitly permits joint and several liability: "If the court finds that more than [one] defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants …." 18 U.S.C. § 3664(h) (emphasis added). Because "a primary reason behind the Honeycutt Court's decision was the lack of statutory text authorizing forfeiture to be allowed jointly and severally," Rodriguez, 915 F.3d at 537, Honeycutt should be read narrowly. The Court in Honeycutt never criticized, let alone mentioned the MVRA, a distinct statute, and there is no basis to assume the

decision was intended to undermine the restitution statute. See Rodriguez, 915 F.3d at 536 ("[N]othing in Honeycutt undercuts the language of [the MVRA].").

Unlike the statute in Honeycutt, the MVRA does not contain the critical phrase "the person obtained" or "any of the person's property" and thus should be interpreted more broadly. Cf. United States v. Seabrook, 661 F. App'x 84, 86 (2d Cir. 2016) ("18 U.S.C. § 981(a)(1)(C) does not contain the language [contained in Honeycutt], i.e., the forfeiting of 'any proceeds the person obtained' or 'any of the person's property.' The language in § 981 is much broader[.]") (citation omitted).

Likewise, the Honeycutt Court found joint and several liability to be inconsistent with two specific provisions, sections 853(e) and (p). However, similar sections are noticeably absent from the MVRA. First, unlike section 853(e)(1)'s authorization of the pretrial seizure for assets that have a requisite connection to the crime, the MVRA focuses on another factor, the reasonably foreseeable loss to the crime victim. Secondly, whereas a statutory provision in Honeycutt – section 853(p)'s limitation on the confiscation of substitute property – would be rendered futile if the statute was interpreted to permit joint and several liability, 137 S. Ct. 1633, interpreting the MVRA to permit joint and several liability is entirely consistent with the rest of the statute. Therefore, holding co-conspirators jointly and severally liable does not circumvent any provision of the MVRA's carefully constructed statutory scheme.

Thirdly, the legislative history of the MVRA, given the statute's goal of protecting victims, supports an interpretation of joint and several liability. Whereas the legislative history of the statute in Honeycutt demonstrated Congress did not intend a "significant expansion" of property subject to forfeiture, McIntosh, 2017 WL 3396429, at *4, the MVRA's primary purpose is to force offenders to "pay full restitution to the identifiable victims of their crimes." Kalani v.

United States, 02-cv-8663, 2002 WL 31453094, at *9 (S.D.N.Y. Oct. 31, 2002). Thus, contrary to defendant's assertion, Honeycutt does not overrule Second Circuit precedent concerning restitution. See Pierce v. United States, 16-cv-7669, 2018 WL 4179055, at *8 (S.D.N.Y. August 31, 2018) ("Honeycutt exclusively discusses the subject of forfeiture, and does nothing to aid Pierce's challenge to her restitution obligation.").

**F. Joint and Several Liability Under the MVRA**

Because Honeycutt does not apply to a defendant's restitution obligation, "the court may make each defendant liable for payment of the full amount of restitution" if the court finds that more than one defendant has contributed to the loss of the victim. United States v. Smith, 513 F. App'x 43, 45 (2d Cir. 2013). The Court may impose restitution holding a defendant liable for the "reasonably foreseeable acts of all co-conspirators," even when the jury has acquitted the defendant as to some aspects of the conspiracy. See United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000).

However, the purpose of restitution is compensatory, so a restitution order should be "limited to the full amount of each victim's losses" and "must be tied to the victim's actual, provable loss." United States v. Tanner, ___ F.3d ___, 2019 WL 5607685, at *4 (2d Cir. Oct. 31, 2019) (internal quotation marks and citation omitted). In Tanner, the Second Circuit, post-Honeycutt, expressly held that co-conspirators could be held jointly and severally liable for their victims' losses, so long as the restitution amount was a "reasonable approximation of losses supported by a sound methodology. Id. But in Tanner, the district court abused its discretion when it ordered restitution in the amount of $8 million, because it did not approximate any losses to the victims attributable to the defendant's criminal conduct, failing to utilize a "sound methodology." Id. at *5.

Unlike the district court in Tanner, I limited defendant's restitution order to the approximate losses he caused, caused by reasonably foreseeable acts of his co-conspirators, or caused by acts "engaged in furtherance of the scheme, conspiracy, or pattern that was an element of the offense of conviction." United States v. Donaghy, 570 F. Supp. 2d 411, 426 (E.D.N.Y. 2008), aff'd sub nom., 575 F. 3d 226 (2d Cir. 2009). Specifically, I ordered restitution in the amount of $150,000 to Furs by Mina, despite a Nassau County Police report revealing that the robbery netted approximately 150 fur coats and jackets worth $900,000 (or $6,000 per fur coat/jacket). As I discussed earlier, defendant actively planned and participated in this particular robbery, directly supervising his associates within his crew during the robbery and profiting handsomely from their actions. It was reasonably foreseeable that Furs by Mina would suffer losses after defendant recruited two compatriots to help him commit the robbery, rewarding their assistance by distributing to them shares of the crime's proceeds.

I also ordered defendant pay restitution in the amount of $210,000 to Chemical Bank/J.P. Morgan because he was responsible for this loss. The preponderance of the evidence demonstrated that members of defendant's crew, under his supervision and control, carried out the robbery after receiving defendant's permission. Namely, before the bank robbery occurred, defendant "authorized" the bank robbery after speaking with his close associate, Calabro, who testified against him at trial. The crew members sought defendant's permission because he was the crew's captain, who would presumably weigh the costs and benefits of the criminal activity before the crime was executed. Similar to the Furs by Mina robbery, defendant also personally profited from this second robbery because two subordinates gave him a portion of the crime's proceeds.

The presentencing report indicated that approximately $200,000 was stolen from the bank. Due to defendant's status in the Colombo family and the authority he held over the individuals who perpetrated the bank robbery as the crew's captain, the bank would not have suffered any loss "but for" defendant "blessing" the bank heist. Had defendant not authorized the bank job, it is likely his subordinates would not have caused the loss to the bank. Thus, the restitution order of $210,000 reflected the Court's reasonable approximation of losses Chemical Bank/J.P. Morgan suffered due to defendant's actions and the foreseeable actions of his racketeering co-conspirators within the scope of the overall conspiracy.

**G. MVRA's Application to Acquitted or Uncharged Conduct**

Defendant's motion rests on the notion that, since he was never convicted of any crimes perpetrated against Furs by Mina and J.P. Morgan, successor to Chemical Bank, the Court overstepped its authority when it ordered him to pay restitution to these victims. The Second Circuit begs to differ.

"The [Victim and Witness Protection Act and MVRA] confer authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts." United States v. Boyd, 222 F.3d 47, 51 (2d Cir. 2000). "Congress broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused in course of a defendant's criminal conduct, whether the defendant is convicted of each of those offenses or not." Id. In Boyd, the Court unequivocally endorsed joint and several liability in conspiracy cases:

> It is … clear that the VWPA confers authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts, and it follows that the district court's restitution order in this case—made pursuant to the MVRA's identical text—was not plain error.

Id. at 55.

Thus, in Donaghy, 570 F. Supp. 2d at 425-26, the court held the MVRA conferred upon a district court the authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts. See also United States v. Jafari, 104 F. Supp. 3d. 317, 324-25 (W.D.N.Y. 2015) (considering the entire scheme, as opposed to only the counts of conviction, in determining restitution). Thus, as in Donaghy and Jafari, the Court was authorized under the MVRA to consider the entire conspiracy, even uncharged and acquitted counts, when it determined defendant's amount in restitution.

Like the defendant in Rodriguez, who was a supervisor, defendant was active in the criminal enterprise during the relevant timeframes, and he recruited or supervised the perpetrators of the two crimes and personally profited from those acts. See Rodriguez, 915 F.3d at 536 (ordering appellant liable for losses caused by an unindicted co-conspirator appellant had recruited into the organization). Although he was never convicted of the Furs by Mina robbery and Chemical Bank robbery, the individuals who perpetrated these crimes were associates from defendant's crew, whom he recruited, supervised and controlled. He had full knowledge of his subordinates' plans before the commission of each crime, and either actively participated in the crime or authorized it. Defendant also received financial proceeds for both crimes.

Decisions from other circuit courts have squarely addressed this issue, likewise concluding a defendant convicted of a scheme or conspiracy may be required to pay restitution for uncharged or acquitted counts. See, e.g., United States v. Clark, 747 F.3d 890, 897 (D.C. Cir. 2014) (affirming district court's restitution order that included losses from bank fraud count for which the defendant was acquitted); United States v. Brown, 665 F.3d 1239 (11th Cir. 2011) (affirming district court's restitution order that included losses from uncharged charged).

## II. Request to Modify Restitution Amount

### A. Restitution Total

Defendant alternatively requests the Court decrease the total amount he owes in restitution. But the Court cannot because a district court may not alter an imposed sentence, except in narrow circumstances not present here. See 18 U.S.C. § 3582(c). Restitution is part of a criminal sentence, and a district court's jurisdiction to vacate or modify a restitution order is quite limited. See United States v. Kyles, 601 F.3d 78, 83 (2d Cir. 2010). Although the MVRA provides the Court with continuing jurisdiction to modify the timing of payment, 18 U.S.C. § 3664(k), that section makes no mention of altering the amount of payment. See United States v. Hamburger, 414 F. Supp. 2d. 219, 227 (E.D.N.Y. 2006). The Second Circuit in Kyles, 601 F.3d at 83, made it abundantly clear that, although a district court has equitable authority to modify a payment schedule, this authority does not extend to decreasing the amount of restitution.

### B. Modifying the Payment Schedule

Nevertheless, the Court retains jurisdiction to modify the terms of payment if there is a material change in defendant's economic circumstance that may affect his ability to pay restitution, see Kyles, 601 F.3d at 83-84, including adjusting the payment schedule or even requiring immediate payment in full, as the interests of justice may require. See 18 U.S.C. § 3664(k). The Court may adjust the payment schedule on its own motion, and section 3664 even permits a court to accelerate defendant's schedule of restitution payments so his victims are

promptly and justly compensated. See United States v. Gilmartin, 12-cr-287, 2018 WL 2059650, at *3 (S.D.N.Y. May 1, 2018).

I look to the Second Circuit's decision in United States v. Grant, 235 F.3d 95, 100 (2d Cir. 2000), to resolve this issue. In Grant, the defendant's bank account was "frozen" at sentencing, so he couldn't access his money. But post-sentencing, his account became "unfrozen." The Second Circuit held the defendant's present ability to reach previously inaccessible money, totaling approximately $34,000, met the statutory test for a "material change" under section 3664(k). Id. at 101. The Court affirmed the district court's decision to seize the entirety of the defendant's bank account so it could be "applied to the satisfaction of the special assessment penalty and that the remainder be immediately used for restitution." Id. at 99.

Furthermore, if a defendant receives a substantial resource from any source, including settlement or judgment, he "shall be required to apply the value of such resource to any restitution or fine still owed." 18 U.S.C. § 3664(n) (emphasis added). In this case, once defendant's settlement is finalized, he will have immediate access to $250,000. This sudden "windfall" constitutes a material change in his financial circumstance and warrants a modification in restitution. See United States v. Hughes, 914 F.3d 947, 951 (5th Cir. 2019) ("[Material changes are] windfalls or sudden financial injections … that become suddenly available to the defendant."). There is no reason to treat defendant differently than in Grant: his financial circumstances have seismically shifted, and he now has the financial means to make immediate court-ordered restitution. In fact, applying a defendant's settlement recovery from a personal injury lawsuit towards to an outstanding restitution obligation is not a novel idea. See United States v. Simpson-El, 856 F.3d 1295 (10th Cir. 2017); United States v. Gardner, 434 F. App'x 250, 253 (4th Cir. 2011).

For these reasons, defendant's motion to vacate or modify restitution is DENIED. The Court orders defendant to SHOW CAUSE why the Court should not accelerate defendant's restitution payments, based on a material change in his economic circumstance, and direct the application of the prospective settlement fund towards his outstanding restitution obligation.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
November 19, 2019