```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------  X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :      MEMORANDUM
             -against-                                      :      DECISION AND ORDER
                                                            :
THOMAS GIOELI,                                              :      08-cr-240 (BMC)
                                                            :
                                 Defendant.                 :
----------------------------------------------------------  X
```

**COGAN,** District Judge.

Before me is defendant's motion to reduce his sentence to time served or in the alternative, for release to home confinement, pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). Defendant argues that his various medical conditions, coupled with the current COVID-19 pandemic, constitute "extraordinary and compelling reasons" warranting his release him from prison before the termination of his sentence.

The motion is denied. First, defendant has not fully exhausted his claim for compassionate release with the Bureau of Prisons. Second, I do not agree that the mere exposure to COVID-19, even with defendant's pre-existing medical conditions, constitutes "extraordinary and compelling reasons" for his release. Finally, even if I were to overlook these two failings, consideration of the factors under 18 U.S.C. § 3553(a) weigh in favor of continued custody.

## BACKGROUND

### I. The Trial and Sentence

I presided over defendant's racketeering case, together with one of his co-conspirators, over a six-week period in 2012. The evidence showed that he was a captain and then "street boss" of the Columbo crime family. It also showed that defendant had been involved in crime from a very young age, including violent robberies. By the 1990s, he and his crew members, at

his direction, had been committing crimes for decades.  These included bank burglaries, robberies of clothing stores, and truck robberies.  Included in the crew were members or associates who later turned on him and testified against him.  There were a number of individuals who defendant and his crew conspired to kill.  Most importantly, for present purposes, he and his crew committed multiple murders that I know of from the evidence at trial.

The jury convicted him of one count of racketeering conspiracy predicated upon three of three murder conspiracies, not the substantive murder counts themselves, even though there was no dispute that at least two targets of the conspiracy had been murdered.  The first was the murder of one Frank Marasa, a retaliatory killing.  Using a stolen car, members of defendant's crew shot Marasa in the body and head and then escaped in a separate getaway car.  The proof of the murder at trial was highly detailed, and one of the participants testified that defendant had approved the killing and directed them on how to accomplish it, a plan which they successfully followed.

The second conspiracy to commit murder arose in the context of the Columbo Family crime war, in which multiple murders occurred when members of the family had a falling out over leadership.  Much has been written about this internecine violence during the 1990s so I will not address it exhaustively.  It suffices to say that defendant's crew, members of the Persico faction of the Columbo family, targeted a number of members of the opposing Orena faction.  Defendant and his crew, heavily armed, conducted searches of various locations in an effort to isolate and kill Orena faction members.  In one violent exchange, an attempt to kill one Orena member known as Bobo Malpeso, defendant was shot in the hand.

The third conspiracy resulted in the death of John Minerva and Michael Imbergamo. Defendant's involvement in the conspiracy and the brutality of the execution was well-established at trial.

Those were the main charges of which defendant was convicted. At sentencing, I found him responsible by a preponderance of the evidence of participating in two other murders: (1) that of Richard Greaves, a member or associate of the crew, who was killed because he had discussed withdrawing from the mob and moving to Arizona; and (2) William Cutolo, who headed another crew, and who was shot in the head by members of the crew after being transported to the murder location by defendant, acting upon instructions of Persico, who thought that Cutolo had become too powerful. The evidence of these murders was again detailed, grisly, and left me with no doubt as to defendant's involvement.

I sentenced defendant to 224 months out of a possible 240 months' custody. The principal reason that I did not impose the maximum sentence was because of his age and ill health. The Second Circuit affirmed defendant's conviction and sentence. See United States v. Cacace, 796 F.3d 176 (2d Cir. 2015). With credit for good time, which he has so far received, defendant has a projected release date of May 2, 2024.

## II.     The Instant Motion

Defendant seeks compassionate release under 18 U.S.C. § 3582(c) because he has an injured knee, diabetes, prior heart attacks and heart surgery, and, now, exposure to COVID-19. He has had three tests for the virus, although he is and has always been asymptomatic. The first test showed the presence of COVID-19 antibodies. The second test was negative. The third test was originally reported as positive for COVID-19, but then declared a false positive, the false report due to the presence of the COVID-19 antibodies.

Defendant, through counsel, filed a request for compassionate release with the warden of his facility. It asserted that defendant had not been convicted of any crimes of violence and that he had been rehabilitated. The warden denied the request 25 days later. He found that defendant's medical conditions were being adequately addressed, and that possible exposure to COVID-19 did not warrant a reduction in sentence because the facility was taking "extraordinary measures" to contain the spread of the virus. As of this date, defendant has not sought to administratively appeal the warden's denial.

## DISCUSSION

### I. Exhaustion

In general, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, a defendant may bring a motion to reduce the term of his imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). A defendant may only apply to the court for release under this provision once he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden." Id. § 3582(c)(1)(A).

District courts in this Circuit have split on how to interpret this language, and the Court of Appeals has not yet resolved the split. As defendant argues here, some courts have held that delivery of the request for compassionate release to the warden and the expiration of 30 days thereafter – whether or not the warden acts on the request – is sufficient to fully exhaust. See, e.g., United States v. Haney, No. 19-cr-541, 2020 WL 1821988, at *3 (S.D.N.Y. April 13, 2020). Other district courts have held that if the warden denies the request within 30 days, a defendant must complete each of the two levels of appeal that follow the warden's denial. See United

4

States v. Ng Lap Seng, No. 15-cr-706, 2020 WL 2301202, at *6 (S.D.N.Y. May 8, 2020) (interpreting the word "lapse" as "requiring the BOP's failure to respond to a prisoner's request for compassionate release motion within thirty days"); United States v. Bolino, No. 06-cr-806, 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020). The Third Circuit has sided with the latter view. See United States v. Raia, 954 F.3d 594, 596-97 (3d Cir. 2020).

I do too, for precisely the reasons recently stated by Judge Korman in United States v. Davis, No. 96-cr-912, 2020 WL 2522079 (E.D.N.Y. May 18, 2020). He rejected the same argument that defendant makes here:

> [Defendant's] reading of § 3582(c)(1)(A) converts a statutory command that inmates "fully exhaust[ ] all administrative rights to appeal" into a waiting period that does not require inmates to pursue any administrative appeal from a warden's denial. Indeed, under this reading, an inmate would never have a reason to exhaust his administrative remedies, since he could simply make a motion in the district court after waiting for 30 days following his submission of his request to the warden. While the defendant suggests that such a reading makes sense, because of Congress's intent to speed the process of obtaining a judicial forum, even that argument is hard to reconcile with the language of the statute. Although the 30-day window speeds the process by limiting the warden's ability to delay a request by sitting on it, under Davis's interpretation, there would be no reason to require the defendant to wait for 30 days for the warden to act. On the contrary, "[i]t seems odd that Congress would allow a defendant to short-circuit the Bureau of Prison's administrative procedures simply by waiting 30 days after filing his request, despite the warden timely acting on that request." United States v. Miller, 2020 WL 113349 at *2 (D. Idaho Jan. 8, 2020).

(internal quotations omitted). The language of the statute seems clear that Congress wanted to ensure that one thing and one thing only happened in a timely fashion – the warden of the facility, the person with the best access to information about a defendant's condition and conduct in prison, must complete his review within 30 days. If the warden denies his request within thirty days, the defendant is relegated to the superior administrators charged with reviewing the warden's determination.

Not only is this consistent with the plain language of § 3582(c), but, as Judge Korman also pointed out in Davis, it is consistent with the notice and posting requirements of the statute set forth in § 3582(d)(2)(C)(iii). That subsection requires that the BOP post notice in all available prison handbooks and libraries of "the right to appeal a denial of [a request for compassionate release by the warden] *after all administrative rights to appeal within the Bureau of Prisons have been exhausted*." (emphasis added). If all a prisoner needed to do before going to court was wait 30 days after he delivered his request to the warden, regardless of whether the warden acted upon the request, there is no reason why the prisoner would bother to take any administrative appeals, and so no reason to require such notice.

It is true that the language of the statute creates a very narrow opportunity for compassionate release from the courts, and in urgent cases (which the instant case is not), sometimes none at all. But there is no anomaly in that. Final sentences in criminal cases are relatively immutable by design, and Congress was acting fully within the parameters of compassionate release in requiring full administrative determination absent a dereliction by the warden of at least 30 days.

## II.     "Extraordinary and Compelling Reasons"

If defendant had exhausted his request for compassionate relief, it would be a closer question of whether he has demonstrated "extraordinary and compelling reasons" for a sentence reduction. The defendant bears the burden of showing that these factors compel his release. See United States v. Ebbers, No. 02-cr-1144, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992).

Absent a terminal illness, the Sentencing Commission would permit compassionate release because of a defendant's medical condition if he is "suffering from a serious physical or

6

medical condition . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 Application Note 1(A).  I view the application note as constituting fairly clear examples of when extraordinary and compelling circumstances are present, not a floor that a defendant must meet, as the note explains that other circumstances may suffice.  Id. § 1B1.13(1)(D).  But in this case, it is undisputed that defendant has neither a terminal illness nor an inability to administer self-care.

Beyond that, I cannot find that defendant's circumstances warrant compassionate release.  First, his pre-existing medical conditions by themselves are simply not the kind of life-threatening impairments that militate towards release.  I do not think defendant disputes that.  Instead, he relies on his vulnerability to COVID-19 as a result of those conditions (and his age).

But defendant has not yet, and may not ever, become seriously ill due to COVID-19.  Most people who contract the disease do not.  See United States v. Santiago, No. 92-cr-563, 2020 WL 2475068, at *3 (E.D.N.Y. May 13, 2020).[1]  There is reason to think that is the case with defendant, because although he previously tested positive for the virus, this turned out to be a false positive.  He has had antibodies but no symptoms.  I certainly cannot conclude that defendant has any immunity based on those antibodies, but I must conclude that his having the virus that produced the antibodies does not necessarily make him sick.

Moreover, if he does become symptomatic, his facility seems well equipped to deal with it.  When his initial positive was discovered, the prison's staff took immediate precautionary

---

[1] Dara K. Lee Lewis, How does cardiovascular disease increase the risk of severe illness and death from COVID-19, Harvard Med. School Health Blog (Apr. 2, 2020), https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401 ("[M]ost COVID-19 patients (about 80%) will develop mild flulike symptoms, including fever, dry cough, and body aches that can be managed at home.").

7

steps to remove defendant from the general population and move him into an isolated unit. This shows FCI Danbury can and has timely reacted to defendant's circumstances and being receptive to his perceived needs. The BOP has, thus far, been successful in preventing defendant from becoming ill due to the virus.

Without minimizing the seriousness of the pandemic and the present conditions at FCI Danbury, I cannot find that the danger defendant faces from the mere threat of exposure to COVID-19 constitutes an extraordinary and compelling reason for granting compassionate release. See United States v. Korn, No. 15-cr-815, 2020 WL 1808213, at *7 (W.D.N.Y. April 9, 2020) (finding that the "mere possibility of contracting a communicable disease, in the absence of any [BOP] failures," is insufficient).

### III. Section 3553(a) Factors

Nor could defendant's motion survive the application of the relevant sentencing factors. He is an upper echelon Mafia leader who has committed heinous misconduct. Until his arrest in 2008, defendant was the "captain of all captains" in a vicious and violent organized crime syndicate. I cannot overlook defendant's participation in multiple conspiracies to commit murder.

To reduce defendant's sentence would be diminishing his transgressions and undermining the goals of the original sentence, among them, the need to dispense adequate punishment for defendant's multiple acts throughout his criminal career and to deter others from emulating his behavior. See United States v. Ebbers, 2020 WL 91399, at *7. He displayed a callous disregard for human life, and I am not persuaded that he warrants more compassion and understanding than I demonstrated when I imposed a less than maximum sentence.

8

Lastly, although defense counsel contends her client is "a weakened fraction" of the man he once was based on his age and infirmities, the danger posed by mob leaders, like defendant, is not that these leaders will personally engage in acts of violence, but that they "can command others to do so." See United States v. Gotti, No. 02-cr-743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates to do their bidding."). The record shows that defendant hurt his knee after playing table tennis. Neither that nor his other medical conditions would stop him from picking up a telephone.

## CONCLUSION

Defendant's motion to reduce his sentence [2110] and for release from custody [2112 and 2214] are denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       May 21, 2020