```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------  X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :    **MEMORANDUM**
                    -against-                               :    **DECISION AND ORDER**
                                                            :
THOMAS GIOELI,                                              :    08-cr-240-2 (BMC)
                                                            :
                    Defendant.                              :
----------------------------------------------------------  X
```

**COGAN,** District Judge.

Before me is defendant's second motion to reduce his sentence to time served or, in the alternative, for release to home confinement, pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). His first motion asserted that his various medical conditions, coupled with the current COVID-19 pandemic, constituted "extraordinary and compelling reasons" warranting his release from prison before the termination of his sentence. I denied that motion by Order entered May 20, 2021, finding that he failed to exhaust his administrative remedies; that he had not demonstrated extraordinary and compelling reasons warranting his release; and that the factors under 18 U.S.C. § 3553(a) did not weigh in favor of release.

In this second motion, there is no issue about exhaustion, and for the reasons set forth below, I find that defendant's medical status has deteriorated to the point where he has satisfied his burden of showing extraordinary and compelling reasons under the statute. However, the assessment of the sentencing factors under § 3553(a) has not changed and that assessment precludes release.

The unfortunate fact in this case is that defendant's crimes were so heinous and the nature of his leadership role so dangerous that release would not be appropriate. The motion is therefore denied.

# BACKGROUND

## I. The Trial and Sentence

I presided over defendant's racketeering case, together with one of his co-conspirators, over a six-week period in 2012. The evidence showed that he was a captain and then "street boss" of the Columbo crime family. It also showed that defendant had been involved in crime from a very young age, including violent robberies. By the 1990s, he and his crew members, at his direction, had been committing crimes for decades. These included bank burglaries, robberies of clothing stores, and truck robberies. Included in the crew were members or associates who later turned on him and testified against him. There were a number of individuals who defendant and his crew conspired to kill. Most importantly, for present purposes, he and his crew committed multiple murders that I know of from the evidence at trial.

The jury convicted him of one count of racketeering conspiracy predicated upon three of these murder conspiracies, not the substantive murder counts themselves, even though there was no dispute that at least two targets of the conspiracy had been murdered. The first was the murder of one Frank Marasa, a retaliatory killing. Using a stolen car, members of defendant's crew shot Marasa in the body and head and then escaped in a separate getaway car. The proof of the murder at trial was highly detailed, and one of the participants testified that defendant had approved the killing and directed them on how to accomplish it, a plan which they successfully followed.

The second conspiracy to commit murder arose in the context of the Columbo Family crime war, in which multiple murders occurred when members of the family had a falling out over leadership. Much has been written about this internecine violence during the 1990s so I will not address it exhaustively. It suffices to say that defendant's crew, members of the Persico

faction of the Columbo family, targeted a number of members of the opposing Orena faction. Defendant and his crew, heavily armed, conducted searches of various locations in an effort to isolate and kill Orena faction members. In one violent exchange, an attempt to kill one Orena member known as Bobo Malpeso, defendant was shot in the hand.

The third conspiracy resulted in the death of John Minerva and Michael Imbergamo. Defendant's involvement in the conspiracy and the brutality of the execution was well-established at trial.

Those were the main charges of which defendant was convicted. At sentencing, I found him responsible by a preponderance of the evidence of participating in two other murders: (1) that of Richard Greaves, a member or associate of the crew, who was killed because he had discussed withdrawing from the mob and moving to Arizona; and (2) William Cutolo, who headed another crew and was shot in the head after being transported to the murder location by defendant. During this murder defendant was acting upon instructions of Persico, who thought that Cutolo had become too powerful. The evidence of these murders was again detailed, grisly, and left me with no doubt as to defendant's involvement.

I sentenced defendant to 224 months out of a possible 240 months' custody. The principal reason that I did not impose the maximum sentence was because of his age and ill health. The Second Circuit affirmed defendant's conviction and sentence. See United States v. Cacace, 796 F.3d 176 (2d Cir. 2015). With credit for good time, which he has so far received, defendant has a projected release date of May 2, 2024.

## II. The Instant Motion

Defendant has been incarcerated since 2008. He was first diagnosed with bladder cancer in 2018. He had regular follow up appointments until the COVID-19 pandemic struck, at which

3

point he had no follow-up treatment from February 10, 2020, to July 8, 2021. When he finally did have a follow-up appointment on July 8, 2021, it was determined that his bladder cancer had recurred, after which he had regular appointments. He had surgery and more than one malignant tumor removed from his bladder.

Much of defendant's motion alleges the inadequacy of care during his incarceration. The records contradict some part of those claims, but it is clear that he received no care for 18 months during the height of the COVID-19 pandemic. That is unacceptable even allowing that prisons are not required to provide a gold-standard level of healthcare. See Smith v. Greifinger, 208 F.3d 203 (2d Cir. 2000) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital," quoting, Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984)). Cancer patients need routine follow-up more than once every 18 months to check for recurrence, and prisoners are entitled to more than a recurrence cancer screening for that length of time. Thus, although the recurrence of his bladder cancer was caught on July 21, 2021, and his surgical treatment occurred promptly thereafter, we will never know if his bladder cancer could have been caught earlier, and perhaps treated more effectively, because he had no follow-up for the 18 months preceding the recurrence diagnosis.

He had a digital prostate examination about two months after his bladder surgery. It showed a high likelihood of prostate cancer. This was confirmed by a biopsy about six weeks after that which showed a high-intermediate to high-grade level of cancer. A PET scan thereafter showed that the prostate cancer had spread locally into nearby lymph nodes. The BOP obtained a consultation from a radiation oncologist, but at the present time, radiation has been rejected in favor of hormone injection therapy. That therapy requires injections at least weekly.

**DISCUSSION**

Absent a terminal illness, the Sentencing Commission would permit compassionate release because of a defendant's medical condition if he is "suffering from a serious physical or medical condition . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 Application Note 1(A). The application note, according to the Second Circuit, supplies examples of when extraordinary and compelling circumstances may be present, but it is not a threshold that a defendant must meet. See United States v. Brooker (Zullo), 976 F.3d 228 (2d Cir. 2020). Rather, the district court must use its discretion to consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." Id. at 237.

Having considered all of the circumstances here, I conclude that defendant has demonstrated extraordinary and compelling reasons sufficient under the First Step Act to proceed to the next step of the analysis (consideration of the sentencing factors under 18 U.S.C. § 3553(a)). This is not a case of mere potential exposure to COVID-19, nor actual contraction of COVID-19 with co-morbidities, as was the case with defendant's first application for compassionate release. At this point, he is a double-cancer survivor, and although his prostate cancer has not metastasized beyond locally, its migration to some of his lymph nodes suggests that such a scenario is more than remotely possible.

Notwithstanding this conclusion, however, I cannot find that consideration of the § 3553(a) factors warrant relief. I recognize that in assessing these factors, I am not to merely consider how they were assessed at the time of his sentencing, but to re-weigh them in light of

his current circumstances. See United States v. Rose, 379 F. Supp. 3d 223, 231 (S.D.N.Y. 2019). However, the most important of those factors in this case remain the nature and circumstances of his offenses and his history and characteristics – factors which are largely immutable.

As I found in denying his first motion, until his arrest in 2008, defendant was the "captain of all captains" in a vicious and violent organized crime syndicate. I cannot overlook defendant's participation in multiple conspiracies to commit murder. It remains the case that the danger posed by mob leaders, like defendant, is not that these leaders will personally engage in acts of violence, but that they "can command others to do so." See United States v. Gotti, No. 02-cr-743, 2020 WL 497987, at *9 (S.D.N.Y. Jan. 15, 2020) ("Bosses don't commit violence themselves, they have subordinates to do their bidding.").

At the time I imposed sentence, defendant was already not a young or well man, and for that reason – indeed, almost entirely for that reason – I did not impose the maximum sentence. It is true that he is now older and even less well, but that was anticipated at sentencing. I must conclude that the additional factor of general deterrence is served by making it clear that aging and illness will not shorten the sentence for such horrendous crimes and the life of organized crime that defendant chose to embrace.

I also recognize that defendant's present medical condition is no less relevant in considering his characteristics under § 3553(a) than it was in determining the presence of extraordinary and compelling circumstances. And that medical condition of course is also no less severe when considered in the context of § 3553(a). But there has been no showing that the Bureau of Prisons is unable to administer the hormone injections that he requires. Weekly or even more frequent injections do not seem beyond the BOP's medical competence.[1]

---

[1] There are two caveats to this. First, cancer patients on hormone therapy require more than just the injections. Follow-up testing to measure effectiveness and to re-evaluate the course of therapy are part of the treatment. A

Finally, during oral argument, I stated that there had been no showing of remorse or acceptance of responsibility for defendant's life of crime, factors under § 3553(a) that could affect the balance. In response, defendant submitted an affidavit addressed to satisfying that concern. I have to agree with the Government that the affidavit was carefully crafted to answer the questions I raised, but it is unpersuasive as a genuine expression of remorse or acceptance of responsibility. Defendant's self-evaluation has not genuinely changed since the sentencing.[2]

## CONCLUSION

Defendant's second motion for release from custody [2126, 2132] is denied.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       March 22, 2022

---

showing that the BOP is failing to provide a proper level of consultation may support a third application for release. Second, I might decide a subsequent motion differently if the medical situation changes so that radiation therapy or surgery is recommended by the consulting physician.

[2] I also inquired during argument how defendant could assert a "changed person" rationale in light of an internet blog he created and to which he frequently posted while in custody, in which he verbally attacked and insulted the Court and everyone else involved in his prosecution. I am satisfied by counsel's response that these postings occurred relatively early during his term of incarceration and were the product of frustration. I have therefore not considered those postings in assessing his characteristics under § 3553(a).